

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-15-00220-CV

THE EPISCOPAL CHURCH, THE
LOCAL EPISCOPAL PARTIES,
THE LOCAL EPISCOPAL
CONGREGATIONS, AND THE
MOST REV. KATHARINE
JEFFERTS SCHORI

APPELLANTS

V.

FRANKLIN SALAZAR AND
INTERVENING CONGREGATIONS

APPELLEES

----------

FROM THE 141ST DISTRICT COURT OF TARRANT COUNTY
TRIAL COURT NO. 141-252083-11

----------

## OPINION

----------

## I. Introduction

The parties' long-running dispute involves, among other things, title to and possession of church property.[1] In 2014, on a direct appeal,[2] the Supreme Court of Texas identified the appropriate methodology to determine the property ownership issue—neutral principles of law—and remanded this case to the trial court. *See Episcopal Diocese of Fort Worth v. Episcopal Church*, 422 S.W.3d 646, 647 (Tex. 2013), *cert. denied*, 135 S. Ct. 435 (2014); *see also Masterson v. Diocese of Nw. Tex.*, 422 S.W.3d 594, 596, 608 (Tex. 2013), *cert. denied*, 135 S. Ct. 435 (2014). No one disputes that the Corporation of the Episcopal Diocese of Fort Worth (the Corporation) holds legal title to the property or that the Corporation holds the property in trust for the Episcopal Diocese of Fort Worth (EDFW). Rather, at its heart, the parties' dispute is over who has the right to control the Corporation and EDFW as legal entities.

In a single issue containing multiple sub-issues, Appellants The Episcopal Church (TEC), the Most Reverend Katharine Jefferts Schori, The Local Episcopal Parties, and The Local Episcopal Congregations (collectively, the TEC parties)

---

[1]For a review of how such disputes have affected jurisprudence and religious groups over the past decade, *see* Michael W. McConnell & Luke W. Goodrich, *On Resolving Church Property Disputes*, 58 Ariz. L. Rev. 307, 308–10 (2016) ("Hundreds of local congregations have voted to withdraw from these national denominations, raising the question: Who owns the church property?" (footnote omitted)).

[2]*See* Tex. Gov't Code Ann. § 22.001(c) (West Supp. 2017).

appeal the trial court's summary judgment for Appellees Franklin Salazar and the Intervening Congregations (collectively, Appellees).[3]

For ease in navigating this highly complex case, we set forth the following roadmap: Part II of this opinion contains EDFW's history and the procedural background of this case as pertinent to its disposition. Part III sets out the standard of review and the case's legal framework, starting with the binding precedent of the United States Supreme Court and the Supreme Court of Texas and followed by persuasive authorities that inform our judgment before addressing the applicable state substantive law on associations, corporations, and trusts and then applying these authorities to the case's dispositive issues in parts III.B.2–B.4. Part IV sets out in full our conclusion, which is that we affirm the trial court's judgment in part and reverse it in part and remand the case to the trial court for further proceedings.

## II. Background

Religious schisms that give rise to property disputes are not unprecedented.[4] TEC, for example, was founded in 1789 after its revolutionary

---

[3]The Appellees include Bishop Jack Leo Iker, Jo Ann Patton, Walter Virden III, Rod Barber, and Chad Bates.

[4]*See* McConnell & Goodrich, 58 Ariz. L. Rev. at 311 & n.11 (stating that church property disputes are as old as any church and referring to an excommunicated bishop's refusal in 269 A.D. to relinquish control of a church building and the early church's subsequent appeal to the Roman emperor for assistance).

constituents broke away from the Church of England.  *See Episcopal Diocese*, 422 S.W.3d at 647; *Bennison v. Sharp*, 329 N.W.2d 466, 468 (Mich. Ct. App. 1982); Hon. John E. Fennelly, *Property Disputes and Religious Schisms:  Who is the Church?*, 9 St. Thomas L. Rev. 319, 347 n.251 (1997).  The Church of England, in turn, began with Henry VIII's break with the Roman Catholic Church in 1534. Fennelly, 9 St. Thomas L. Rev. at 347 & n.251 (referencing *Protestant Episcopal Church v. Barker*, 171 Cal. Rptr. 541, 544 (Cal. Dist. Ct. App.), *cert. denied*, 454 U.S. 864 (1981)).  And, as observed by the United States Supreme Court, "14 autocephalous hierarchical churches . . . came into existence following the schism of the universal Christian church in 1054."  *Serbian E. Orthodox Diocese for U.S. of Am. & Canada v. Milivojevich*, 426 U.S. 696, 699, 96 S. Ct. 2372, 2376 (1976); *see also Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church*, 344 U.S. 94, 100, 73 S. Ct. 143, 146 (1952) ("The schism of 1054 A.D. split the Universal Church into those of the East and the West.").

## A.  The Hierarchical Church

TEC has been identified by our supreme court as a "hierarchical" type of religious organization, composed of tiers,[5]

> [t]he first and highest [of which] is the General Convention.  The General Convention consists of representatives from each diocese

---

[5]Factors Texas courts have used to characterize a church as hierarchical include (1) the local church's affiliation with a parent church; (2) an ascending order of ecclesiastical judicatories in which the local church's government is subject to review and control by higher authorities; (3) subjugation of the local church to the jurisdiction of a parent church or to a constitution promulgated by the parent church; (4) a charter from the parent church governing the affairs of the local

4

and most of TEC's bishops. It adopts and amends TEC's constitution and canons. The second tier is comprised of regional, geographically defined dioceses.[6] Dioceses are governed by their own conventions. Each diocese's convention adopts and amends its own constitution and canons[] but must accede to TEC's constitution and canons. The third tier is comprised of local congregations. Local congregations are classified as parishes, missions, or congregations.[7]

---

church and specifying ownership of local church property; (5) the repository of legal title; and (6) the licensing or ordination of local ministers by the parent church. *Green v. Westgate Apostolic Church*, 808 S.W.2d 547, 550–51 (Tex. App.—Austin 1991, writ denied) (citing *Templo Ebenezer, Inc. v. Evangelical Assemblies, Inc.*, 752 S.W.2d 197, 198–99 (Tex. App.—Amarillo 1988, no writ)).

"The terms hierarchical and congregational are poles on a continuum along which church organizations fall." *Id.* at 551. A congregational church is governed primarily by the will of the local assembly, while a hierarchical church submits certain issues to the rules and control of a larger religious organization. *Id.* A congregational church is independent of any other ecclesiastical association, owes no obligation to any higher authority, and "totally controls its own destiny." *Templo Ebenezer, Inc.*, 752 S.W.2d at 198. Because a congregational form of church government vests the ultimate decision-making authority in its members, if the controversy cannot be decided by the application of neutral principles, then the court defers to the majority vote of the congregation. *Libhart v. Copeland*, 949 S.W.2d 783, 793 (Tex. App.—Waco 1997, no writ) (explaining ecclesiastical deference in congregational church context).

[6]The record reflects that TEC also groups its dioceses into provinces, each of which contains a synod consisting of a house of bishops and a house of deputies. While many of the provinces are geographically determined, some of TEC's provinces consist of TEC dioceses outside of the United States.

[7]This framework ignores TEC's self-identification as a constituent member of an even larger community, which TEC acknowledges in the preamble to its constitution, stating,

The Protestant Episcopal Church in the United States of America, otherwise known as The Episcopal Church (which name is hereby recognized as also designating the Church), *is a constituent member of the Anglican Communion*, a Fellowship with the One, Holy, Catholic, and Apostolic Church, of those duly constituted Dioceses, Provinces, and regional Churches in communion with the See of

*Episcopal Diocese*, 422 S.W.3d at 647–48; *Masterson*, 422 S.W.3d at 608 ("We agree with the court of appeals that the record conclusively shows TEC is a hierarchical organization.").

TEC's constitution and canons "establish the structure of the denomination and rules for how it operates." *Masterson*, 422 S.W.3d at 600. As set out in its constitution and canons, TEC's Presiding Bishop is its "chief pastor," elected by the General Convention—consisting of the House of Bishops and the House of Deputies—to a multi-year term of office and "charged with responsibility for leadership in" initiating, developing, and implementing TEC's policy and strategy. In addition to the Presiding Bishop's policy and leadership tasks, he or she also presides over meetings of TEC's House of Bishops and performs ecclesiastical tasks, including, "[i]n the event of an Episcopal vacancy" in a diocese, consulting with that diocese's "Ecclesiastical Authority to ensure that adequate interim Episcopal Services are provided." The Presiding Bishop "shall perform such other functions as shall be prescribed in" TEC's canons and may delegate some duties and responsibilities to officers in the General Convention's Executive Council, which is responsible for carrying out the General Convention's programs and

Canterbury, upholding and propagating the historic Faith and Order as set forth in the Book of Common Prayer. [Emphasis added.]

While occasional references are made to the Anglican Communion throughout the record of this case, no one has explained what form of organization is involved in its membership, and no property interests are asserted on its behalf.

policies and exercises "powers conferred upon it by Canon, and such further powers as may be designated by the General Convention." The Presiding Bishop is the chair and president of the Executive Council.

The bishop in each diocese is chosen by the rules prescribed by the convention of that diocese but cannot be ordained and consecrated without the consent of a majority of the standing committees of all of the dioceses and without the consent of a majority of TEC's bishops.[8] If one of TEC's bishops abandons communion with TEC by open renunciation, formal admission into any religious body not in communion with TEC, or other activities, subject to the procedures set out in TEC's canons and the consent of the majority of TEC's bishops, the Presiding Bishop may depose that bishop.[9]

The convention of each diocese must appoint a standing committee, which acts as the council of advice for the diocese's bishop or substitutes as the diocese's ecclesiastical authority if there is no bishop canonically authorized to act. Under TEC's canons, a diocese without a bishop may, by an act of its convention and in consultation with the Presiding Bishop, "be placed under the provisional charge

---

[8] If a majority of the diocesan standing committees or a majority of TEC's bishops do not consent to the bishop's election within 120 days from the date of notification of the election, the Presiding Bishop "shall declare the election null and void," and the diocesan convention can then proceed to a new election.

[9] TEC's governing documents define "Deposition" as "a Sentence by which a Member of the Clergy is deprived of the right to exercise the gifts and spiritual authority of God's word and sacraments conferred at ordination."

7

and authority of a bishop of another diocese or of a resigned bishop, who shall by that act be authorized to exercise all the duties and offices of the Bishop of the Diocese until a Bishop is elected and ordained" for that diocese or until the act of the diocese's convention is revoked.

Each diocese's secretary of convention has the responsibility to forward to the secretary of TEC's House of Deputies a copy of the latest journal of the diocesan convention. Each diocese's bishop has the duty to forward to TEC's Recorder an annual report certifying information such as the names of clergy canonically resident in the diocese and their status, including suspension, removal, deposition, or restoration.

TEC's Executive Council sets a budget that, once approved by TEC's General Convention, is sent to each diocese, setting out each diocese's proportionate part of estimated expenditures. Each diocese then notifies each parish and mission therein of its individual "apportionment" to be raised, "which shall include both its share of the proposed Diocesan Budget and its share of the objective apportioned to the Diocese by the Executive Council."[10] Each diocese accounts annually to the Executive Council for its receipts and distributions,[11] and

---

[10]The amount of "apportionment" suggested by the Executive Council is based on the income of the parishes in the dioceses, and TEC uses these funds for administration and to carry out the Church's programs nationally.

[11]TEC makes loans to facilitate the acquisition of real property and construction of church buildings through various programs and entities.

each diocese submits an annual report that contains statistical information concerning the diocese's parishes and missions and other "relevant information." TEC established and administers a pension fund for TEC's clergy supported by the royalties from publications authorized by the General Convention and by collections levied upon "all Parishes, Missions, and other ecclesiastical organizations or bodies subject to the authority of this Church."

A parish, part of the third tier identified by the supreme court, is governed by a rector or priest-in-charge and a vestry comprised of lay persons elected by parish members. *Masterson*, 422 S.W.3d at 600. Members of the vestry must meet certain qualifications, including committing to "conform to the doctrine, discipline and worship of The Episcopal Church." *Id.* To be accepted into union with TEC, a local congregation must accede to and agree to be subject to the constitutions and canons of both TEC and the diocese in which the congregation is located.[12] *Id.*

---

[12]By way of illustration, the record contains a copy of a March 15, 2002 letter from Bishop Iker to the rector, wardens, and vestry of one of EDFW's churches, informing them that "[n]either the Episcopal Church nor this Diocese are congregational in nature" and that the vestry accordingly could not fire their congregation's rector. Rather, he advised that the vestry and rector were to work with each other "until such time as the relationship is broken by the death or resignation of the priest" or is dissolved by the bishop "acting with the counsel of the Diocesan Standing Committee."

The record also contains the memoir of Rector Emeritus William A. Komstedt, who observed that "in the Bible Belt, most people have a congregational understanding of church administration" and that he was frequently asked why the people of the St. Francis Mission would pay for land and buildings that EDFW would end up owning. He wrote that "[i]n time, most warmed to the idea after they

Every parish and other congregation prepares an annual report to the bishop of its diocese, who then sends a copy to TEC's Executive Council.  The annual report covers not only the number of baptisms, confirmations, marriages, and burials during the year and the total number of baptized persons and communicants in good standing but also a summary of receipts and expenditures and "such other relevant information as is needed to secure an adequate view of the state of this Church, as required by the approved form."  At the time that EDFW joined TEC, "other relevant information" included a statement of the real and personal property held by each parish with an appraisal of its value, the parish's indebtedness for the property, and the amount of insurance carried on the property.

## B. The Episcopal Diocese of Fort Worth (EDFW)

### 1. Diocese's Origins

In 1849, "[t]he Church in the State of Texas accede[d] to the Constitution of the Protestant Episcopal Church in the United States of America" and "acknowledg[ed] its authority," and in 1850, the Diocese of Texas was admitted into union with TEC.  In 1874, a missionary bishop of Northern Texas was elected and consecrated and the Diocese of Texas was delimited to set apart the area to

---

were taught that the diocese was like a house and its missions and parishes were like rooms in it."  He also described the efforts taken by the mission's congregation to pay off the $31,500 no-interest, five-year loan obtained from one of TEC's programs, wiping out $21,000 of the debt in one night by holding a gala Barbeque, Country Dance, and Wild West show.

the north and west as the Missionary District of Northern Texas.  Four years later,

the 1878 Journal of the Fourth Annual Convocation of the Protestant Episcopal

Church in the Missionary District of Northern Texas set out the form for a

constitution of a parish acceding to the TEC and diocesan constitutions and

canons:

> This Parish, as a constituent part of the Protestant Episcopal Church in the Missionary District of Northern Texas, expressly accedes to, recognizes and adopts the Constitution, Canons, Doctrines, Discipline and Worship of the Protestant Episcopal Church in the United States of America, and the Constitution and Canons of the Protestant Episcopal Church in this jurisdiction, and acknowledges their authority accordingly.

In 1893, TEC's constitution provided that no churches or chapels would be

consecrated until the bishop sufficiently certified that the property was "secured,

by the terms of the devise, or deed, or subscription by which they are given, from

the danger of alienation, either in whole or in part, from those who profess and

practise the doctrine, discipline, and worship of the Protestant Episcopal Church

in the United States of America."

Two years later, the Diocese of Dallas held its first diocesan convention. The

preamble to its originating December 1895 constitution states,

> We, the Clergy and Laity, of the Protestant Episcopal Church, in the United States of America, resident in that portion of the State of Texas which, by the General Convention of said Church, was in the year A.D. 1874 set off as the Missionary District of Northern Texas, having been convened by the Missionary Bishop of Northern Texas, for the purpose of organizing a Diocese whose territorial limits shall be co-extensive with those of said Missionary District, do now, by and with the consent of said Bishop and in order to effect the organization of said Diocese, ordain and establish this Constitution.

11

Over half a century later, at its 53rd annual convention held in 1948, the Diocese of Dallas amended its constitution's article 13, "On Title to Church Property." That article provided that title to all real property acquired "for the use of the Church in this Diocese," including the real property of all parishes and missions, "shall be vested in the Bishop and his successors in office, in trust."[13]

More than three decades after that, in June 1982, the Diocese of Dallas held a special convention to consider a resolution to divide itself and, if approved, to request that TEC's General Convention ratify the division.[14] The resolution passed.

TEC held its General Convention that same year, from September 5 to 15, 1982. On the fourth day, the motion to adopt Resolution B-18, providing for the

---

[13]Alexander C. Garrett, who had been the Missionary Bishop of Northern Texas, served as the Bishop of Dallas from 1874 to 1924 and was succeeded in that office by Harry T. Moore (who served from 1924 to 1946), Charles Avery Mason, (who served from 1946 to 1970), and A. Donald Davies (who served from 1970 until 1982, when Bishop Davies opted to become the bishop of the newly formed EDFW). Clarence C. Pope served in the office of EDFW's bishop from 1986 until 1994, when he retired to become a Roman Catholic. Bishop Iker was elected by EDFW's convention as bishop coadjutor in 1992 but was not consecrated until 1993, when he received consent from TEC's other dioceses.

[14]Under Article V of TEC's constitution, one of the three ways that a new diocese may be formed is through the division of an existing diocese with the consent of the General Convention "and under such conditions as the General Convention shall prescribe by General Canon or Canons." Under TEC's constitution, a new diocese may also be formed through the joining of two or more dioceses or parts thereof or from mission territory, which is "an unorganized area evangelized" by TEC but not yet included in any of TEC's dioceses.

division of the Diocese of Dallas, carried in the House of Bishops. On the seventh day, the House of Deputies concurred, ratifying the division to create EDFW (known at that time only as the "Western Diocese") based on, among other things, the certificate of the Diocese of Dallas's Chancellor that all of the requisite documents had been executed and "that all of the appropriate and pertinent provisions of the Constitution and Canons of the General Convention of the Episcopal Church in the USA and the Constitution and Canons of the Diocese of Dallas have been fully complied with in respect of this submission."

The October 1982 Annual Meeting Journal of the Diocese of Dallas reflected that seventy-two years after the division issue was first raised in 1910, the Diocese of Dallas was finally sharing "in the trauma and excitement of such a division," resulting, at least in part, from the area's significant population growth over time and the size of the diocese (larger than 43 other dioceses, including some dioceses that covered entire states).[15] Bishop Davies observed that the General Convention had ratified the action of the diocesan convention when it voted to divide the Diocese of Dallas, that the new diocese planned to come into existence as of January 1, 1983, with the filing of its documents with the Secretary of TEC's General Convention, and that the new diocese would hold its primary convention

---

[15]In his address to the diocesan convention, Bishop Davies noted that the "twin cities of Dallas and Fort Worth are growing like young giants" and that "[t]he little towns in between are stretching out their steel fingers with emerald rings strung all along to bind each other together in bonds of common life."

on November 13, 1982, to name itself, organize committees and officers, accede to the national constitution and charters, adopt its own constitution and charters, and implement a budget.

One of the resolutions promulgated at the Diocese of Dallas's October 1982 Annual Meeting declared that "[t]itle to all real property . . . located within the territorial boundaries of the western diocese shall be transferred to the western diocese."[16] During the meeting, the Diocese of Dallas's Chancellor was granted permission to initiate and conduct for the diocese "such action in the courts of the State of Texas as may be necessary and prudent for the accomplishment of the goals and purposes of the foregoing resolution, including partition actions, cy-pres actions, and other actions under the laws of Texas or the United States." Additionally, the resolution provided that the division of all corporations, foundations, and funds "shall be made subject to the terms, conditions[,] and purposes of the instruments establishing them and any amendments thereto."

EDFW adopted its constitution and canons on November 13, 1982. It was admitted into union with TEC on December 31, 1982.

---

[16]The resolution provided that title to all such real property would be transferred except for some small oil and gas interests owned by Episcopal Funds, Inc., and the ad valorem tax liability of Camp Crucis, which would be divided 65/35 between the two dioceses.

## 2.  1983–1990

Article 13 of EDFW's constitution provided that "title to all real estate acquired for the use of the Church in this Diocese . . . shall be held subject to control of the Church in the Episcopal Diocese of Fort Worth acting by and through a corporation" and that "[a]ll such property as well as all property hereafter acquired for the use of the Church and the Diocese, including parishes and missions, shall be vested in [the] Corporation of the Episcopal Diocese of Fort Worth."[17]  EDFW's canons established the parameters for the Corporation's management.  *See Episcopal Diocese*, 422 S.W.3d at 648.  Specifically, canon 11, "Corporation of the Episcopal Diocese of Fort Worth," set out,

> Sec. 11.1  Corporation of the Episcopal Diocese of Fort Worth is a non-profit benevolent[18] and charitable organization organized under Texas laws, also known as the "Diocesan Corporation".  In addition to its regular powers, it may receive, hold, manage and administer funds and properties acquired by gift or by will or otherwise for the use and benefit of the Diocese and any Diocesan Institutions.

> Sec. 11.2  The management of its affairs shall be conducted and administered by a Board of Trustees of five (5) elected members, all of whom are either Lay persons[19] in good standing of a parish or mission in the Diocese, or members of the Clergy canonically resident in the Diocese, in addition to the Bishop of the Diocese who shall serve as Chairman of the Board or may designate the President or other officer of the corporation to serve as such.  The Board of Trustees shall have the power and authority to conduct the affairs of said corporation in accordance with its charter and by-laws and in

---

[17] The Diocese of Dallas adopted a similar provision in December 1983.

[18] "Benevolent" was removed from the canon in 1989.

[19] "Persons" was changed to "communicants" in 1989.

accordance with the Constitution and Canons of the Diocese from time to time adopted.

Sec. 11.3  One member of the Board of Trustees shall be elected at each Annual Convention and each member shall serve a term of five (5) years.  The terms of members shall be so arranged that the term of only one (1) member shall expire annually.  The Board of Trustees shall fill any vacancy which occurs on the Board until the annual election.  The Bishop shall nominate the members of the Board of Trustees.

Sec. 11.4  The Board of Trustees shall adopt its own by-laws and shall elect such officers as its by-laws may require.

Sec. 11.5  The Board of Trustees shall submit a report at each Annual Convention covering its operations for the preceding fiscal year and showing its financial condition.  If and when required by the Standing Committee of the Diocese, the Board of Trustees shall make such additional reports and furnish such additional information as may [be][20] requested. The books and records of the Board of Trustees shall at all times be open for inspection and examination by the Standing Committee of the Diocese or its representatives.

EDFW filed articles of incorporation for the Corporation on February 28, 1983.  The 1983 articles established that the Corporation was a nonprofit corporation of perpetual duration with the following purposes set out as follows, in pertinent part:

(1)  To receive and maintain a fund or funds or real or personal property, or both, from any source including all real property acquired for the use of the Episcopal Diocese of Fort Worth as well as the real property of all parishes, missions and diocesan institutions.  Subject to the limitations and restrictions hereinafter set forth, to use and apply the whole or any part of the income therefrom and the principal thereof exclusively for charitable, religious, scientific, literary, or educational purposes either directly or by contributions to organizations that

_____

[20]By 1989, this typographical error in the original 1982 canon had been corrected.

16

qualify as exempt organizations under Section 501(c)(3) of the Internal Revenue Code and its Regulations as they now exist or as they may hereafter be amended.

(2) The property so held pursuant to (1) supra shall be administered in accordance with the Constitution and Canons of the Episcopal Diocese of Fort Worth as they now exist or as they may hereafter be amended.

The articles also set out that the election of the Corporation's board of directors ("Board of Trustees") and their terms of office "shall be fixed by the by-laws of the corporation as the same may be adopted and from time to time amended."

The Corporation adopted its bylaws on May 17, 1983. Article I, "Authority," states,

> Section 1. General  The affairs of this nonprofit corporation shall be conducted in conformity with the Constitution and Canons of the Episcopal Church in the United States of America and the Constitution and Canons of the Episcopal Diocese of Fort Worth, as they may be amended or supplemented from time to time by the General Convention of the Church or by the Convention of the Diocese. In the event of any conflict between these Bylaws and any part or all of said Constitution or Canons, the latter shall control.

The bylaws conferred general power to perform all lawful acts and things "as are not by statute or by the Articles of Incorporation or by these Bylaws prohibited." With regard to the number and election of the board of directors and their terms of office, the bylaws paralleled EDFW's constitutional and canonical provisions, stating,

> The Bishop of the Diocese of Fort Worth shall be the Chairman of the Board of Trustees of the Diocesan Corporation. In addition to the Bishop the number of elected Trustees which shall constitute the Board shall be five. The term of office for each elected Trustee shall be for five years and each Trustee shall hold office from the date of

17

his election until his successor shall have been duly elected and qualified, or until his death, resignation, disqualification or removal. There shall be elected at each annual meeting one Trustee. Trustees may be either lay persons in good standing of a parish or mission in the Diocese of Fort Worth, or members of the Clergy canonically resident within the Diocese, in addition to the Bishop.

*See* Tex. Bus. Orgs. Code Ann. § 22.207 (West 2012) ("Election and Control by Certain Entities"). The bylaws also provided for holding regular meetings and special meetings whenever called by the President—designated in the bylaws as the chairman of the board—"or by any two Trustees." They further provided that the quorum necessary to transact business would be not less than a majority of the total number of trustees then acting and set forth the procedures for resignation, board vacancies, and the removal of trustees: "Any Trustee of the Diocesan Corporation may be removed by the Bishop of the Diocese of Fort Worth." The bylaws also included a provision for amendment, stating,

These Bylaws may be amended, altered, changed, added to or repealed, in whole or in part, by the affirmative vote of a majority of the total number of Trustees at any regular or special meeting of the Board, if notice of the proposed change is included in the notice of such meeting.

In 1984, a civil court judgment transferred part of the Diocese of Dallas's real and personal property to EDFW and vested legal title of the property in the Corporation,[21] except for certain assets for which the Diocese of Dallas's bishop and his successors had been designated as trustee; those assets transferred to

---

[21]The 1984 judgment likewise vested legal title of the property remaining with the Diocese of Dallas in the Corporation of the Episcopal Diocese of Dallas.

EDFW's bishop as trustee and to his successors in office.[22]  *Episcopal Diocese*, 422 S.W.3d at 648.

### 3. 1991–2005

Less than ten years after its admission into union with TEC, conflicts based on differing theological views began to arise between both TEC and EDFW and EDFW and some of its congregations.

In 1991, the Episcopal Church of St. Mary the Virgin withdrew from TEC and EDFW to join a Roman Catholic Diocese.[23]  And at a standing committee meeting, after TEC assigned an apportionment of approximately $230,000 to EDFW, the committee noted that "the withholding of apportionment is regarded by some as sanctions against immorality."  The committee agreed to allow the individual parishes within EDFW to choose whether to fund TEC's Executive Council's activities by apportionment through vestry action indicating whether the individual

---

[22]The Diocese of Dallas and its diocesan corporation, EDFW and its diocesan corporation, and the Dioceses' bishops as trustees were parties to the 1984 judgment.  In the 1984 judgment, the trial court stated, "Nothing in this judgment shall be deemed to deal with, or otherwise affect, properties, real or personal, disposed of under testamentary or inter vivos gift executed or effective prior to December 31, 1982, which bequest is to the Diocese of Dallas or the Bishop thereof," but it also noted that the two dioceses had resolved that their "various assets, properties, investments, trusts and related matters" would be divided in an equitable manner.

[23]EDFW's standing committee unanimously recommended that the parish be allowed to withdraw upon receipt and review of proper documentation, and in 1993, the standing committee approved the Roman Catholic Diocese's board of trustees' resolution to pay off the loan on the former Episcopal parish's property and to transfer title to the property to the Roman Catholic Diocese.

parish's percentage of the diocesan assessment would be forwarded to TEC's Executive Council or should remain under EDFW's control.

During the 1990s, the standing committee received a letter from another diocese that "encouraged the Diocese of Fort Worth to remain in the Episcopal Church" and other correspondence "from those dioceses questioning the intentions of [EDFW] of remaining in the Episcopal Church in the United States of America and the reasons why [EDFW] had reduced its apportionment to the Executive Council's program."

In 1992, the rector and vestry of Holy Apostles Episcopal Church, one of EDFW's parishes, announced the parish's intent to seek membership in the Antiochean Orthodox Church and to sever its relationship with EDFW, TEC, and "the rest of the Anglican Communion."[24] Around then, EDFW's standing committee discussed developing a "future strategy regarding a parish that may try to leave and take diocesan property with them," and in early 1994, the committee finalized the membership of a "Protection of Diocesan Property Committee."[25] The

---

[24]The standing committee agreed that the Holy Apostles rector and vestry had left them "no choice but to pursue in the manner required under the Canons of the Episcopal Church and the Diocese of Fort Worth," including obtaining a temporary restraining order and notices to inhibit and to excommunicate. Three years later, a negotiated settlement cut short litigation between EDFW and the breakaway parish and returned full possession of the property in question to EDFW.

[25]Later in 1994, one of the standing committee's members, the Reverend Keith L. Ackerman, resigned to become the Bishop of the Diocese of Quincy, which subsequently faced property issues similar to the ones in the instant case. *See*

20

president of the standing committee was named as the property protection committee's chairman. Also during the same time period, the standing committee questioned whether it had veto power over the Corporation's trustees. At their June 1993 meeting, the standing committee received the answer to its question—after a lengthy discussion between Canon James DeWolfe, Bishop Iker, and the Corporation's trustees, it was determined that the Corporation's trustees "had final authority in matters concerning Diocesan property."

By 2000, TEC's General Convention had formed a task force to visit EDFW regarding the implementation of some of TEC's resolutions. In 2000 and 2001, the standing committee was faced with ecclesiastical charges involving Samuel L. Edwards, one of the priests then canonically resident in EDFW. Edwards had moved from Texas to begin acting as the rector of a parish in the Diocese of Washington despite having not been licensed to do so by the bishop pro tempore of the diocese in which that parish was located. *See Dixon v. Edwards*, 290 F.3d 699, 703, 705, 707 (4th Cir. 2002).[26] On December 17, 2001, the standing

---

*Diocese of Quincy v. Episcopal Church*, 2014 IL App (4th) 130901, ¶¶ 1, 9, 14 N.E.3d 1245, 1249–50 (Ill. App. Ct. 2014), *appeal denied*, 21 N.E.3d 713 (Ill. 2014).

[26]A federal lawsuit filed not long after the ecclesiastical charges against Edwards were transferred to EDFW sought a declaration that Edwards was not the parish's rector based on his not being found "duly qualified" under a TEC canon, in part on Edwards's having advised the bishop pro tempore that "he would not guarantee her that he would not attempt to lead Christ Church out of [TEC] or attempt to take Church property as part of that effort." *Dixon*, 290 F.3d at 703, 705–08 & nn.5, 8. Along with then-Bishop of the Diocese of Pittsburgh Robert William Duncan Jr., Bishop Iker filed an amicus brief in the federal suit in support of Edwards on January 8, 2002. In the brief, the two bishops stated that an

21

committee issued a presentment against Edwards on one of the three ecclesiastical charges, *id.* at 707, and the following year the standing committee consented to Edwards's deposition.

In 2003, EDFW continued to object to actions by TEC and other dioceses with which it disagreed, and the standing committee unanimously agreed "to work together in initiating a gathering . . . in [EDFW] of the Network of Confessing Dioceses in order to work on the realignment of the Anglican Communion." The standing committee met with a bishop of the Reformed Episcopal Church (REC) in May 2003, and decided to meet with REC in the future to further discuss their relationship.[27]

---

Episcopal bishop "is governed by the constitution and canons of the Church" and that an Episcopal bishop does not act "independently of the checks and balances of the legal system of which they are a part. A bishop must adhere to the constitution and canons of the Church or be subject to discipline." They also stated that "[t]he dioceses have canons that cannot be inconsistent with national canons." The district court awarded summary judgment to Washington's bishop pro tempore, and the Fourth Circuit affirmed the district court's judgment in May 2002. *Id.* at 703.

Presiding Bishop Schori deposed Duncan on September 19, 2008, and on October 4, 2008, the majority of the Pittsburgh Diocese voted to secede from TEC and align with the Anglican Province of the Southern Cone. *Calvary Episcopal Church, Pittsburgh v. Duncan*, No. 293 C.D. 2010, 2011 WL 10841592, at *2, *5 (Pa. Commw. Ct. Feb. 2, 2011) (construing "the Episcopal Diocese of Pittsburgh of the Episcopal Church of the United States of America" as used in stipulation to mean the loyalist faction that remained with TEC), *appeal denied*, 30 A.3d 1193 (Pa. 2011).

[27]REC was organized in 1873 after a schism with TEC. *See* The Reformed Episcopal Church, *An Overview of the REC*, http://www.recus.org/about.html (last visited Mar. 28, 2018). REC's vision, as set out in a paper by its bishop that was

EDFW was not the only diocese experiencing strife in its relationship with TEC during this time. In addition to the Diocese of Quincy[28] and the Diocese of Pittsburgh,[29] which were experiencing their own differences with TEC, in 2004, the Diocese of San Joaquin began the process of amending its governing documents, including the articles of incorporation for "the corporation sole," which held title to the diocese's trust funds and real property, redefining how the vacancy of a bishop was to be filled, and omitting the requirements that the local choice of bishop be approved by the national church as provided in TEC's constitution and canons. *See Diocese of San Joaquin v. Gunner*, 202 Cal. Rptr. 3d 51, 56–57 (Cal. Ct. App. 2016, pet. denied) (op. on reh'g). Nevertheless, even as St. Michael's Episcopal Church in Fort Worth considered holding a parish vote to leave TEC and affiliate with the Anglican Church in America, in 2005, Bishop Iker and the standing committee still expressed hope that "all of us will stand together during this time of difficulty in the Episcopal Church."

---

distributed at a 2003 standing committee meeting, was the formation of an Anglican Province of America outside of TEC.

[28] *See Diocese of Quincy*, 2014 IL App (4th) 130901, ¶ 9, 14 N.E.3d at 1250 ("Over the years a doctrinal controversy developed . . . .").

[29] *See Calvary*, 2011 WL 10841592, at *1 (noting that in 2003, Calvary Episcopal Church filed a complaint against Duncan and members of the Diocese of Pittsburgh's standing committee, alleging that they "intended to extinguish the property rights and interests of" TEC).

## 4. 2006–2008

In June 2006, immediately after Presiding Bishop Schori's election, Bishop Iker and the standing committee approved the following statement,

> The Bishop and the Standing Committee of the Episcopal Diocese of Fort Worth appeal in good faith to the Archbishop of Canterbury, the Primates of the Anglican Communion, and the Panel of Reference for immediate alternative Primatial Oversight and Pastoral Care following the election of Katharine Jefferts Schori as Presiding Bishop of the Episcopal Church.
>
> This action is taken as a cooperative member of the Anglican Communion Network in light of the Windsor Report and its recommendations.

A month later, Bishop Iker discussed with the standing committee a recent meeting of EDFW's Constitution and Canons Committee and its proposed resolutions, additions, and changes to EDFW's constitution and canons "in light of recent developments in our Church," which would be submitted to the diocesan convention in November 2006.[30]

On August 15, 2006, the Corporation amended its bylaws to remove all references to TEC. *Episcopal Diocese*, 422 S.W.3d at 648. Article I, "Authority," was amended to provide that the Corporation's affairs

> shall be conducted in conformity with the body now known as the Episcopal Diocese of Fort Worth's acknowledgment of and allegiance

---

[30]In July 2006, Bishop Iker, along with the bishops of Dallas, Pittsburgh, San Joaquin, South Carolina, Springfield, and Central Florida, appealed to the Archbishop of Canterbury, asserting, "Seven dioceses are seeking to reshape their life together as dioceses . . . under the oversight of a Canterbury appointed Commissary, temporarily exercising some of the responsibilities normally assigned to the American primate."

24

to the One, Holy, Catholic and Apostolic Church of Christ; recognizing the body known as the Anglican Communion to be a true branch of said Church; with all rights and authority to govern the business and affairs of the Corporation being solely in the board of trustees (as hereinafter defined, the "Board") of the Corporation.

This amendment also deleted the reference to "the Constitution and Canons of the Episcopal Church in the United States of America and the Constitution and Canons of the Episcopal Diocese of Fort Worth." A new section was added to Article II, "Directors," which stated,

> Section 2. The Bishop. The bishop recognized by the body now known as the Episcopal Diocese of Fort Worth (the "Bishop") shall be a trustee and a member of the Board. The Bishop shall be the Chairman of the Board of the Corporation.
>
> In the event of a dispute or challenge regarding the identity of the Bishop of the body now known as the Episcopal Diocese of Fort Worth, the Elected Trustees (as hereinafter defined in Article II, Section 3) shall have the sole authority to determine the identity of the Bishop for purposes of the Corporation's Articles of Incorporation, as amended from time to time, and these Bylaws.
>
> In the event the body now known as the Episcopal Diocese of Fort Worth is without a Bishop, a majority of the Elected Trustees shall have the sole authority to appoint a Chairman of the Board who shall, for purposes of the Corporation's Articles of Incorporation, as amended from time to time, and these Bylaws, have all the rights and privileges of the Bishop of the body now known as the Episcopal Diocese of Fort Worth.
>
> If a determination pursuant to this Article II becomes necessary in the discretion of any member of the Board, the Board member may call a special meeting of the Board, subject to the notice provisions set forth in these Bylaws, for the purpose of making the determination. The vote of a majority of members of the Board present at the special meeting, wherein a quorum is present, shall be decisive.

There was no change to the number, election, or terms of office for trustees other than to clarify that the trustees, who were elected at a rate of one per annual meeting, could be either lay persons in good standing of a parish or mission "in the body now known as the Episcopal Diocese of Fort Worth" or members of the clergy "canonically resident within the geographical region of the body now known as the Episcopal Diocese of Fort Worth." The rest of the sections remained substantively unchanged except for the section pertaining to removal of trustees. While the previous version of the section provided that any trustee could be removed by the bishop, the amended section stated that any elected trustee could be removed by a majority of the remaining members of the board. The amended bylaws also stated, "These Bylaws were considered and unanimously approved at the Board's annual meeting August 15, 2006, at which every Board member was present."

On September 5, 2006, the Corporation's board likewise amended the Corporation's articles of incorporation. *Id.* The preamble recited that articles IV, V, and VI had been revised and approved by a unanimous vote by the board on August 15, 2006.

Section 1 of article IV was amended to state that the Corporation was organized "[t]o receive and maintain a fund or funds or real or personal property, or both, from any source," deleting the portion of the earlier article that specified that "any source" included "all real property acquired for the use of [EDFW] as well as the real property of all parishes, missions and diocesan institutions."

26

Section 2 of article IV was amended to state that the property held under section 1 "shall be administered in accordance with the Bylaws of the Corporation as they now exist or as they may hereafter be amended," deleting reference to EDFW's constitution and canons. Article VI incorporated a provision to identify the Corporation's chairman, paralleling and referencing the amended bylaws. Article VI also listed the names of the trustees serving at that time: Salazar, Barber, Bates, Virden, Patton, and Bishop Iker. According to Virden, the 2006 amendments to the Corporation's bylaws "were not adopted as part of any plan to withdraw from TEC, as those discussions did not begin until the summer of 2007."

On October 19, 2006, Presiding Bishop Schori informed Bishop Iker that some of the provisions in EDFW's constitution and canons were contrary to TEC's constitution and canons and that those provisions needed to be changed. Otherwise, Presiding Bishop Schori said that she would have to consider what sort of action to take to bring EDFW into compliance. On November 15, 2006, TEC's Executive Council received a task force report identifying EDFW as a "problem diocese" that needed to be monitored.

On June 14, 2007, TEC's Executive Council declared some of EDFW's constitutional and canonical amendments to be "null and void." Four days later, Bishop Iker and the standing committee released a statement noting that an adversarial relationship had developed between EDFW and TEC, asserting that TEC's Executive Council "ha[d] no legislative authority, and its resolutions [were] not binding on anyone," and further positing that it was the Executive Council's

resolution "in this matter that is null and void, and it is of no force or effect in this Diocese."

On November 8, 2007, the week before EDFW's November 17, 2007 Annual Convention, Presiding Bishop Schori published an open letter to Bishop Iker, stating that several of the proposed changes to EDFW's constitution would violate the requirement in TEC's constitution for the diocese's "unqualified accession."[31] In the letter, she warned Bishop Iker of the potential canonical consequences and asked him to lead EDFW "on a new course that recognizes the interdependent and hierarchical relationship between the national Church and its dioceses and parishes" instead of in a direction "that would purportedly permit [EDFW] to depart from [TEC]." The Episcopal Church, *Fort Worth bishop receives notice of possible consequences if withdrawal effort continues* (Nov. 8, 2007), at https://www.episcopalchurch.org/library/article/fort-worth-bishop-receives-notice-possible-consequences-if-withdrawal-effort.

On November 12, 2007, Bishop Iker responded by publishing his own open letter, in which he stated,

> While I do not wish to meet antagonism with antagonism, I must remind you that 25 years ago this month, the newly formed Diocese of Fort Worth voluntarily voted to enter into union with the General Convention of the Episcopal Church. If circumstances warrant it, we

---

[31]In the interest of time, instead of requesting that the already voluminous record be supplemented, we have opted to take judicial notice sua sponte of Presiding Bishop Schori's letter and Bishop Iker's response—both of which were published on the internet and referenced, but not included, in the record—for the sole purpose of providing context for the parties' dispute. *See* Tex. R. Evid. 201.

28

can likewise, by voluntary vote, terminate that relationship. Your aggressive, dictatorial posturing has no place in that decision. Sadly, however, your missive will now be one of the factors that our Convention will consider as we determine the future course of this diocese for the next 25 years and beyond, under God's grace and guidance.

The Episcopal Diocese of Fort Worth, *A letter from Bishop Iker to the Presiding Bishop* (Nov. 12, 2007), at http://www.fwepiscopal.org/bishop/bishoppbreply.html.

In his November 17, 2007 address at the Annual Convention, Bishop Iker recounted the Executive Council's resolution and stated "that such declarations exceeded the authority of the Executive Council, which is responsible for the program and budget of the General Convention, and that they had no legislative or judicial authority to make such a pronouncement." Bishop Iker stated, "The Council's declaration about the legitimate legislative process in this Diocese is, in fact, null and void." Bishop Iker also voiced his objection "to the claim that the Presiding Bishop has any canonical authority in this Diocese or any legitimate power over the leadership of this Diocese" and stated that "[t]here is no such thing as 'the national Church,'" but rather a confederation of dioceses.

At the standing committee's follow-up meeting on November 19, 2007, Bishop Iker expressed his desire that his convention address be shown in all of EDFW's parishes and missions prior to each congregation's annual parish meeting. The standing committee discussed with Bishop Iker "the need to begin immediate study of the Constitution and Canons of the Province of the Southern Cone."

In January 2008, Bishop Iker sent a directive to appoint clerical members of the standing committee plus four rectors "who have said they want to remain in TEC and four who believe it is time to separate," asking for their assistance in addressing conflicts in EDFW "concerning the plan to separate from The General Convention of The Episcopal Church." Three months later, at the March 2008 meeting, the standing committee also discussed, among other things, "the current situation in the Diocese of San Joaquin."[32]

A month later, the committee's notes reflect that Bishop Iker was "trying to work out a pastoral plan and provision" for the parishes "who may wish to remain in TEC following [the] November Diocesan Convention," with the assistance of Dallas's bishop and standing committee. Bishop Iker and the standing committee sent a letter to the Internal Revenue Service to inform the IRS that EDFW "no longer desires to be included under the group ruling of the Protestant Episcopal Church of the United States of America." In May 2008, the standing committee

---

[32]A month after EDFW's November 2007 convention, the annual convention of the Diocese of San Joaquin voted to leave TEC and to affiliate with the Anglican Province of the Southern Cone. *Diocese of San Joaquin*, 202 Cal. Rptr. 3d at 57. The bishop of that diocese then filed with the California Secretary of State an amendment to the articles of incorporation of the corporate sole to change its name from "The Protestant Episcopal Bishop of San Joaquin" to "The Anglican Bishop of the Diocese of San Joaquin." *Id.* In March 2008, the San Joaquin bishop was deposed by TEC. *Id.* at 57–58. The Right Reverend John Clark Buchanan, a member of TEC's House of Bishops, averred that since 2006, the leaders of five of TEC's 109 dioceses—including EDFW, the Diocese of Pittsburgh, and the Diocese of San Joaquin—had purported to remove their dioceses from TEC over internal disputes.

approved a new civil employment contract with Bishop Iker and ended the former employment agreement.

Reverend Buchanan declared in his affidavit that in 2008, prior to EDFW's purported disaffiliation, TEC's House of Bishops had "affirmed that diocesan leaders have no authority to remove their dioceses from The Episcopal Church." But by September 2008, the standing committee was poised to recommend that EDFW "affiliate with the Anglican Province of the Southern Cone as a member diocese, on a temporary, pastoral basis, until such time as an orthodox Province of the Anglican Communion can be established in North America." The standing committee's members unanimously approved and endorsed the following resolution from EDFW's Convention Resolutions Committee:

> BE IT RESOLVED, that the Episcopal Diocese of Fort Worth, meeting in its 26th Annual Convention, does hereby accept the provision made by the Anglican Province of the Southern Cone, and the Episcopal Diocese of Fort Worth does hereby immediately enter into membership with the Anglican Province of the Southern Cone as a full and equal constituent member of such Province, and the Episcopal Diocese of Fort Worth does hereby accede to the authority of the Constitution and Canons of the Anglican Province of the Southern Cone to the extent such Constitution and Canons are not contrary to Holy Scripture and the Apostolic teaching of the one holy, catholic and apostolic Church.

In September 2008, Bishop Iker sent a letter to the rector of All Saints Episcopal Church, Christopher Jambor, stating that properties located at 4936, 4939, 5001, and 5005 Dexter Avenue, Fort Worth, were not "picked up" by the 1984 declaratory judgment nor held by the Corporation but rather were held in the

31

name of All Saints Episcopal Church. In the letter, Bishop Iker asked that a deed be executed to transfer the parcels to the Corporation.

On November 15, 2008, in his address at the 26th Annual Convention, Bishop Iker observed that EDFW had come "to this historic moment of decision making" during which EDFW would "vote to rescind" its accession to TEC's constitution and canons and to align itself "instead with an orthodox Province of the Anglican Communion, the Province of the Southern Cone." Bishop Iker stated,

> Some have asked, "Will we still be Episcopalians after our realignment vote is taken?" And the answer is, "Well, yes and no – that all depends!" After all, no one can "un-Episcopalian-ize you, and no one is being kicked out of the family. We will still be The Episcopal Diocese of Fort Worth. We are not changing our name, because we are not changing our identity. We will still have an Episcopal form of polity, which means being in a church that is under a Bishop. We will continue to stand for what our forebears meant when they called themselves Episcopalians. But we will no longer be a part of the ecclesiastical structure sometimes known as the Protestant Episcopal Church in the United States of America, which is governed by the General Convention. TEC is not the only Episcopal Church in the Anglican Communion, and it does not own the name "Episcopalian."
>
> . . . .
>
> . . . [T]he proposals before this Convention have one clear message: We here in the Episcopal Diocese of Fort Worth intend to be who we have always been, to believe what we have always believed, and to do what we have always done. We are not going away, nor are we abandoning anything. We are not leaving the Church – we are the Church. We will remain an orthodox diocese of catholic Christians, full members of the worldwide Anglican Communion.

The majority of EDFW's Annual Convention voted to leave TEC and to affiliate with the Anglican Province of the Southern Cone.[33]

Following the 26th Annual Convention in November, EDFW published a statement on its website, declaring,

> We remain a member diocese of the Anglican Communion.
>
> We remain the Episcopal Diocese of Fort Worth. The word "episcopal" identifies us as part of the apostolic succession, with a bishop as our elected chief pastor.
>
> We remain in communion with other Episcopalians. We share fellowship with all those in any Province who recognize the authority of Scripture and the faith and order of historic Anglicanism.

Shortly thereafter, TEC issued a letter of inhibition, to which Bishop Iker replied three days later, stating that "the inhibition is of no force or effect, since the Bishop and Diocese, meeting in annual convention, constitutionally realigned with another province of the Anglican Communion on Saturday, Nov. 15, and are now constituent members of the Anglican Province of the Southern Cone." Bishop Iker further clarified his position, stating,

> Katharine Jefferts Schori has no authority over me or my ministry as a Bishop in the Church of God. She never has, and she never will.
>
> Since November 15, 2008, both the Episcopal Diocese of Fort Worth and I as the Diocesan Bishop have been members of the Anglican Province of the Southern Cone. As a result, canonical declarations of the Presiding Bishop of The Episcopal Church pertaining to us are irrelevant and of no consequence.

---

[33]The proposed constitutional amendments under consideration at the Annual Convention were the same ones presented the previous year that required a second reading.

On December 5, 2008, TEC accepted Bishop Iker's November 24, 2008 renunciation and removed and released him from the obligations of all ministerial offices of TEC.  On December 16, 2008, at a special meeting of the standing committee, the Corporation's board, and the chairman of the constitution and canons committee, the first item of discussion addressed parishes and individuals who wanted to stay with TEC.  Of particular concern was the perception that the "Steering Committee of North Texas Episcopalians" and the "'Remain Episcopal' folks" were using the official Diocesan shield "in lots of their publicity – in newspaper ads and on the web, etc. – identifying themselves boldly as 'the Episcopal Diocese of Fort Worth in the Episcopal Church U.S.A,'" which the meeting's attendees said was confusing and misleading.  Those attending unanimously agreed to send a "cease and desist" letter regarding use of EDFW's official seal and shield in publicity.  They then discussed the "very conflicted situation which now exists at All Saints' Church, Fort Worth."

**5. 2009**

Presiding Bishop Schori issued a "Notice of Special Meeting of the Convention of the Episcopal Diocese of Fort Worth, Saturday, February 7, 2009." In that notice, she stated that as there was no bishop nor any qualified members of the standing committee in the diocese, she had called the meeting "in consultation with the Steering Committee of faithful Episcopalians of that Diocese," to elect a provisional bishop and to elect or appoint members of the standing

committee, executive council, and other officers, to adopt a budget, and to consider resolutions relating to "recent purported amendments to the Constitution and canons of the Diocese," as well as other resolutions relating to the TEC-affiliated diocese's organization and governance.

The emergency convention convened at Trinity Episcopal Church under Presiding Bishop Schori. After quorums were verified and the "parliamentary necessities were accomplished," the first order of business was to elect a provisional bishop. Edwin F. Gulick Jr., who was elected to the post, thereafter made appointments to various commissions and committees for the vacancies resulting from the schism. Bishop Gulick also appointed trustees for the Corporation, on the basis that the previous trustees' effective resignation occurred when they left TEC by the "irregular, illegal action of the convention in 2008."[34]

In his deposition, Bishop Gulick acknowledged that the Corporation's board members were supposed to be elected one per year and, between sessions, replacements would be voted on by the board. And despite his inability to point to specific language authorizing EDFW to remove all of the trustees, he nevertheless explained that "in the unforeseen, unanticipated emergency moment," everything possible had been done to comply with EDFW's and TEC's constitutions and canons.

---

[34]Additionally, Bishop Gulick testified in his deposition that "sufficient persons" were elected in offices "necessary to conduct the business of the Diocese."

35

On April 14, 2009, the TEC parties adopted amended and restated articles of incorporation for the Corporation and filed them with the Texas Secretary of State. These amended and restated articles purported to return to the Corporation's original articles of incorporation (i.e., administration in accordance "with the Constitution and Canons of the Episcopal Diocese of Fort Worth and the Episcopal Church of the United States"), and listed Bishop Gulick, James Hazel, John Stanley, Robert Bass, Cherie Shipp, and Trace Worrell as the current members of the board of trustees.[35]

At the 27th Annual Meeting of the Diocesan Convention on November 14, 2009, the TEC-affiliated EDFW ratified the actions of the February 7, 2009 special meeting, and after Bishop Gulick's resignation, C. Wallis Ohl was elected and installed as the TEC-affiliated EDFW's bishop. The same individuals who were put into place at the February 7, 2009 special meeting were elected to the TEC-affiliated diocese's standing committee and the Corporation's board of trustees. The convention also ratified the resolutions made and actions taken at the February 7, 2009 special meeting and brought EDFW's constitution and canons back into compliance with TEC's constitution and canons. Bishop Ohl testified that the faction headed by Bishop Iker was not the "Episcopal Diocese of Fort Worth," that he—not Bishop Iker—was the legitimate and properly elected EDFW Bishop,

---

[35]A week later, Bishop Iker sent a certificate of correction to the secretary of state regarding the Corporation's articles.

36

and that he, Hazel, Shipp, Worrell, Bass, and Stanley—and not Bishop Iker, Salazar, Patton, Virden, Barber, and Bates—were the Corporation's legitimate and properly elected trustees. *See Episcopal Diocese*, 422 S.W.3d at 647–49.

## C. The Lawsuit

On the same day that the TEC parties' amended and restated Articles of Incorporation were filed—April 14, 2009—the TEC parties filed suit for conversion and violations of business and commerce code section 16.29.[36] Additionally, the TEC parties sought declaratory and injunctive relief regarding who could act as EDFW's representatives and who had use and control of EDFW's real and personal property.[37] *See In re Salazar*, 315 S.W.3d 279, 282 (Tex. App.—Fort Worth 2010, orig. proceeding).

### 1. Summary Judgment—First Round

The parties filed competing motions for summary judgment. As explained by the supreme court,

> In its motion for summary judgment TEC argued, in part, that the actions of the Board of Trustees in amending the Fort Worth

---

[36]Business and commerce code section 16.29 is now section 16.103, "Injury to Business Reputation; Dilution." *See* Tex. Bus. & Com. Code Ann. § 16.103 (West Supp. 2017).

[37]In 2009, the Corporation transferred titles to Trinity Episcopal Church (Fort Worth) and St. Martin-in-the-Fields Episcopal Church (Southlake) to the rector, wardens, and vestry of these parishes that stayed with TEC. It also transferred title to St. Luke's Episcopal Church (Stephenville) to the rector, wardens, and vestry of that parish after evidence of satisfactory removal of the Corporation's name from any encumbrances on the property. Bishop Iker thereafter issued orders dissolving the relationship between the diocese and these churches.

Corporation's articles of incorporation were void because the actions went beyond the authority of the corporation, which was created and existed as an entity subordinate to a Diocese of TEC. TEC argued that "[t]he secular act of incorporation does not alter the relationship between a hierarchical church and one of its subordinate units" and that finding otherwise "would risk First Amendment implications." The Diocese, on the other hand, argued that the case was governed by the Texas Non-Profit Corporation Act and the Texas Uniform Unincorporated Nonprofit Association Act; under those statutes a corporation may amend its articles of incorporation and bylaws; and TEC had no power to limit or disregard amendments to the Corporation's articles and bylaws.

*Episcopal Diocese*, 422 S.W.3d at 650 (footnotes omitted).

After the trial court granted summary judgment and issued a declaratory judgment for the TEC parties in 2011, stating that the changes made by Appellees to the Corporation's articles and bylaws were ultra vires and void,[38] Appellees appealed directly to the supreme court. The heart of the dispute, as identified by the supreme court, was "whether the 'deference' (also sometimes referred to as the 'identity') or 'neutral principles of law' methodology should be applied to resolve the property issue." *Id.* at 649.

The court's opinion in the direct appeal issued in 2013. In it, the court reversed the trial court's judgment and remanded the case to the trial court to be

_____

[38]The original cause number in the trial court was 141-237105-09. The trial court granted Appellees' motion to sever to make the trial court's interlocutory judgment for the TEC parties final and appealable. The trial court severed the claims subject to the summary judgment into cause number 141-252083-11 and stayed the remainder of the unfinished action. Among others, the petitioners in the direct appeal included Bishop Iker, Salazar, Patton, Virden, Barber, Bates, several clergy, and 47 churches.

considered under the neutral principles methodology. *Id.* at 647. In its opinion, the court stated that under this methodology, ownership of disputed property is to be determined by considering evidence such as the deeds to the properties, the terms of the local church charter (including articles of incorporation and bylaws, if any), the relevant provisions of governing documents of the general church and local church entities, the governing state statutes, and other items as applicable. *Id.* at 651–52 ("[O]n remand the trial court is not limited to considering only the four factors listed in *Jones* [*v. Wolf*, 443 U.S. 595, 99 S. Ct. 3020 (1979)]. . . . [t]he elements listed in *Jones* are illustrative."). It also referenced *Masterson*, which issued on the same day, as applicable to this case regarding church canons and Texas law. *Id.* at 653.

In *Episcopal Diocese* as well as in *Masterson*, the court established guidance for the case on remand. In *Episcopal Diocese*, the court observed, "[A]bsent agreement or conclusive proof of title to the individual properties and the capacities in which titles were taken, fact questions exist under neutral principles of law, at a minimum, about who holds title to each property and in what capacity." *Id.* at 652. The court also instructed,

> While we agree that determination of who is or can be a member in good standing of TEC or a diocese is an ecclesiastical decision, the decisions by Bishops Gulick and Ohl and the 2009 convention do not necessarily determine whether the earlier actions of the corporate trustees were invalid under Texas law. The corporation was incorporated pursuant to Texas corporation law and that law dictates how the corporation can be operated, including determining the terms of office of corporate directors, the

circumstances under which articles and bylaws can be amended, and the effect of the amendments.

*Id.* The court concluded that the record failed to conclusively show as a matter of law that the Corporation's trustees had been disqualified from serving as such at the relevant times, whether the 2009 appointments to the Corporation's board by Bishop Ohl were valid or invalid under Texas law, or whether, under Texas law, the actions taken by the trustees appointed by Bishop Ohl in 2009 were valid or invalid. *Id.* at 652–53.

## 2. Summary Judgment—Second Round

Upon remand to the trial court, the TEC parties filed an amended petition in which they renewed their severed claims.[39] By this time the severed claims included not only conversion and business and commerce code section 16.29 violations but also breach of fiduciary duty, breach of trust, trespass to try title, and an action to quiet title. Additionally, the TEC parties had pleaded for the imposition

---

[39]Prior to the TEC parties' filing the amended petition, the trial court had denied their motion to consolidate their previously severed claims.

of a constructive trust under a number of theories, including estoppel. They also

continued to seek declaratory and injunctive relief and an accounting.[40]

The parties once more filed competing motions for partial summary

judgment.[41]

### a. Appellees' Motion and the TEC Parties' Response

In their motion, Appellees argued:

- that the deeds, the 1984 judgment, the Diocese's charters, and adverse possession vested the Corporation with title and control, that TEC's charters made no claim to title and only asserted an invalid trust, and that the TEC parties' pleadings conceded that title was in the Corporation;

- that state corporations and associations law requires adherence to the Corporation's and Association's bylaws, making Appellees the Corporation's elected trustees and Bishop Iker the chairman of the Corporation's board and

---

[40]Appellees moved to strike the renewed claims, but the trial court denied the motion.

[41]We note here that in considering the competing summary judgment motions, the trial court was faced with the same herculean task that has been presented to us on appeal. First, it was required to read a record totaling over 10,000 pages on remand, a task that would take an above-average reader, such as a trial judge, an estimated 200 hours, or between five and six weeks, assuming he or she devoted 40 hours per week solely to the endeavor. (Including the portions of the record developed prior to the direct appeal, the record currently totals over 14,000 pages.) Then the trial court was presented with the daunting task of conducting the research and analysis necessary to apply to that voluminous record such exceedingly complex legal issues as state corporations, associations, and trust law, heavily overlaid by the U.S. Supreme Court's First Amendment jurisprudence, an endeavor that could easily have taken as much time—if not a good deal more—than the reading of the record. All the while, the trial court was expected to carry out its other obligations of attending to the hundreds of cases pending on its docket that were, likewise, deserving of the trial court's attention. On appeal, as acknowledged by Appellees in their February 12, 2018 "Supplemental Response to Latest Letter Brief," we have received an additional "346 pages of briefing from the parties in this appeal" to consider and address.

depriving the TEC parties of standing when TEC's own charters prevented the TEC parties from convening the special convention upon which their claims were based;

- that state law prohibits an express, implied, or constructive trust interest for the TEC parties;

- that the same rules that allocated control to Appellees of the real property also applied to the funds, trusts, and endowments that the TEC parties sought; and

- that estoppel and quasi-estoppel did not apply because Appellees only wanted a declaration to be left alone.

The TEC parties responded that Appellees had judicially admitted that the Corporation held all property in trust for EDFW and its congregations, and since those entities were subordinate affiliates of the hierarchical church, the Corporation therefore held the property in trust for the TEC parties because they were the only parties recognized by TEC as those entities. They also argued, as they do on appeal, that the Dennis Canon, in addition to Appellees' words and actions prior to the schism, imposed a trust—express, contractual, or constructive—in their favor. And they argued that Appellees' adverse possession claim failed because there was no "adverse" interest until the 2008 schism.

### b. The TEC Parties' Motion and Appellees' Response

In their summary judgment motion, the TEC parties contended:

- that because TEC had determined that Appellees *did not* represent EDFW and its congregations and that the TEC parties *did* represent them, the property held in trust by the Corporation was held in trust for the TEC parties;

- that Appellees had no right to control the Corporation because, in addition to the plain terms of the Corporation's bylaws, it was a subordinate entity of EDFW that only the TEC parties could control;

42

- that state associations law favored the TEC parties because local chapters are treated as constituents of larger organizations;

- that an express trust was created when EDFW agreed to TEC's rules in exchange for formation, membership, and property, including the Dennis Canon, but that even without an express trust, the TEC parties were entitled to a constructive trust;

- that Appellees' adverse possession claim failed because they did not meet all of the necessary elements to establish that claim;

- that Appellees were estopped from raising claims and defenses that contradicted their commitments, conduct, and prior statements to courts and other federal and state authorities;

- that, contrary to Appellees' assertion, the TEC parties did have standing; and

- that based on all of the above, the trial court should grant summary judgment on the TEC parties' trespass-to-try-title claim and their request for attorney's fees and for declaratory judgment.[42]

Appellees responded that the supreme court had rejected the TEC parties' deference theory in favor of neutral principles, that there was no express or irrevocable trust in TEC's favor nor a contractual or constructive trust, that there was no breach of fiduciary duty, and that the TEC parties' remaining grounds were baseless.

### c. Supplemental Motions

On March 2, 2015, the trial court, except as to claims involving All Saints Episcopal Church, granted Appellees' motion and denied the TEC parties' motion. The parties filed supplemental summary judgment motions to address the All

_____

[42]The TEC parties also raised retroactivity and deference, re-urging their original, pre-*Episcopal Diocese* and *Masterson* arguments.

Saints issues[43] and agreed that the remaining claims in cause number 141-252083-11—the claims for attorney's fees, conversion, violations of business and commerce code section 16.29, damages for breach of fiduciary duty (as opposed to the predicate for a constructive trust), the action to quiet title, and for an accounting—should be severed and stayed.

In their summary judgment motion relating to All Saints Episcopal Church,[44] Appellees argued that the Corporation held legal title to two of the All Saints properties—the sanctuary and parish hall on 5001 Crestline and the rectory on 5003 Dexter—by virtue of the 1984 judgment's property transfer and that beneficial title was held by the group affiliated with them. Ergo, applying the same reasoning as the trial court's previous summary judgment, Appellees were entitled to

---

[43]The record reflects that All Saints had a troubled history with EDFW's leadership. Four years after the 1986 agreement between All Saints and EDFW to designate All Saints as EDFW's Cathedral Church, in October 1990, a dispute arose between then-Bishop Pope and All Saints with regard to cathedral status and how the property was held—the bishop wanted title to the property to be held in conformity with EDFW's constitution and canons, while All Saints's vestry wanted to hold it in trust for TEC in conformity with TEC's constitution and canons.

[44]The articles of incorporation for All Saints Episcopal Church are contained in the record and indicate that it was incorporated for a fifty-year term in 1953. No one has indicated whether any efforts were taken to maintain its incorporated status after 2003 or what effect the lack of status might have, but in their reply to the TEC parties' All Saints motion for summary judgment, Appellees asserted that All Saints's incorporation "in the 1950s has no bearing on this dispute" and that all parties agreed that under EDFW's canons, the All Saints Corporation is merely an "adjunct or instrumentality" of the parish that cannot hold real property.

summary judgment as to those two properties. Appellees waived their claims to the remaining four All Saints properties "so as to resolve this case without a trial."[45]

The TEC parties, in their All Saints summary judgment motion, asked the trial court to construe the deeds, to declare the TEC parties the properties' equitable owners, and to remove Appellees as the trustees or owners of legal title.[46] The trial court disposed of the All Saints summary judgment motions in its final summary judgment.

### 3. Trial Court's Judgment

On July 24, 2015, the trial court signed a final judgment in this case, consolidating its prior orders.

In the judgment, the trial court granted Appellees' motion as to All Saints on the two pieces of property under dispute and denied the TEC parties' opposing motion. The trial court recited in its judgment that the claims for attorney's fees in both the original and severed action, the claims in the severed action for conversion, damages for breach of fiduciary duty, to quiet title and for an

---

[45]5001 Crestline and 5003 Dexter are adjacent to the properties referenced by Bishop Iker in his September 2008 letter to the All Saints rector.

[46]The TEC parties also revisited all of their prior arguments in the case, prompting Appellees to remark in their summary judgment response that "the Court should reject these 95 pages that summarize what the Court rejected when it was 153 pages" and that "[t]he last 95 pages of the 111 pages of Plaintiffs' motion can be ignored because Plaintiffs admit their 'global arguments' merely re-assert the same grounds this Court rejected in its Partial Summary Judgment of March 2, 2015."

accounting, and the claims under business and commerce code section 16.29 remained pending in the original action, cause number 141-237105-09, and ordered that those remaining claims, "to the extent they are also pending in this cause," were dismissed without prejudice and preserved for litigation in cause number 141-237105-09.

The trial court made the following declarations in its judgment:

> 1.    Neutral principles of Texas law govern this case, and applying such law is not unconstitutionally retroactive.[47]

> 2.    The Corporation of the Episcopal Diocese of Fort Worth and Defendant Congregations hold legal title to all the properties listed

---

[47]In this, the trial court was merely obeying the law of the case: the supreme court stated in *Episcopal Diocese* that it had "concluded in *Masterson* that the neutral principles methodology was the substantive basis [for the supreme court's] decision in *Brown v. Clark*, 102 Tex. 323, 116 S.W. 360 (1909)," and that "as to the argument that application of neutral principles may pose constitutional questions if they are retroactively applied, we note that over a century ago in *Brown* . . . our analysis and holding substantively reflected the neutral principles methodology." 422 S.W.3d at 650–51, 653. Based on the supreme court's determination that the neutral principles methodology had substantively applied to this type of case since 1909, the trial court did not err by determining that its application here would not be retroactive. *See Farmers Grp. Ins., Inc. v. Poteet*, 434 S.W.3d 316, 329 (Tex. App.—Fort Worth 2014, pet. denied) (explaining that the law of the case doctrine is the principle under which questions of law decided on appeal to a court of last resort will govern the case throughout its subsequent stages). Therefore, to the extent that the TEC parties have raised subissues in footnote 5 of their appellants' brief with regard to their issues 1(a) and 1(b), in which they re-urge their pre-*Episcopal Diocese* and *Masterson* retroactivity and deference methodology arguments, we overrule these subissues without further discussion. *But see* Eric G. Osborne & Michael D. Bush, *Rethinking Deference: How the History of Church Property Disputes Calls into Question Long-Standing First Amendment Doctrine*, 69 SMU L. Rev. 811, 813 (2016) (suggesting that the deference model itself is fundamentally flawed and that its result "has been to empower denominational hierarchies, thus making divisions and intra-church fights for control especially bitter").

on Exhibit 1 attached to this Order, subject to control by the Corporation pursuant to the Diocese's charters.[48]

3.    The Episcopal Diocese of Fort Worth and the Defendant Congregations in union with that Diocese hold beneficial title to all the properties listed on Exhibit 1 attached to this Order.

4.    Defendants Dr. Franklin Salazar, Jo Ann Patton, Walter Virden, III, Rod Barber, and Chad Bates are, and have been since 2005, the properly elected Trustees of the Corporation for the Episcopal Diocese of Fort Worth.

5.    Defendant Jack Iker is, and has been since 2005, the proper Chairman of the board and one of the Trustees of the Corporation for the Episcopal Diocese of Fort Worth.

6.    Defendants are the proper representatives of the Episcopal Diocese of Fort Worth, the Texas unincorporated association formed in 1982.

7.    The Defendants hold legal title and control of the funds and endowments listed on Exhibit 2 attached to this Order, subject to the terms of each.

8.  Plaintiffs have no express, implied, or constructive trust in the properties or funds listed in the Exhibits attached to this Order.

9.  Defendants have not breached any fiduciary duty to or special relationship with any Plaintiffs.

---

[48]The supreme court acknowledged in *Episcopal Diocese* that "[t]he 1984 judgment [transferring real and personal property from the Diocese of Dallas] vested legal title of the transferred property in the Fort Worth Corporation, except for certain assets for which the presiding Bishop of the Dallas Diocese and his successors in office had been designated as trustee." 422 S.W.3d at 648. Those other assets were transferred by the 1984 judgment to the Bishop of the Fort Worth Diocese and his successors in office as trustee. *Id.*; *see Farmers Grp.*, 434 S.W.3d at 329 (law of the case doctrine). Ultimately, legal title to that property was also placed under the Corporation's control. *See* Tex. Bus. Orgs. Code Ann. § 252.015 (West 2012). No one disputes that the Corporation holds legal title.

47

Exhibit 1 attached to the order listed 121 properties. Exhibit 2 listed four funds for which the Corporation is listed as trustee, six funds for which Bishop Iker is listed as trustee, and one fund for which the EDFW Treasurer, the EDFW Chancellor, and Bishop Iker are listed as trustees.

The TEC parties filed a joint notice of appeal.

### III. Discussion

TEC argues that the trial court erred as a matter of law in its application of the "neutral principles" approach by failing to defer to and apply TEC's ecclesiastical determination of which entity constitutes EDFW. The TEC parties argue that the trial court erred by denying their motion for summary judgment and granting summary judgment for Appellees by:

a. Violating *Masterson*, *Episcopal Diocese*, and the First Amendment by overriding the Episcopal Church on who may control an Episcopal Diocese and Episcopal Congregations;

b. Violating *Masterson*, *Episcopal Diocese*, and the First Amendment's limits on neutral principles by refusing to "accept as binding" the Church's determination of ecclesiastical issues within this property case;

c. Failing to apply neutral principles of Texas Associations law, including an association's right to interpret and enforce its own rules;

d. Failing to apply this Court's holding in *Shellberg v. Shellberg*, 459 S.W.2d 465, 470 (Tex. Civ. App.—Fort Worth 1970, writ ref'd n.r.e.), the law in effect when the Diocese made its contract;

e. Violating Texas trust law by refusing to enforce the express, unrevoked trusts in favor of the Church in fifty-five individual recorded deeds;

48

f.      Failing to find breach of fiduciary duty and to impose a constructive trust where Appellees broke a century's worth of oaths and commitments;

g.      Failing to estop Appellees from contradicting their own statements to other courts and parties;

h.      Failing to apply Texas Corporations law to the undisputed facts, including a plain application of the Corporation's bylaws;

i.      Failing to reject Appellees' claim to title by adverse possession;

j.      Holding, if it did, that Appellants did not have standing; and

k.      Denying Appellants' trespass-to-try-title claim.

Because TEC also adopted and incorporated by reference all of the TEC parties' issues and arguments, we will address their dispositive issues together.

## A. Standard of Review

In a summary judgment case, the issue on appeal is whether the movant met the summary judgment burden by establishing that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law. Tex. R. Civ. P. 166a(c); *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009). We review a summary judgment de novo. *Travelers Ins. Co. v. Joachim*, 315 S.W.3d 860, 862 (Tex. 2010). When both parties move for summary judgment and the trial court grants one motion and denies the other, the reviewing court should review both parties' summary judgment evidence and determine all questions presented. *Mann Frankfort*, 289 S.W.3d at 848. The reviewing court should render the judgment that the trial court should have

49

rendered. *See Myrad Props., Inc. v. LaSalle Bank Nat'l Ass'n*, 300 S.W.3d 746, 753 (Tex. 2009); *Mann Frankfort*, 289 S.W.3d at 848.

## B. Jurisdiction

Standing is a threshold issue that implicates subject matter jurisdiction, focuses on the question of who may bring an action, and presents the issue of whether a court may consider a dispute's merits. *See In re J.W.L.*, 291 S.W.3d 79, 85 (Tex. App.—Fort Worth 2009, orig. proceeding [mand. denied]). "To have standing, a plaintiff must be personally aggrieved, and his alleged injury must be concrete and particularized, actual or imminent, and not hypothetical." *Heat Shrink Innovations, LLC v. Med. Extrusion Techs.-Tex., Inc.*, No. 02-12-00512-CV, 2014 WL 5307191, at *7 (Tex. App.—Fort Worth Oct. 16, 2014, pet. denied) (mem. op.) (citing *DaimlerChrysler Corp. v. Inman*, 252 S.W.3d 299, 304–05 (Tex. 2008)). "A party may be personally aggrieved if it has a legal or equitable interest in the controversy." *Id.* (citing *Goswami v. Metro. Sav. & Loan Ass'n*, 751 S.W.2d 487, 489 (Tex. 1988) (holding that plaintiff had standing to contest sale of property in which he had an equitable interest), *$574.37 U.S. Coin & Currency v. State*, No. 02-06-00434-CV, 2008 WL 623793, at *6 (Tex. App.—Fort Worth Mar. 6, 2008, no pet.) (mem. op.) (holding that although vehicle was owned by another person, plaintiff had equitable interest in truck to confer standing to contest forfeiture), and *First Nat'l Bank of El Campo, TX v. Buss*, 143 S.W.3d 915, 922 (Tex. App.—Corpus Christi 2004, pet. denied) (noting that a person in possession of a vehicle who is the intended owner of the vehicle has an equitable possessory right in the

vehicle even if that person is not named on the vehicle's title)). Without a breach

of a legal right belonging to a specific party, that party has no standing to litigate.

*Cadle Co. v. Lobingier*, 50 S.W.3d 662, 669–70 (Tex. App.—Fort Worth 2001, pets.

denied) (en banc op. on reh'g). We review standing de novo and may review the

entire record to determine whether any evidence supports it. *Senger Creek Dev.,*

*LLC v. Fuqua*, No. 01-15-01098-CV, 2017 WL 2376529, at *13 (Tex. App.—

Houston [1st Dist.] June 1, 2017, no pet.) (mem. op.) (citing *Mayhew v. Town of*

*Sunnyvale*, 964 S.W.2d 922, 928 (Tex. 1998); *Tex. Ass'n of Bus. v. Tex. Air Control*

*Bd.*, 852 S.W.2d 440, 444–45 (Tex. 1993)).

The TEC parties argue that a party has standing as long as he or she alleges

a pecuniary interest. They contend that they have done so as "(1) the displaced

minority that formerly enjoyed use of the property and as the only parties

authorized by the Church to lead the Diocese; and (2) the Church that formed the

Diocese and received a trust interest in the property," citing *Getty Oil Company v.*

*Insurance Company of North America*, 845 S.W.2d 794, 798–99 (Tex. 1992),[49]

---

[49]In *Getty*, a chemical buyer sued the seller and the seller's insurers after the chemicals exploded and killed someone and a wrongful death judgment was obtained against it; the buyer claimed in its subsequent suit that the seller and the seller's insurers were contractually obligated to provide insurance to cover the judgment against it. 845 S.W.2d at 796–98. The court held that res judicata barred the claims against the seller because the buyer could have asserted those claims in the earlier suit despite their contingency. *Id.* at 799. From this, Appellants draw their argument that once their identity has been established, their claims will no longer be contingent.

*cert. denied*, 510 U.S. 820 (1993), and *Hunt v. Bass*, 664 S.W.2d 323, 324 (Tex. 1984).[50]

According to Appellees, in contrast,

No matter how [the TEC parties] claim to have suffered injury, a state statute says they have no standing to sue the Corporation or its Trustees for violating fiduciary duties or corporate charters. Any claim for breach of fiduciary duty owed to the Diocese or the Corporation must be brought by those entities. Since [the TEC parties'] counsel represent neither, they have no authority to bring such claims for them.

Additionally, lawsuits claiming that the acts or property transfers of a Texas nonprofit corporation violate its corporate purposes can be brought only by a member or the Attorney General. [The TEC parties] are neither; the Corporation has no "members," and the Attorney General is not a party.

Since [the TEC parties] severed all connection with the Diocese and the Corporation and have no right to represent either, they have no standing to complain about how either is governed.

---

[50]In *Hunt*, several plaintiffs filed a petition for writ of mandamus after their separate lawsuits were delayed because the commissioners' court and commissioners failed to provide adequate courtroom space and personnel. 664 S.W.2d at 324. The trial court determined that the plaintiffs had no standing to sue for mandamus relief and dismissed their petition. *Id.* The supreme court held that because each plaintiff was a party to a lawsuit pending in the district court (as distinguished from the general public, which did not have lawsuits pending), and because they had each alleged a failure of the court system to provide trials in those lawsuits in a reasonable time, which potentially deprived each plaintiff of a valuable property right, the plaintiffs had made sufficient allegations concerning the infringement of their private rights to present justiciable interests, providing them with standing for the mandamus action. *Id.*

[Footnotes omitted.] Appellees refer us to articles 1396-2.03(B)[51] and 1396-2.08(A)[52] of the revised civil statutes[53] and *Cotten v. Weatherford Bancshares, Inc.*, 187 S.W.3d 687, 698 (Tex. App.—Fort Worth 2006, pet. denied), [54] *disapproved of on other grounds by Ritchie v. Rupe*, 443 S.W.3d 856, 865 n.9, 871 n.17, 877 (Tex. 2014), in support of their argument.

---

[51]Act of Apr. 23, 1959, 56th Leg., R.S., ch. 162, art. 2.03(B), 1959 Tex. Gen. Laws 286, 290 (listing who may bring a proceeding against the corporation with regard to an ultra vires act—a member, the corporation itself through a receiver, trustee, or other legal representative, or the Attorney General) (current version at Tex. Bus. Orgs. Code Ann. § 20.002(c)(1)–(3) (West 2012)).

[52]Act of Apr. 23, 1959, 56th Leg., R.S., ch. 162, art. 2.08(A), 1959 Tex. Gen. Laws 286, 292 ("A corporation may have one or more classes of members or may have no members.") (current version at Tex. Bus. Orgs. Code Ann. § 22.151(a) (West 2012)).

[53]In their pleadings in the trial court, the parties appear to have at least implicitly agreed that the applicable provisions of the former statutes and current statutes in the business organizations code are largely the same, and neither party has indicated to us that there are any substantive differences between the Corporation's law of formation and the current law. Accordingly, in the interest of judicial economy, we will cite to the current sections of the business organizations code.

[54]We stated in *Cotten*,

> While corporate officers owe fiduciary duties to the corporation they serve, they do not generally owe fiduciary duties to individual shareholders unless a contract or confidential relationship exists between them in addition to the corporate relationship. Due to its extraordinary nature, the law does not recognize a fiduciary relationship lightly. Therefore, whether such a duty exists depends on the circumstances.

187 S.W.3d at 698 (citations omitted).

With regard to this particular case, standing turns at least in part on the neutral principles analysis with which we have been tasked by the supreme court.[55] From the application of these neutral principles, we will determine whether the TEC parties have an interest in the property or entities that would give them standing for the claims that were resolved by the trial court's final judgment.[56]

---

[55]The standing debate arose several times during the course of the proceedings, summed up by Appellees at one hearing as,

> The only argument that they [the TEC parties] have the right to argue is whether they're – the individuals are duly elected . . . . Because it's the nature of the claims that the individuals are bringing that only the diocese and the diocesan corporation could bring. An individual who sues in a representative capacity is suing on behalf of the individual entity that the person represents.

[56]We touched on this issue in *In re Salazar*, when Appellees filed a petition for writ of mandamus after the trial court denied part of their motion to show authority under rule of civil procedure 12 as to attorneys hired by the TEC parties to represent the Corporation and EDFW in the property dispute. 315 S.W.3d at 281. The essence of that original proceeding was one of identity. *See id.* at 282, 284 (observing that both plaintiffs and defendants purported to represent EDFW and the Corporation and that plaintiffs argued that the issue of the identity of the true bishop and trustees was at the heart of the suit). We did not reach the question of the "true identity" of the bishop and trustees because we agreed with the trial court that a rule 12 motion was not the appropriate vehicle to reach the merits of an intra-church dispute. *Id.* at 285.

Instead, because neither side challenged the trial court's finding that the two attorneys did not discharge their burden of proof, we concluded that the trial court abused its discretion by not striking the pleadings filed by those attorneys on behalf of the Corporation and EDFW. *Id.* at 286. We granted mandamus relief because a corporation cannot sue itself, and we reasoned that presentations from two opposing factions each claiming to be the Corporation and EDFW could unnecessarily confuse a trier of fact. *Id.* at 287.

Additionally, we note that the ecclesiastical abstention doctrine, which arises from the Free Exercise Clause of the First Amendment to the United States Constitution, may also affect our jurisdiction to consider some of the claims. *See* U.S. Const. amend. I ("Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof."); *Masterson*, 422 S.W.3d at 601 (observing that the Free Exercise clause severely circumscribes the role that civil courts may play in resolving church property disputes by prohibiting civil courts from inquiring into matters concerning theological controversy, church discipline, ecclesiastical government, or conformity of church members to the church's moral standards).

### 1. Neutral Principles Framework

The structural underpinning of our review of the trial court's judgment begins with a review of cases from the U.S. Supreme Court on the evolution of the applicable law, followed by a closer look at *Masterson* and other cases to which the parties have referred us.

### a. Precedent and Persuasive Authority

### (1) United States Supreme Court Cases

### (a) *Watson v. Jones*, 80 U.S. (13 Wall.) 679 (1871).

*Watson*, which set out the original "deference" methodology applicable to hierarchical churches, arose from a schism that presented the question "as to which of two bodies shall be recognized as the Third or Walnut Street Presbyterian Church," as well as who had the authority to lead it and to possess the church's

property.  80 U.S. at 717–18.  The local church's trustees had incorporated to hold title to the property in trust "for the use of the persons who by the constitution, usages, and laws of the Presbyterian body, are entitled to that use," and were elected by the local church's congregation for two-year terms.  *Id.* at 720.

The Court noted that for congregational—that is, independent, stand-alone—churches undergoing a schism into "distinct and conflicting bodies, the rights of such bodies to the use of the property must be determined by the ordinary principles which govern voluntary associations."  *Id.* at 724–25.  In such circumstances, if no trust was previously imposed upon the property when purchased or given, the court would not imply one, the majority would keep the property, and "[t]he minority in choosing to separate themselves into a distinct body, and refusing to recognize the authority of the governing body, can claim no rights in the property from the fact that they had once been members of the church or congregation."  *Id.* at 725.

But the Court treated a local church's membership in a hierarchical church—part of a large and general organization of some religious denomination that is "more or less intimately connected by religious views and ecclesiastical government"—differently.  *Id.* at 726.  The Court acknowledged that the property's legal documents did not indicate its disposition.[57]  *Id.*  Rather, the property was

---

[57]The Court stated, "Here is no case of property devoted forever by the instrument which conveyed it, or by any specific declaration of its owner, to the

purchased for the use of a religious congregation, "and so long as any existing religious congregation can be ascertained to be *that* congregation, or its regular and legitimate successor, it is entitled to the use of the property." *Id.* (emphasis added). Instead of looking to the rules that govern voluntary associations to determine identity or succession, the Court stated that in cases involving a hierarchical church,[58] "we are bound to look at the fact that the local congregation is itself but a member of a much larger and more important religious organization, and is under its government and control, and is bound by its orders and judgments" with regard to "questions of discipline, or of faith, or ecclesiastical rule, custom, or law" that have been decided by the highest of the hierarchical church's judicatories, and to accept those decisions as final and binding "in all cases of ecclesiastical cognizance." *Id.* at 726–27, 729.

In resolving the matter in favor of the local faction that had remained with the national, hierarchical church, the Court stated,

> Whatever may have been the case before the Kentucky court, the appellants in the case presented to us have separated themselves wholly from the church organization to which they belonged when this controversy commenced. They now deny its authority, denounce its

support of any special religious dogmas, or any peculiar form of worship. . . ." *Watson*, 80 U.S. at 726.

[58]The Court specifically identified the "Protestant Episcopal" church as one of the "large and influential bodies [with] . . . a body of constitutional and ecclesiastical law of its own, to be found in [its] written organic laws, [its] books of discipline, in [its] collections of precedents, in [its] usage and customs, which as to each constitute a system of ecclesiastical law and religious faith that tasks the ablest minds to become familiar with." *Watson*, 80 U.S. at 729.

action, and refuse to abide by its judgments. They have first erected themselves into a new organization, and have since joined themselves to another totally different, if not hostile, to the one to which they belonged when the difficulty first began.

*Id.* at 734. Accordingly, the Court concluded, "the appellants, in their present position, have no right to the property, or to the use of it, which is the subject of this suit." *Id.*

*Watson* governed church property disputes until neutral principles made an appearance, *see Windwood Presbyterian Church, Inc. v. Presbyterian Church (U.S.A.)*, 438 S.W.3d 567, 602 (Tex. App.—Houston [1st Dist.] 2014, no pet.) (op. on reh'g) (referencing Justice Brennan's concurring opinion in *Maryland & Va. Eldership of Churches of God v. Church of God at Sharpsburg, Inc.*, 396 U.S. 367, 370, 90 S. Ct. 499, 501 (1970) (Brennan, J., concurring)),[59] and elements of it remain in play. *See Masterson*, 422 S.W.3d at 602 (stating that deference is not optional when ecclesiastical questions are at issue).

---

[59] *Maryland* ended in dismissal from the U.S. Supreme Court because the state court's resolution of the church property dispute involved no inquiry into religious doctrine. 396 U.S. at 367–68, 90 S. Ct. at 499–500. In his concurring opinion, Justice Brennan recited that under *Watson*, a majority of a congregational church or the highest authority of a hierarchical church could make the property decision "unless 'express terms' in the 'instrument by which the property is held' condition the property's use or control in a specified manner" as long as those express conditions may be effected without consideration of doctrine and as long as the appropriate church governing body can be determined without the resolution of doctrinal questions and without extensive inquiry into religious policy. 396 U.S. at 368–70 & n.2, 90 S. Ct. at 500–01 & n.2 (Brennan, J., concurring).

**(b)** *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in North America*, 344 U.S. 94, 73 S. Ct. 143 (1952).

*Kedroff* involved a dispute over the right to use and occupy a church building. 344 U.S. at 95, 73 S. Ct. at 144. The American branch of the Russian Orthodox Church had created a corporation under New York state law in 1925 to acquire a cathedral as "a central place of worship and residence of the ruling archbishop." *Id.*, 73 S. Ct. at 144. Title was in the corporation's name. *Id.* at 96 n.1, 73 S. Ct. at 144 n.1. The only issue was who had the right to use the cathedral—Archbishop Leonty, who was elected to his ecclesiastical office by the American churches, or Archbishop Benjamin,[60] who was appointed by the Supreme Church Authority of the Russian Orthodox Church in Moscow. *Id.* at 96 & n.1, 73 S. Ct. at 144 & n.1. The Court observed that determination of the right to use and occupy the cathedral depended "upon whether the appointment of Benjamin by the Patriarch or the election of the Archbishop for North America by the convention of the American churches validly selects the ruling hierarch for the American churches." *Id.* at 96–97, 73 S. Ct. at 144.

The lower state courts concluded that the cathedral had to be occupied by an archbishop appointed by the central authorities in Moscow (i.e., Benjamin).

---

[60]Benjamin ordained Kedroff as a priest, and Kedroff then "gave" the cathedral to Benjamin. *See Saint Nicholas Cathedral of Russian Orthodox Church in N. Am. v. Kedroff*, 96 N.E.2d 56, 67 (1950), *rev'd sub nom. Kedroff*, 344 U.S. 94, 73 S. Ct. 143 (1952).

*Saint Nicholas*, 96 N.E.2d at 67. The highest state court disagreed, relying on a state statute that "had a conclusive effect upon the issues presented," in addition to the fact that the lower courts had not determined whether Benjamin et al. "could be relied upon to carry out faithfully and effectively the purposes of the religious trust," and the fact that the Moscow patriarchy functioned "as an arm of the Russian Government to further its domestic and foreign policy." *Id.* at 67–68. The statute upon which the state court relied purported to define the "Russian Church in America," and to define "Russian Orthodox church" as a term of art "to denote the particular local buildings or organizations of the Russian Orthodox faith as distinguished from the spiritual church" and, using that term of art, purported to identify who was the church's leader. *Id.* at 69–70 (quoting the statute, which provided, in pertinent part, that "[e]very Russian Orthodox church in this state . . . shall recognize and be and remain subject to the jurisdiction and authority of the . . . governing bodies and authorities of the Russian Church in America, pursuant to the statutes for the government thereof adopted at a general convention . . . held in the city of New York"). The state court relied on the legislative determination that the "Russian Church of America" was the trustee that could be relied upon "to carry out more effectively and faithfully the purposes of th[e] religious trust." *Id.* at 72.

Predictably, the losing party in the state court appealed to the Court, challenging the state statute as invalid based on interference with the exercise of religion. *Kedroff*, 344 U.S. at 100, 73 S. Ct. at 146. The statute had come into

being because of "differences between the Mother Church and its American offspring." *Id.* at 105, 73 S. Ct. at 149. The Court concluded that because the statute undertook by its terms to transfer the control of the New York churches of the Russian Orthodox religion from the central governing hierarchy of the Russian Orthodox Church—the Patriarch of Moscow and the Holy Synod—to the governing authorities of the Russian Church in America, it violated the Fourteenth Amendment. *Id.* at 107–08, 73 S. Ct. at 150 ("Legislation that regulates church administration, the operation of the churches, [and] the appointment of clergy, by requiring conformity to church statutes" adopted by the general convention of the Russian Church in America held in New York City in 1937 "prohibits the free exercise of religion"). This was impermissible, even though the legislature had sought to protect "the American group from infiltration of [the Russian Government's] atheistic or subversive influences" when the legislature gave the use of the churches to the American group "on the theory that this church would most faithfully carry out the purposes of the religious trust." *Id.* at 109–10, 73 S. Ct. at 151.

The Court then proceeded to review its precedent with regard to hierarchical churches, which it defined as "those organized as a body with other churches having similar faith and doctrine with a common ruling convocation or ecclesiastical head." *Id.* at 110–14, 73 S. Ct. at 151–53 (referencing *Watson*, 80 U.S. at 727). The Court concluded that the controversy over the right to use the cathedral was "strictly a matter of ecclesiastical government, the power of the Supreme Church

Authority of the Russian Orthodox Church to appoint the ruling hierarch of the archdiocese of North America," and that the statute, by fiat, displaced one church administrator with another and passed the control of strictly ecclesiastical matters from one church authority to another in violation of the federal constitution. *Id.* at 115–16, 119, 73 S. Ct. at 154–56 ("Freedom to select the clergy, where no improper methods of choice are proven . . . must now be said to have federal constitutional protection as a part of the free exercise of religion against state interference.").

In sum, then, the transfer by statute of control over churches, including the determination thereby of church leadership, violates the constitutional rule of separation between church and state. *Id.* at 110, 73 S. Ct. at 151; *see also Kreshik v. Saint Nicholas Cathedral*, 363 U.S. 190, 191, 80 S. Ct. 1037, 1038 (1960) (applying the same rule to judicial pronouncements). But at issue in the case before us is not a statute that may or may not unconstitutionally infringe upon the parties' freedom of religion or the identification of religious leadership. Rather, we are to consider our business organizations, property, and trust statutes within the confines of the nondoctrinal portions of the parties' governing documents to determine whether the Corporation followed its articles and bylaws and whether a trust or trusts were created, and if so, for whom.

**(c)** *Presbyterian Church v. Mary Elizabeth Blue Hull Memorial Presbyterian Church*, **393 U.S. 440, 89 S. Ct. 601 (1969).**

*Presbyterian Church*, which involved a church property dispute in which two local churches withdrew from a hierarchical national church, formalized the neutral principles framework as an option for resolving such disputes. 393 U.S. at 441, 449, 89 S. Ct. at 602, 606. In 1966, the membership of two local churches, under the leadership of their ministers and most of their ruling elders, voted to withdraw and reconstitute themselves as autonomous organizations after they concluded that some of the national church's actions and pronouncements violated the organization's constitution and departed from the doctrine and practice that were in force at the time they affiliated. *Id.* at 442–43, 89 S. Ct. at 602–03. The state courts considered the implied trust theory and integrated a departure-from-doctrine element that allowed a jury to conclude that the local churches should retain their property. *Id.* at 443–44, 449–50, 89 S. Ct. at 603, 606.

The Court noted that while the First Amendment severely circumscribes the role that civil courts may play in resolving church property disputes, not all such disputes are precluded from the civil courts' consideration. *Id.* at 447, 449, 89 S. Ct. at 605–06 (observing that in *Kedroff*, the Court converted into a constitutional rule *Watson*'s principle as to the binding and conclusive nature of a hierarchical court's ecclesiastical decisions in the absence of fraud or collusion, even when affecting civil rights). Specifically, "there are neutral principles of law, developed for use in all property disputes, which can be applied without 'establishing'

63

churches to which property is awarded." *Id.* at 449, 89 S. Ct. at 606. But to do this, states, religious organizations, and individuals must structure relationships involving church property so as not to require the civil courts to resolve ecclesiastical questions. *Id.*, 89 S. Ct. at 606.

Accordingly, the Court reversed the decision of the state court as violating the First Amendment because the departure-from-doctrine element required the state court to determine matters at the very core of a religion—whether the general church's challenged actions departed substantially from prior doctrine pursuant to the court's interpretation of the doctrine's meaning and then, after assessing the relative significance to the religion of the tenets from which departure was found, whether the issue on which the general church departed "holds a place of such importance in the traditional theology as to require that the trust be terminated." *Id.* at 449–50, 89 S. Ct. at 606–07. The Court remanded the case for further proceedings. *Id.* at 452, 89 S. Ct. at 607 (stating that a civil court may no more review a church decision applying a state departure-from-doctrine standard than it may apply that standard itself).

On remand, the state court held that, in light of the Supreme Court's pronouncement on the departure-from-doctrine element, the implied-trust theory itself was no longer valid. *Presbyterian Church in U.S. v. E. Heights Presbyterian Church*, 167 S.E.2d 658, 659 (Ga. 1969), *cert. denied*, 396 U.S. 1041 (1970). Accordingly, because no trust was created for the general church in the property's deed or required by the general church's constitution, and because the general

64

church had put no funds into the property, legal title to the property remained with the local churches. *Id.* at 659–60.

> ### (d) *Serbian Eastern Orthodox Diocese for the United States of America & Canada v. Milivojevich*, 426 U.S. 696, 96 S. Ct. 2372 (1976).

*Milivojevich* involved a challenge to the suspension, removal, and defrocking of a bishop in—and the reorganization of his diocese into three dioceses by—the Serbian Orthodox Church. 426 U.S. at 697–98, 96 S. Ct. at 2375. The basic dispute, according to the Court, arose from a quarrel over control of the Serbian Eastern Orthodox Diocese for the United States of America and Canada, its property, and its assets. *Id.* at 698, 96 S. Ct. at 2375. Years before the dispute arose, the Serbian Eastern Orthodox Diocese for the United States and Canada and other nonprofit corporations were organized under the state laws of Illinois, New York, California, and Pennsylvania to hold title to property. *Id.* at 701–02, 96 S. Ct. at 2377. In the years immediately before the dispute, the bishop had been the subject of numerous complaints challenging his fitness to serve and his administration of the diocese. *Id.* at 702, 96 S. Ct. at 2377. He subsequently refused to accept either his suspension or the reorganization of his diocese on the basis that they were not done in compliance with the Mother Church's constitution and laws and his diocese's constitution. *Id.* at 704, 96 S. Ct. at 2378. This

ultimately led to his defrocking and his diocese's declaration that it was autonomous.  *Id.* at 705–06, 96 S. Ct. at 2379.

Prior to his defrocking, the bishop had sued to enjoin the Mother Church from interfering with the assets of the nonprofit corporations and to have himself declared the true bishop.  *Id.* at 706–07, 96 S. Ct. at 2379.  The Mother Church's representatives counterclaimed for a declaration that he had been removed as bishop and that the diocese was properly reorganized, and they sought control of the reorganized dioceses and diocesan property.  *Id.* at 707, 96 S. Ct. at 2379.  The Illinois trial court granted summary judgment for the ex-bishop and dismissed the Mother Church's countercomplaints.  *Id.*, 96 S. Ct. at 2379.  After the intermediate appellate court reversed that judgment and remanded the case for a trial on the merits, the trial court gave each side some relief.  *Id.* at 707–08, 96 S. Ct. at 2379–80.

In its judgment on remand, the trial court concluded that no substantial evidence was produced that fraud, collusion, or arbitrariness existed in any of the actions or decisions before or during the final proceedings of the defrocking decision; that the property held by the corporations was held in trust for all members of the American-Canadian Diocese; that the Mother Church exceeded its authority by dividing the diocese into three new dioceses; and that the new bishop was validly appointed as temporary administrator of the whole diocese in place of the defrocked bishop.  *Id.*, 96 S. Ct. at 2379–80.

66

The Illinois Supreme Court reversed part of the trial court's judgment, holding that the ex-bishop's removal and defrocking had to be set aside because the proceedings resulting in those actions "were procedurally and substantively defective under the internal regulations of the Mother Church and were therefore arbitrary and invalid" when not conducted according to the court's interpretation of the Mother Church's constitution and penal code, and it purported to reinstate him. *Id.* at 698, 708, 96 S. Ct. at 2375, 2380. But it affirmed part of the trial court's judgment, agreeing that the diocesan reorganization was invalid as beyond the Mother Church's scope of authority to do so without diocesan approval. *Id.* at 708, 96 S. Ct. at 2380.

Thirteen years after the litigation's inception, the U.S. Supreme Court reversed the Illinois Supreme Court's judgment, holding that the inquiries that the Illinois court had made "into matters of ecclesiastical cognizance and polity and [its] actions pursuant thereto contravened the First and Fourteenth Amendments." *Id.* at 698, 706–07, 96 S. Ct. at 2375, 2379.

Specifically, the Court stated that the "fallacy fatal to the judgment of the Illinois Supreme Court is that it rests upon an impermissible rejection of the decisions of the highest ecclesiastical tribunals of this hierarchical church upon the issues in dispute" and that the court had impermissibly substituted its own inquiry into church polity and the resolutions based thereon to those disputes. *Id.* at 708, 96 S. Ct. at 2380. The state supreme court's conclusion that the Mother Church's decisions were "arbitrary" was based on the court's conclusion that the Mother

67

Church had not followed its own laws and procedures in arriving at those decisions. *Id.* at 712–13, 96 S. Ct. at 2382. But, as the Court pointed out, there is no "arbitrariness" exception to the First Amendment. *Id.* at 713, 96 S. Ct. at 2382. "[R]ecognition of such an exception would undermine the general rule that religious controversies are not the proper subject of civil court inquiry, and that a civil court must accept the ecclesiastical decisions of church tribunals as it finds them." *Id.*, 96 S. Ct. at 2382.

Because the case's resolution "essentially involve[d] not a church property dispute, but a religious dispute the resolution of which . . . is for ecclesiastical and not civil tribunals," the state supreme court had overstepped its authority. *Id.* at 709, 717, 721, 96 S. Ct. at 2380, 2384, 2386 (observing that there was no dispute that questions of church discipline and the composition of the church hierarchy were at the core of ecclesiastical concern). The hierarchical church's religious bodies made the decisions to suspend and defrock the bishop, and the authority to make those decisions was vested solely in them. *Id.* at 717–18, 96 S. Ct. at 2384. And as to the diocesan reorganization, the court had impermissibly substituted its own interpretations of the diocesan and Mother Church's constitutions for that of the highest ecclesiastical tribunals in which church law vested authority. *Id.* at 720–21, 96 S. Ct. at 2386 (noting that reorganization of the diocese involved a matter of internal church government, an issue at the core of ecclesiastical affairs).

68

The Court noted in a footnote, "No claim is made that the 'formal title' doctrine by which church property disputes may be decided in civil courts is to be applied in this case."[61]  *Id.* at 723 n.15, 96 S. Ct. at 2387 n.15.  The Court observed, "Whether corporate bylaws or other documents governing the individual property-holding corporations may affect any desired disposition of the Diocesan property is a question not before us."[62]  *Id.* at 724, 96 S. Ct. at 2387.  The Court nonetheless noted that the Mother Church's decisions to defrock the bishop and to reorganize the diocese "in no way change[d] formal title to all Diocesan property, which continue[d] to be in the respondent property-holding corporations in trust for all members of the reorganized Dioceses; only the identity of the trustees is altered by the Mother Church's ecclesiastical determinations."  *See id.* at 723 n.15, 96 S. Ct. at 2387 n.15.

Accordingly, *Milivojevich* instructs us to confine our analysis to formal title, corporate bylaws, and other documents prevalent in the management of non-religious entities rather than to attempt to interpret internal church government—

---

[61]The "formal title" doctrine became the neutral principles approach.  *See Milivojevich*, 426 U.S. at 723 n.15, 96 S. Ct. at 2387 n.15.

[62]A dissenting justice would have held that the state court's jurisdiction had been invoked by both parties with regard to the church property and claims to diocesan authority, thus entitling the state court to ask "if the real Bishop of the American-Canadian Diocese would please stand up."  426 U.S. at 725–26, 96 S. Ct. at 2388 (Rehnquist, J., dissenting).

the core of which pertains not to business but rather to the mysteries of faith—and to avoid ecclesiastical determinations like any other proverbial plague.

**(e)** ***Jones v. Wolf*, 443 U.S. 595, 99 S. Ct. 3020 (1979).**

In *Jones*, the United States Supreme Court addressed a dispute over the ownership of church property following a schism in a local church affiliated with a hierarchical church organization; in particular, it considered the question of which faction of a formerly united congregation was entitled to possession and enjoyment of the disputed property. 443 U.S. at 597, 602, 99 S. Ct. at 3022, 3024. The Court once more acknowledged that the First Amendment "prohibits civil courts from resolving church property disputes on the basis of religious doctrine and practice." *Id.* at 602, 99 S. Ct. at 3025 (citing *Milivojevich*, 426 U.S. at 710, 96 S. Ct. at 2381; *Maryland*, 396 U.S. at 368, 90 S. Ct. at 500 (Brennan, J., concurring); *Presbyterian Church*, 393 U.S. at 449, 89 S. Ct. at 606). That is, a civil court can resolve a church property dispute "'so long as it involves no consideration of doctrinal matters, whether the ritual and liturgy of worship or the tenets of faith.'" *Id.*, 99 S. Ct. at 3025 (quoting *Maryland*, 396 U.S. at 368, 90 S. Ct. at 500 (Brennan, J., concurring)). It held that the neutral principles approach was consistent with the federal constitution when merely looking to the language of the deeds, the terms of the local church charters, state statutes, and the provisions of the constitution

of the general church concerning the ownership and control of church property. *Id.* at 602–03, 99 S. Ct. at 3025.

The Court approved of this methodology because before any dispute arises, a religious group could determine its priorities as to the disposition of church property and enshrine those priorities under the applicable civil law, making it easy both on themselves and the court system:

> [t]hrough appropriate reversionary clauses and trust provisions, religious societies can specify what is to happen to church property in the event of a particular contingency, or what religious body will determine the ownership in the event of a schism or doctrinal controversy [and] . . . [i]n this manner, a religious organization can ensure that a dispute over the ownership of church property will be resolved in accord with the desires of the members.
>
> . . . .
>
> . . . At any time before the dispute erupts, the parties can ensure, if they so desire, that the faction loyal to the hierarchical church will retain the church property. They can modify the deeds or the corporate charter to include a right of reversion or trust in favor of the general church. Alternatively, the constitution of the general church can be made to recite an express trust in favor of the denominational church. The burden involved in taking such steps will be minimal. And the civil courts will be bound to give effect to the result indicated by the parties, provided it is embodied in some legally cognizable form.

*Id.* at 603–04, 606, 99 S. Ct. at 3025–26, 3027.

The Court cautioned that in reviewing church documents, if the interpretation of instruments of ownership would require a civil court to resolve a religious controversy, then the court would have to defer to the resolution of the doctrinal issue by the authoritative ecclesiastical body. *Id.* at 604, 99 S. Ct. at 3026.

71

In addressing which faction was entitled to control local church property, the Court identified as a fact question for remand whether Georgia had adopted a presumptive rule of majority representation with regard to a voluntary religious association's being represented by the majority of its members or whether the corporate charter or constitution of the general church set out how the identity of the local church was to be established if not by majority rule. *Id.* at 607–08, 99 S. Ct. at 3027–28 (observing that majority rule is generally employed in the governance of religious societies and that a majority faction generally can be identified without resolving any question of religious doctrine or polity). The Court observed that if state law provided for the identity of the church to be determined according to the general hierarchical church's "laws and regulations," then the First Amendment would require the civil courts to give deference to the church's determination of the local church's identity. *Id.* at 609, 99 S. Ct. at 3028. The implicit corollary of this statement would be that if state law did *not* provide for the church's identity to be determined by the general hierarchical church's laws and regulations, then the court would need to examine everything else to identify the property's owners.[63]

---

[63]The parties have brought no such state statute to our attention—and we have found none—that would allow us to so facilely dispose of this appeal. *Cf.* Calvin Massey, *Church Schisms, Church Property & Civil Authority*, 84 St. John's L. Rev. 23, 34 (2010) ("Virginia has adopted a statute directing courts how to decide church property disputes when churches divide into contending factions." (citing Va. Code Ann. § 57-9)). On remand from the U.S. Supreme Court, the state court in *Jones* held that while the state's rebuttable presumption of majority rule could be overcome by reliance on neutral statutes, corporate charters, relevant

Accordingly, *Jones* instructs us that we must perform a non-religious-doctrine-related review, within the context of our state law, of the language of the deeds and the provisions dealing with ownership and control of property contained within the local and general churches' governing documents—i.e., the plain language to ascertain the parties' intent—but that if we attempt to divine ownership from the church's ritual and liturgy of worship or the tenets of its faith, or if interpreting the parties' documents would require us to resolve a faith-based controversy, then we veer into constitutionally-prohibited territory.

### (f) *Hosanna-Tabor Evangelical Lutheran Church & School v. E.E.O.C.,* 565 U.S. 171, 132 S. Ct. 694 (2012).

In *Hosanna-Tabor*, the Court recently addressed a related ecclesiastical matter, reviewing whether the Establishment and Free Exercise Clauses of the First Amendment bar an employment discrimination lawsuit when the employer is a religious group and the employee is one of the group's ministers. 565 U.S. at 176–77, 132 S. Ct. at 699. Cheryl Perich went from an elementary school "lay" (also known as "contract") teacher to a "called" (also known as "Minister of Religion, Commissioned") teacher—both positions of which generally performed the same duties—at a religious school. *Id.* at 177–78, 132 S. Ct. at 699–700. Following an employment dispute, Perich's employer's congregation voted to

_____

deeds, and the organizational constitutions of the denomination, none of these sources in that case disclosed a provision that would rebut the majority-rule presumption. *Jones v. Wolf*, 260 S.E.2d 84, 84–85 (Ga. 1979), *cert. denied*, 444 U.S. 1080 (1980).

73

rescind her "call," and her employment was terminated.  *Id.* at 178–79, 132 S. Ct. at 700.   After reviewing *Kedroff* and *Milivojevich*, among others, the Court reaffirmed that it is impermissible for the government to contradict a church's determination of who can act as its ministers and recognized the "ministerial exception" as to the employment relationship between a religious institution and its ministers.  *Id.* at 185–88, 132 S. Ct. at 704–06 (reasoning that to require a church to accept or retain an unwanted minister, or to punish a church for failing to do so, intrudes not upon a mere employment decision but rather interferes with the church's internal governance and infringes upon the religious group's right to shape its own faith and mission through its appointments).[64]  *But see* McConnell & Goodrich, 58 Ariz. L. Rev. at 336 (explaining that in contrast to the ministerial exception set out in *Hosanna-Tabor*, church property cases present a conflict between two church entities through which state trust and property law is used to

---

[64]In *Hosanna-Tabor*, the Court concluded that the ministerial exception applied to Perich based on the circumstances of her employment:  her ministerial title in becoming a "called" teacher reflected the six years of religious education that she had pursued to obtain the designation; her election by the congregation, "which recognized God's call to her to teach"; Perich's having claimed a religious exemption's housing allowance on her taxes; and Perich's having taught religion four days a week and led her students in prayer three times a day, performing "an important role in transmitting the Lutheran faith to the next generation."  565 U.S. at 190–92, 132 S. Ct. at 707–08.  Accordingly, the Court held that because Perich was a minister under the exception, the First Amendment required dismissal of her employment discrimination suit against her religious employer.  *Id.* at 194–95, 132 S. Ct. at 709 (observing that the exception ensures "that the authority to select and control who will minister to the faithful—a matter 'strictly ecclesiastical'—is the church's alone").

discern the church's original decision and to give legal effect to that decision, not a conflict between civil law and internal church rules).

## (2) Supreme Court of Texas Cases

### (a) *Masterson v. Diocese of Northwest Texas*, 422 S.W.3d 594 (Tex. 2013), *cert. denied*, 135 S. Ct. 435 (2014).

As instructed by our supreme court in *Episcopal Diocese*, we also look to *Masterson*. *See Episcopal Diocese*, 422 S.W.3d at 653. In *Masterson*, the court addressed what happens to property when a majority of the membership of a local church—rather than an entire diocese—votes to withdraw from the larger religious bodies of which it has previously been a part—specifically, TEC and the Episcopal Diocese of Northwest Texas. 422 S.W.3d at 596. As in the case before us, legal title to the local church's property was held by a Texas nonprofit corporation. *Id.* A doctrinal dispute with TEC led a majority of the local church's members to vote to amend the corporation's articles of incorporation and bylaws to revoke any trusts in favor of TEC or the diocese that were on the property. *Id.* at 596, 598. Predictably, a lawsuit over the property's possession and use followed. *Id.*

The court traced the parties' background, starting in 1961 when individuals bought some of the land at issue and donated it to the Northwest Texas Episcopal Board of Trustees for establishment of a mission church. *Id.* at 597. Four years later, a group of worshippers filed an application with the diocese to organize a mission, which the diocese approved. *Id.* TEC made loans and grants to the church to assist its growth. *Id.* More individuals bought more land and donated it

to the church's board of trustees, and in 1974, the church applied for parish status with the diocese and received it. *Id.* The diocesan canons required that parishes be corporations,[65] so the church incorporated under Texas law. *Id.* All of the property was conveyed to the corporation; none of the deeds to the corporation provided for or referenced a trust in favor of TEC or the diocese. *Id.*

The corporation's bylaws provided that it would be managed by a vestry elected by members of the parish and that those elected members "shall hold office in accordance with the Church Canons." *Id.* at 597 & n.1. The bylaws also described the qualifications for voting at parish meetings—being a communicant of the parish as shown on the parish register, at least sixteen years old, baptized, and a regular contributor according to the treasurer's records—and specified that amendments to the bylaws would be by majority vote at an annual parish meeting or at a special meeting called for that purpose by a majority vote of the duly qualified voters of the parish. *Id.* at 597 & nn.2–3.

Pursuant to the bylaws, the parish held a called meeting in November 2006, seeking—among other things—to amend the corporate bylaws to remove all references to TEC and the diocese and to revoke any trusts that may have been imposed on any of the corporation's property by TEC, the diocese, or the original trustees. *Id.* at 598. After the resolutions passed by majority vote, amended

---

[65]In contrast, here, under EDFW's canons, parishes and missions may form a corporation as an adjunct or instrument but may not incorporate themselves.

articles of incorporation changing the corporate name from "The Episcopal Church of the Good Shepherd" to the "Anglican Church of the Good Shepherd" were filed. *Id.* In conjunction with these acts, the majority of the church's members withdrew from the diocese and TEC and retained possession of the parish property. *Id.*

Like the first round of the case before us, in the ensuing litigation between the church's withdrawing faction and the faction that remained loyal to TEC and to the diocese, the parties' focus was on deference rather than the application of neutral principles. *Id.* at 599. The trial court and the intermediate appellate court both relied on deference to identify the continuing parish and the proper custodians of the church's property. *Id.* After reviewing both its own and U.S. Supreme Court precedent, our supreme court acknowledged the "neutral principles" methodology as the sole applicable methodology, requiring courts to decide non-ecclesiastical issues such as property ownership based on the same neutral principles of law applicable to other entities while deferring to religious entities' decisions on ecclesiastical and church polity issues. *Id.* at 596, 601–07.

The supreme court concluded that TEC is a hierarchical organization. *Id.* at 608. But the court clarified that the question of identifying who owns the property is not necessarily inextricably linked to or determined by ecclesiastical matters, explaining that

> [t]here is a difference between (1) the Bishop's determining which worshipers are loyal to the Diocese and TEC, whether those worshipers constituted a parish, and whether a parish properly established a vestry, and (2) whether the corporation's bylaws were

77

complied with when the vote occurred to disassociate the corporation from the Diocese and TEC.

*Id.* That is, the corporation, with its secular existence derived from state law and its articles of incorporation and bylaws, is subject to a neutral principles determination. *Id.* Accordingly, the court reversed the judgment of the court of appeals and remanded the case to the trial court to apply the neutral principles methodology. *Id.*

The court noted that the trial court lacked jurisdiction over whether the diocese's bishop was authorized to form a new parish and recognize its membership and whether he could or did authorize that parish to establish a vestry or recognize members of the vestry because these items were ecclesiastical matters of church governance, questions upon which the trial court properly deferred to the bishop's exercise of ecclesiastical authority. *Id.*

The court also took the opportunity, in the interest of judicial economy, to address issues likely to be raised on remand in the trial court, some of which apply directly to the case now before us and are summarized as follows:

- Absent specific, lawful provisions in a corporation's articles of incorporation or bylaws otherwise, whether and how a corporation's directors or those entitled to control its affairs can change its articles of incorporation and bylaws are secular, not ecclesiastical matters, and an external entity—under the former or current statutory scheme—is not empowered to amend them absent specific, lawful provision in the corporate documents. *Id.* at 609–10 (citing Tex. Bus. Orgs. Code § 3.009; Tex. Rev. Civ. Stat. Ann. art. 1396–2.09).

- The TEC-affiliated bishop could, as an ecclesiastical matter, determine which faction of believers was recognized by and was the "true" church loyal to the Diocese and TEC, and courts must defer to such ecclesiastical decisions, but his decision identifying the loyal faction as the continuing parish does not

78

necessarily determine the property ownership issue, and his decisions on secular legal questions such as the validity of the parish members' vote to amend the bylaws and articles of incorporation are not entitled to deference. *Id.* at 610.

- If the title to the real property is in the corporation's name and the language of the deeds does not provide for an express trust in favor of TEC or the Diocese, then the corporation owns the property. *Id.*

- As to the Dennis Canon's terms, which provide in part that "all real and personal property held by or for the benefit of any Parish, Mission or Congregation is held in trust for TEC,"—assuming, without deciding, that the Dennis Canon attempted to impose a trust on the nonprofit corporation's property and limited the nonprofit corporation's authority over the property—these terms do not make a trust *expressly* irrevocable under Texas law. *Id.* at 613. To the contrary, "[e]ven if the Canon could be read to *imply* the trust was irrevocable, that is not good enough under Texas law. The Texas statute requires *express* terms making it irrevocable." *Id.*

### (b) *Brown v. Clark*, 116 S.W. 360 (Tex. 1909).

In *Brown*, the 1909 case upon which the supreme court relied to resolve the

initial methodology issue in *Masterson* and *Episcopal Diocese*, the supreme court

was faced with a task similar to the one before us: two groups litigated over

property deeded "by different persons at different times to trustees for the

Cumberland Presbyterian Church at Jefferson, Tex." 116 S.W. at 361. One group

claimed to constitute "the church session of the Cumberland Presbyterian Church

at the city of Jefferson, Tex.," while the other claimed to be "the church session of

the Presbyterian Church in the United States of America at Jefferson, Tex." *Id.*

At the time, nationally, the Cumberland Presbyterian Church and the

Presbyterian Church of the United States of America (PCUSA) had overcome their

differences and reunited. *Id.* The members of the Jefferson church held

differences of opinion "upon the subject of reunion," and those who opposed the reunion sued those who claimed that the reunion had transferred the property to PCUSA. *Id.* at 362. Upon the conclusion of a bench trial, the trial court agreed with the PCUSA faction; the intermediate appellate court disagreed and reversed the trial court's judgment. *Id.*

The supreme court declined to address the argument that the national churches could not reunite because the highest court of the church—to which the decision of doctrine and the modification of the confession of faith were directed— had exclusive jurisdiction over that question. *Id.* at 363–64. Instead, the only question that the supreme court had jurisdiction to address was the effect the reunion had on the property when the deed's plain language was made "to the trustees of the Cumberland Presbyterian Church at Jefferson, Tex."[66] *Id.* at 364.

The supreme court concluded that the church to which the deed was made still owned the property and that "whatever body is identified as being the church to which the deed was made must still hold the title." *Id.* at 364–65. In reaching the conclusion that the property resided with the PCUSA faction, the court traced the identity from the Cumberland-PCUSA reunion, stating,

> The Cumberland Presbyterian Church at Jefferson was but a member of and under the control of the larger and more important Christian organization, known as the Cumberland Presbyterian Church, and the local church was bound by the orders and judgments of the courts of the church. The Jefferson church was not disorganized by the act of union. It remained intact as a church, losing nothing but the word

---

[66]The property had been paid for by the local church "in the ordinary way of business." *Brown*, 116 S.W. at 364.

"Cumberland" from its name. Being a part of the Cumberland Presbyterian Church, the church at Jefferson was by the union incorporated into the Presbyterian Church of the United States of America. . . . those members who recognize the authority of the Presbyterian Church of the United States of America are entitled to the possession and use of the property sued for.

*Id.* at 365. The supreme court affirmed the trial court's judgment. *Id.*

### (c) *Westbrook v. Penley*, 231 S.W.3d 389 (Tex. 2007).

Our supreme court has previously acknowledged that when a church dispute involves property or a contract and is purely secular, we have jurisdiction to consider it. *See Westbrook*, 231 S.W.3d at 398–99. *Westbrook* involved a tort action that arose from an act of church discipline (shunning) resulting from counseling performed by the church's pastor. *Id.* at 391.

The court first observed that the First Amendment prohibits governmental action, including court action, that would burden the free exercise of religion by encroaching on a church's ability to manage its internal affairs, presenting a question of subject matter jurisdiction reviewed sua sponte and de novo. *Id.* at 394 & n.3, 395 ("[T]he majority of courts broadly conceptualize the prohibition as a subject-matter bar to jurisdiction."); *see M.O. Dental Lab v. Rape*, 139 S.W.3d 671, 673 (Tex. 2004) ("[W]e are obligated to review *sua sponte* issues affecting jurisdiction."). To gauge the constitutional validity of a particular civil action, a court must identify the nature of the constitutional and other interests at stake. *Westbrook*, 231 S.W.3d at 396; *see* David J. Young & Steven W. Tigges, *Into the Religious Thicket-Constitutional Limits on Civil Court Jurisdiction over*

81

*Ecclesiastical Disputes*, 47 Ohio St. L.J. 475, 499 (1986) (describing some steps to take in analyzing intrachurch litigation). "In determining whether subject matter jurisdiction exists, courts must look to the 'substance and effect of a plaintiff's complaint to determine its ecclesiastical implication, not its emblemata.'" *Westbrook*, 231 S.W.3d at 405 (quoting *Tran v. Fiorenza*, 934 S.W.2d 740, 743 (Tex. App.—Houston [1st Dist.] 1996, no writ). The difficulty comes in determining whether a particular dispute is "ecclesiastical" or simply a civil law controversy in which church officials happen to be involved. *Tran*, 934 S.W.2d at 743 (holding that whether priest had been excommunicated—divesting him of his priestly authority—was unavoidably an ecclesiastical matter even if the truth of that fact would bar his defamation claim).

"'Membership in a church creates a different relationship from that which exists in other voluntary societies formed for business, social, literary, or charitable purposes.'" *Westbrook*, 231 S.W.3d at 398 (quoting *Minton v. Leavell*, 297 S.W. 615, 622 (Tex. Civ. App.—Galveston 1927, writ ref'd)). Because a church's autonomy in managing its affairs has long been afforded broad constitutional protections, the court must ask whether its decision of the issues would "unconstitutionally impede the church's authority to manage its own affairs." *Id.* at 397.

Ultimately, in *Westbrook*, the court concluded that subjecting the church's pastor to tort liability for professional negligence as a counselor for engaging the church's disciplinary process once facts were revealed that triggered such

82

discipline would have a "chilling effect" on the church's ability to discipline members and deprive churches of their right to construe and administer church laws. *Id.* at 400. The court reasoned that

> while the elements of Penley's professional-negligence claim can be *defined* by neutral principles without regard to religion, the *application* of those principles to impose civil tort liability on Westbrook would impinge upon [the church's] ability to manage its internal affairs and hinder adherence to the church disciplinary process that its constitution requires.

*Id.* The secular confidentiality interest represented by Penley's professional-negligence claim failed to override the strong constitutional presumption that favors preserving the church's interest in managing its affairs, particularly when the pastor's actions did nothing to endanger Penley's or the public's health or safety. *Id.* at 402, 404. The values underlying the constitutional interest in prohibiting judicial encroachment upon a church's ability to manage its affairs and discipline its members, who have voluntarily united themselves to the church body and impliedly consented to be bound by its standards, must be zealously protected, and when presented with conflicting interests like those presented in *Westbrook*, generally "a 'spirit of freedom for religious organizations' prevails, even if that freedom comes at the expense of other interests of high social importance." *Id.* at 403 (internal citations omitted). Accordingly, after liberally construing Penley's pleadings, the court held that the trial court properly dismissed the case on Westbrook's plea to the jurisdiction. *Id.* at 405.

### (3) Intermediate Appellate Court Cases

This court's cases involving churches have run the gamut, from the relationship between a church and its ministers, which we recognized as of "prime ecclesiastical concern," to whether a church incorporated under the nonprofit corporations act gave proper notice of a business meeting. *Compare Smith v. N. Tex. Dist. Council of Assemblies of God & House of Grace*, No. 02-05-00425-CV, 2006 WL 3438077, at *3 (Tex. App.—Fort Worth Nov. 30, 2006, no pet.) (mem. op.) (affirming dismissal for want of jurisdiction when appellants sued for declaration that church's district council did not follow church constitution, bylaws, and rules of procedure and for a division of church's assets between two congregations), *Dean v. Alford*, 994 S.W.2d 392, 395 (Tex. App.—Fort Worth 1999, no pet.) (holding that the vote on a pastor's removal in a congregational church involved a purely ecclesiastical, administrative matter), *and Patterson v. Sw. Baptist Theological Seminary*, 858 S.W.2d 602, 603–04 (Tex. App.—Fort Worth 1993, no writ) (affirming dismissal in wrongful termination suit because case essentially involved a religious dispute, the "key inquiry under the First Amendment [being] whether a religious organization is making an ecclesiastical decision"), *with Kelly v. Church of God In Christ, Inc.*, No. 02-10-00047-CV, 2011 WL 1833095, at *13 n.18 (Tex. App.—Fort Worth May 12, 2011, pet. denied) (mem. op.) (avoiding issue of whether negligence claims were barred by First Amendment by concluding that the trial court properly granted summary judgment on the negligence claims), *and Randolph v. Montgomery*, No. 02-06-00087-CV, 2007 WL 439026, at *1–2

(Tex. App.—Fort Worth Feb. 8, 2007, no pet.) (mem. op.) (holding no intrusion into ecclesiastical matters when issue was whether proper notice of business meeting was given by church incorporated under nonprofit corporations act and trial court merely had to apply statute's plain language and apply neutral principles of law). Yet, to the extent the application of neutral principles requires discussion and analysis, the issues now before us appear to be of first impression. *Cf. Smith*, 2006 WL 3438077, at *3.[67] This is not so with some of our sister courts.

For example, the Amarillo court discussed the issue in *African Methodist Episcopal Church, Allen Chapel v. Independent African Methodist Episcopal Church* (*AMEC*), within the context of what the case was not: "[T]his is *not* one of

---

[67] *Smith* involved an intracongregational dispute that arose after some church members unsuccessfully sought a division of church assets. 2006 WL 3438077, at *1. One of the complaints raised in the ensuing litigation was that the church constitution, bylaws, and rules of procedure had not been followed. *Id.* at *2. We agreed that the trial court correctly dismissed the case for want of jurisdiction when the plaintiffs' claims asked the trial court to determine matters involving clergy, church discipline, and ecclesiastical governance. *Id.* We noted that the difficulty—as here—lies in determining whether a particular dispute is ecclesiastical or simply a civil law controversy in which church officials happen to be involved. *Id.* at *3. We held that "[m]atters involving the interpretation of church bylaws and constitutions, the relationship between an organized church and its minister, and the division of church assets are all ecclesiastical concerns." *Id.* (citing *Milivojevich*, 426 U.S. at 708–09, 724–25, 96 S. Ct. at 2380, 2387–88). However, per the supreme court's instructions in *Episcopal Diocese* and *Masterson*, we are required to consider the division of church assets insofar as we can determine ownership through the application of neutral principles and are required in that analysis to consider church bylaws and constitutions. *See Episcopal Diocese*, 422 S.W.3d at 651–52; *see also Masterson*, 422 S.W.3d at 606 (observing that many disputes "will require courts to analyze church documents and organizational structures to some degree").

those suits where the local congregation becomes divided and each division claims to have the right to the property to the exclusion of the other members." 281 S.W.2d 758, 759 (Tex. Civ. App.—Amarillo 1955, writ ref'd n.r.e.) (emphasis added). In *AMEC*, all of the property was bought and paid for by the local church, the deed was made out to the trustees of the African Methodist Church of Vernon and not to the mother church, and the entire membership of the local church— including the pastor—quit the mother church. *Id.* at 759–60. When *all* of the members withdrew from the mother church, dissolved the local church, and organized under the name of Independent AMEC of Vernon, Texas, because the trustees held the property in trust for the benefit of those who had bought and paid for it, the court concluded that the property belonged to the local church. *Id.* at 760. Part of the rationale, however, was that this case preceded the ability of unincorporated nonprofit associations to hold property in any form other than under trustees. *See id.*; *cf.* Tex. Bus. Orgs. Code Ann. § 252.003 (West 2012) (providing that nonprofit associations may acquire, hold, encumber, and transfer real and personal property in this state).

The Texarkana court discussed the issue before us in *Presbytery of the Covenant v. First Presbyterian Church of Paris, Inc.*, 552 S.W.2d 865 (Tex. Civ. App.—Texarkana 1977, no writ). In that case, the majority of the members of the First Presbyterian Church of Paris sought to withdraw from the national church, PCUSA, and to affiliate with another group. *Id.* at 867. The Presbytery of the Covenant—one of PCUSA's governing layers—sought to prevent the withdrawing

86

faction from taking possession of and asserting ownership to the church property, and the withdrawing faction sued the Presbytery and others to try title. *Id.* After a jury trial, the trial court rendered judgment for the withdrawing faction. *Id.* The appellate court reversed the trial court's judgment. *Id.* at 872.

On appeal, the court determined that prior to June 17, 1973—the date of the attempted withdrawal—there was only one First Presbyterian Church of Paris, which was affiliated with PCUSA and which had acquired all of the real property involved at a time when there was no disagreement over the church property. *Id.* at 867–69. Each of the deeds named as grantee either First Presbyterian Church of Paris U.S. or the corporation First Presbyterian Church U.S. of Paris, Inc., which was chartered in Texas in 1966 to hold property for the First Presbyterian Church of Paris U.S. *Id.* at 869. On February 13, 1973, the Presbytery established an administrative commission in anticipation that some of the local congregations might attempt to withdraw from PCUSA and a pastoral letter required written notices prior to calling a congregational meeting to consider a proposal to withdraw. *Id.* The required written notices were not given; rather, on June 10, 1973, oral notice was given from the pulpit of the congregational meeting to be held on June 17 to consider a resolution to withdraw from PCUSA. *Id.*

At the June 17, 1973 meeting, 101 of the 149 members on the church's active roll attended the meeting and voted for the withdrawal. *Id.* The Presbytery turned the matter over to the administrative commission, which began a process that resulted in the formal suspension and divestiture of the local church's

87

leadership, and in July 1973, the commission declared that the action taken to withdraw was null and void. *Id.* at 869–70. The withdrawing faction transferred the real property and assets owned by the First Presbyterian Church of Paris U.S. to a corporation that they attempted to create by way of an amendment to the charter of the First Presbyterian Church U.S. of Paris, Inc., and they affiliated with a schismatic organization, the Vanguard Presbytery of the Continuing Presbyterian Church. *Id.* at 870. Of the 149 members, 30 signed statements of loyalty and desire to remain in the PCUSA-recognized church, and on September 13, 1973, the administrative commission recognized them as constituting the First Presbyterian Church of Paris U.S. *Id.*

The Texarkana court first identified the two general types of religious organizations recognized in the law: (1) congregational, which is strictly independent of any other ecclesiastical association and owes no fealty or obligation to any higher authority, and (2) hierarchical, in which the local congregation is but a subordinate member of some general church organization in which there are superior ecclesiastical tribunals with general and ultimate power of control more or less complete in some supreme judicatory over the whole membership of that general organization. *Id.* PCUSA—like TEC—is recognized as a hierarchical church, "at least as to ecclesiastical matters and church government." *Id.*

The Texarkana court acknowledged that civil courts' power to resolve disputes relating to church property was restricted to an adjudication of property

rights by the application of neutral principles of law developed for use in all property disputes and that when a hierarchical organization is involved, the decisions of the highest church judicatory to which the question has been taken, as to questions of church discipline or government, are—so far as they are relevant—final and binding on the civil courts, subject only to narrow review if found to have resulted from fraud or collusion. *Id.* at 870–71. With regard to the issue before it, the Texarkana court recited that

> [w]hen a division occurs in a local church affiliated with a hierarchical religious body, and a dispute arises between rival groups as to the ownership or control of the local church property, the fundamental question as to which faction is entitled to the property is answered by determining which of the factions is the representative and successor to the church as it existed prior to the division, and that is determined by which of the two factions adheres to or is sanctioned by the appropriate governing body of the organization. *It is a simple question of identity.* In making such a determination, the civil court exercises no role in determining ecclesiastical questions. It merely settles a dispute as to identity, which in turn necessarily settles a dispute involving property rights. In doing so, the court applies neutral principles of law . . . .

*Id.* at 871 (citations omitted) (emphasis added).

Accordingly, the court reasoned that prior to June 17, 1973, the First Presbyterian Church of Paris U.S. and all of its members were part of PCUSA's organization, and there was no question that members dissatisfied with PCUSA's actions could withdraw their membership from the First Presbyterian Church of Paris U.S. and thus their affiliation with PCUSA. *Id.* But by their unilateral action, the withdrawing members could not dissolve the local church that was an integral part of PCUSA when the PCUSA constitution expressly vested in the presbytery

89

the power to dissolve a local church.  *Id.*  When the local church was not dissolved and still existed after June 17, it became the prerogative of PCUSA's governing judicatories to determine who constituted the lawful congregation of the First Presbyterian Church of Paris U.S.  *Id.*  Because the loyal faction had submitted itself to PCUSA's judicatories and had been recognized as such as the duly existing local congregation, they had "the identity to make of them the First Presbyterian Church of Paris U.S., and they are entitled to possession and control of the property conveyed to that church."  *Id.*

Specifically, despite the vote by the majority to withdraw from PCUSA, the members of a church organization "which is hierarchical as to church government cannot dissolve a local church in contravention of the governing rules or edicts of the mother church, and then re-establish themselves as an independent church or one associated with a schismatic group and take the church property with them." *Id.* at 871–72.  The church existed prior to the schism, still existed, and was composed of those members who remained loyal to PCUSA and who had been recognized by the governing judicatories as the local church.  *Id.* at 872.  The question of the church's right to withdraw from PCUSA without the consent of the Presbytery was one of church government determined adversely to the withdrawing faction by the appropriate church tribunals.  *Id.*; *see also Green*, 808 S.W.2d at 548–49, 552 (relying on *Presbytery of the Covenant* to affirm trial court's judgment awarding possession of church property to loyalist group affiliated with United Pentecostal Church International, Inc., a hierarchical church, which had

90

adopted UPCI's bylaws for local church government prior to the dispute over property ownership). *But see Masterson*, 422 S.W.3d at 605 & n.5 (listing *Presbytery of the Covenant* as one of the court of appeals cases reading *Brown* as applying a deference approach and applying deference principles to hierarchical church property dispute cases); *Schismatic & Purported Casa Linda Presbyterian Church in Am. v. Grace Union Presbytery, Inc.*, 710 S.W.2d 700, 705 (Tex. App.—Dallas 1986, writ ref'd n.r.e.) (stating that although the Texarkana court purported to apply neutral principles in *Presbytery of the Covenant*, "the court in fact applied the deference rule in reaching its decision"),[68] *cert. denied*, 484 U.S. 823 (1987).

Because the foregoing cases involved facts, legal principles, and analysis similar to those facing us here, they provide guidance to us in conducting our analysis.

---

[68]Constitutionally speaking, the court in *Presbytery of the Covenant* did not have a choice about applying deference in that case. Deed construction was not an issue because each of the deeds named either First Presbyterian Church of Paris U.S. or the First Presbyterian Church of Paris U.S., Inc. as grantee. 552 S.W.2d at 869. Instead, the primary questions before the court were (1) whether PCUSA was hierarchical or congregational as to property and (2) who was the "First Presbyterian Church of Paris U.S."? *Id.* at 868, 870–72. The court's answer to the first question—PCUSA was hierarchical—determined the answer to the second. *Id.* at 870–72; *see Brown*, 116 S.W. at 364–65 (holding that the church that recognized the authority of PCUSA was "identified as being the church to which the deed was made").

91

### (4) Other States' Cases

Because other courts have previously faced strikingly similar facts, we also examine these cases to determine how those situations have been resolved.

### (a) Diocese of San Joaquin

The annual convention of the Diocese of San Joaquin voted to leave TEC and affiliate with the Anglican Province of the Southern Cone in December 2007. *Diocese of San Joaquin*, 202 Cal. Rptr. 3d at 57. In January 2008, TEC disciplined then-Bishop John-David Schofield, and Presiding Bishop Schori ordered him to stop all "episcopal, ministerial, and canonical acts, except as relate to the administration of the temporal affairs of the Diocese of San Joaquin." *Id.* Approximately a week later, Schofield filed with the California Secretary of State an amendment to the articles of incorporation of the corporation sole[69] to change its name from "The Protestant Episcopal Bishop of San Joaquin" to "The Anglican Bishop of San Joaquin." *Id.* He represented in the document that the amendment had been duly authorized by the diocese, whose consent by annual convention was required; however, the annual convention had neither considered nor authorized any such amendment. *Id.* at 56–57.

Presiding Bishop Schori issued Schofield's deposition on March 12, 2008, terminating and vacating his ecclesiastical and related secular offices. *Id.* at 57–

---

[69]Under California law, a corporation sole is a perpetual entity through which a religious organization can administer and manage property dedicated to the benefit of that organization. *Diocese of San Joaquin*, 202 Cal. Rptr. 3d at 56 n.1.

58. Nonetheless, on March 27, 2008, Schofield began retitling twenty-seven pieces of real property, first granting them to "The Anglican Bishop of San Joaquin, a Corporate Sole," and then transferring them to the "Anglican Diocese Holding Corporation," which he had formed to perform the same function as the corporation sole and to protect the property from the provisional bishop elected by the minority of parishes and members who had not seceded from TEC. *Id.* at 58. In its lawsuit, TEC and its affiliated diocese sought to reclaim possession of property, among other things. *Id.* California's intermediate appellate court concluded that the dispute regarding the identity of the incumbent "Episcopal Bishop of the Diocese of San Joaquin" was "quintessentially ecclesiastical," as was the continuity of the diocese as an entity within TEC. *Id.* at 58–59. On remand, it instructed the trial court to apply neutral principles of law to resolve the property disputes on the remaining causes of action. *Id.* at 59.

At trial, the parties stipulated that all of the dates of Schofield's transfer of the property had occurred after he had been removed as TEC's bishop. *Id.* Accordingly, the trial court concluded that the property transfers were void either because the property was held in trust for TEC or because Schofield lacked the authority to make the transfers. *Id.* at 59–60.

On appeal, the court noted that deciding whether a diocese can leave TEC does not resolve the property dispute; rather, sources such as deeds, bylaws, articles of incorporation, and relevant statutes must be considered under the neutral principles analysis. *Id.* at 63–64. The court also observed that the trial

93

court erred in its trust finding because the Dennis Canon imposed by its terms an express trust in favor of TEC on property held by a parish, not by a diocese. *Id.* at 64. It refused to imply a trust on church property because that

> almost inevitably puts the civil courts squarely in the midst of ecclesiastical controversies, in that every dispute over church doctrine that produces strongly held majority and minority views forces the court to determine the true implied beneficiaries of the church entities involved. The court would be required to determine which faction continued to adhere to the "true" faith. This is something a civil court is not permitted to do. "If the civil courts cannot properly determine which competing group is the bearer of the true faith, they cannot determine for whose benefit title to church property is impliedly held in trust."

*Id.* (quoting *Barker*, 171 Cal. Rptr. at 551).

The court looked at how title to the property was held and the structure of the corporation sole when Schofield attempted to make the transfers. *Id.* The validity of the 2007 amendments to the diocesan constitution and canons were not determinative because the corporation sole, not the diocese, held title to the property. *Id.* Because TEC had ordered Schofield to continue administering the diocese's temporal affairs in the January 11, 2008 order, he remained the chief officer of the corporation sole until he was deposed on March 12, 2008. *Id.* at 65. However, his attempted amendment was not authorized at the 2007 diocesan convention as required to be valid under California law. *Id.* at 65. And the diocesan convention did not attempt to ratify the action of the diocesan council in trying to amend the canon requiring title of the corporation sole to be "The Protestant

94

Episcopal Bishop of San Joaquin" until October 2008. *Id.* at 65–66. Thus, under the terms of the diocese's canons, the amendment was invalid. *Id.* at 66.

Consequently, Schofield's January 22, 2008 attempt to amend the articles of incorporation was invalid and of no effect. *Id.* And because that amendment was invalid, his attempt to transfer property from the corporation sole known as "The Protestant Episcopal Bishop of San Joaquin" to "The Anglican Bishop of San Joaquin, a Corporation Sole" also failed, because no such entity existed when he executed and recorded those deeds between March and August 2008. *Id.* Likewise, Schofield's attempt to transfer the disputed property from "The Anglican Bishop of San Joaquin, a Corporation Sole" to "The Anglican Diocese Holding Corporation" also failed, and title therefore remained with the Protestant Episcopal Bishop of San Joaquin. *Id.* at 66–67. The court affirmed the judgment returning the property to TEC and the TEC-affiliated diocese. *Id.* at 67.

### (b) Diocese of Quincy

The Diocese of Quincy voted to end its association with TEC and entered into membership with the Anglican Church of the Southern Cone in November 2008. *Diocese of Quincy*, 2014 IL App (4th) 130901, ¶¶ 1, 9, 14 N.E.3d at 1249–50. The dissenters formed the "Diocese of Quincy of the Episcopal Church," and they and TEC (collectively, the TEC dissenters) informed the bank holding approximately $3 million in church assets that a dispute had arisen over the funds' ownership. *Id.* ¶ 1, 14 N.E.3d at 1249. After the bank froze the assets, all parties sought a declaratory judgment on the assets' ownership. *Id.* ¶ 2, 14 N.E.3d at

95

1249. After a three-week bench trial, the trial court, applying neutral principles of law, found against the TEC dissenters and issued twenty-one pages of findings with its order. *Id.* ¶¶ 2, 19, 27, 14 N.E.3d at 1249, 1252–53.

In affirming the trial court's judgment, the court recounted that in 1893, the diocese had formed a state nonprofit corporation called "The Trustees of Funds and Property of the Diocese of Quincy" (hereafter, Corporation #1) to hold, manage, and distribute the diocese's funds. *Id.* ¶ 6, 14 N.E.3d at 1249–50. TEC was not a party to the 1999 contract between the bank and Corporation #1. *Id.* ¶ 7, 14 N.E.3d at 1250. Then in 2005, the diocese incorporated as a state nonprofit corporation called the Diocese of Quincy (hereafter, Corporation #2). *Id.* ¶ 8, 14 N.E.3d at 1250. Corporation #2's directors were members of the diocese, and in March 2009, Corporation #2 filed its annual corporate report with the state, listing its directors. *Id.* ¶¶ 8, 10, 14 N.E.3d at 1250. In April 2009, TEC declared void the diocese's November 2008 decision to disaffiliate and elected a new bishop and other new leaders for the diocese. *Id.* ¶ 12, 14 N.E.3d at 1250. That same month, Corporation #1 filed its annual report with the state, listed its directors, and amended its bylaws to remove references to TEC. *Id.* ¶ 11, 14 N.E.3d at 1250. Corporation #1's amended bylaws provided that directors did not have to be Illinois residents but "shall be communicants in good standing with their parish or mission church within the Diocese of Quincy." *Id.*, 14 N.E.3d at 1250. TEC asked the court to hold that the individuals listed as directors of Corporations #1 and #2 had

96

vacated their offices by leaving TEC and to declare the new persons that had been elected as the corporations' directors. *Id.* ¶ 17, 14 N.E.3d at 1251.

The court observed that Illinois had adopted the neutral principles approach, "whereby a court may objectively examine pertinent church characteristics, constitutions and bylaws, deeds, state statutes, and other evidence to resolve the matter as it would a secular dispute." *Id.* ¶ 44, 14 N.E.3d at 1256. The court further noted that deference is unavailable when the determination of a church's hierarchical structure is not easily discernible. *Id.* ¶ 47, 14 N.E.3d at 1256. It pointed out that the trial court—after hearing conflicting evidence—had concluded that it could not "constitutionally determine the highest judicatory authority or the locus of control regarding the property dispute to which it would be required to defer," because the diocese's status as a subordinate in a hierarchy was "not clear or readily apparent," rendering deference unavailable. *Id.* ¶¶ 20–22, 27, 47, 14 N.E.3d at 1252–53, 1256; *cf. Masterson*, 422 S.W.3d at 608 ("We agree with the court of appeals that the record conclusively shows TEC is a hierarchical organization.").

Because the central matter underlying the parties' dispute was "who owns the disputed property," the court did not have to determine whether the diocese could leave TEC or identify the leaders of the continuing diocese. *Diocese of Quincy*, 2014 IL App (4th) 130901, ¶ 48, 14 N.E.3d at 1257. For the property at issue—funds in the bank account and the deed to the "Diocesan House"—the deed reflected that title to the property was held by Corporation #1, and its language did

97

not provide for an express trust in favor of TEC; TEC was likewise not a party to the contract between Corporation #1 and the bank, and it was undisputed that TEC had never had any involvement with the bank account. *Id.* ¶ 50, 14 N.E.3d at 1257. The corporations were not organized under Illinois's Religious Corporation Act, which would have imposed certain requirements on the incorporating body with regard to trustee membership. *Id.* ¶ 51, 14 N.E.3d at 1257. And the evidence—including the deed, the bank contract, and the diocese's constitution and canons—revealed nothing to show an express or implied trust or any other interest vested in TEC. *Id.* ¶ 54, 14 N.E.3d at 1258. The Dennis Canon provided that parish property was held in trust for the diocese and TEC but included no "similar language with respect to diocesan property being held in favor of" TEC. *Id.*, 14 N.E.3d at 1258. Accordingly, the court affirmed the trial court's judgment.[70] *Id.* ¶ 57, 14 N.E.3d at 1259.

---

[70]In *Diocese of San Joaquin*, the court distinguished *Diocese of Quincy*, observing that the Quincy diocese (Corporation #2) was incorporated as a nonprofit corporation under Illinois law and the property was held, managed, and distributed by another nonprofit corporation (Corporation #1), the directors of whom were members of Corporation #2. 202 Cal. Rptr. 3d at 60–61. In contrast, in the San Joaquin Diocese, the property was held in the name of the corporation sole with the incumbent bishop as the single officeholder. *Id.* at 61. The *San Joaquin* court noted that because the Quincy diocese was organized under the Illinois Not-For-Profit Corporation Act instead of the Illinois Religious Corporation Act, TEC had no authority to remove and replace the incorporated diocese's directors, whereas TEC had more influence and control over the California corporation sole because any amendments to its articles of incorporation had to be "authorized by the religious organization." *Id.* (observing that under the Illinois Religious Corporation Act "a trustee of a religious corporation can be removed from office for, inter alia, abandonment of the denomination"); *see* 805 Ill. Comp. Stat. Ann. 110/46d (West, Westlaw through 2018 Legis. Sess.) (providing that the

### (c) Diocese of South Carolina

During the pendency of this appeal, the Supreme Court of South Carolina issued an opinion—or rather, five opinions, as each justice wrote separately—touching on some of the issues before us. *See Protestant Episcopal Church in the Diocese of S.C. v. The Episcopal Church*, 806 S.E.2d 82, 84, 93 (S.C. 2017), *pet. for cert. filed*, No. 17-1136 (Feb. 9, 2018). As recounted by one of the justices, a majority of three agreed that in secular church disputes, neutral principles of law should be applied to resolve the case, while a different majority of three held that, with regard to the twenty-eight church organizations that acceded to the Dennis Canon, a trust in favor of TEC is imposed on the property, putting title in the national church. *Id.* at 125 n.72 (Toal, Acting J., dissenting).

### (5) Commentary

Unsurprisingly, cases involving church property have attracted a number of scholarly articles weighing in on various aspects of the tension between the First Amendment and state secular law. *See* McConnell & Goodrich, 58 Ariz. L. Rev. at 321–22 (observing the common pattern of church property disputes and the arguments made by each side); Valerie J. Munson, *Fraud on the Faithful? The*

---

trustee of a corporation organized under the Illinois Religious Corporation Act "may be removed from office whenever his office shall be declared vacant . . . for an abandonment of the faith of the congregation, church, society, sect, or denomination, or for failure to observe the usages, customs, rules, regulations, articles of association, constitution, by-laws or canons of the congregation, church or society, or of the ecclesiastical body, or diocesan, or like ecclesiastical officer, having jurisdiction over any ecclesiastical district or diocese).

*Charitable Intentions of Members of Religious Congregations & the Peculiar Body of Law Governing Religious Property in the United States*, 44 Rutgers L.J. 471, 509 (2014) (observing that history suggests that religion-based property disputes will always be around and that "the only constant in that body of law has been its utter inconsistency and uncertainty"); Bertie D. Jones, *Litigating the Schism & Reforming the Canons: Orthodoxy, Property & the Modern Social Gospel of the Episcopal Church*, 42 Golden Gate U. L. Rev. 151, 215 (2012) (asserting that the property disputes within TEC are about theology and proposing that ecclesiastical property courts would be more efficient to determine the Dennis Canon trust question); R. Gregory Hyden, Comment, *Welcome to the Episcopal Church, Now Please Leave: An Analysis of the Supreme Court's Approved Methods of Settling Church Property Disputes in the Context of the Episcopal Church & How Courts Erroneously Ignore the Role of the Anglican Communion*, 44 Willamette L. Rev. 541, 560 (2008) ("By ignoring the judicatory procedures outside of the national polity of the Episcopal Church, courts are not following the principles they set out for a hierarchical church in either a deference approach or a neutral principles approach."); Jeffrey B. Hassler, Comment, *A Multitude of Sins? Constitutional Standards for Legal Resolution of Church Property Disputes in A Time of Escalating Intradenominational Strife*, 35 Pepp. L. Rev. 399, 455 (2008) ("Churches have not ordered their affairs in ways that lend themselves to easy civil court resolution."); Fennelly, 9 St. Thomas L. Rev. at 357 ("The unintended consequence of neutral principles has been . . . an unwarranted intrusion into a

sphere that lies outside government's legitimate boundaries of authority."); Patty Gerstenblith, *Civil Court Resolution of Property Disputes Among Religious Organizations*, 39 Am. U. L. Rev. 513, 519–20 (1990) (observing that Supreme Court jurisprudence that grants greater deference in property disputes to hierarchical religious organizations than to congregational religious organizations "would seem to create a structural relationship violative of the establishment clause"). These commentaries have provided valuable guidance to us.

### (6) Summary

Under the neutral principles methodology, we are required to apply neutral principles of law to issues such as land titles, trusts, and corporate formation, governance, and dissolution, even when religious entities are involved, *Masterson*, 422 S.W.3d at 606, and "what happens to the property is not [an ecclesiastical matter], unless the congregation's affairs have been ordered so that ecclesiastical decisions effectively determine the property issue." *Id.* at 607. That is, as set out above, per *Jones* and *Milivojevich*, we must perform a non-religious-doctrine-related review of the plain language of the deeds and the provisions dealing with ownership and control of property contained within the local and general churches' governing documents, confining ourselves to formal title, corporate documents, and other items used in the secular world to determine ownership issues, while avoiding questions about the tenets of faith, including any religious test as to the parties' leadership or identity. If a case requires the court only to interpret a contract or deed but not to intervene in matters of church discipline, internal

101

administration, or membership—or matters of morality or church doctrine—then it should be a simple matter to resolve a basic civil law controversy that just happens to involve a church. *See Episcopal Diocese*, 422 S.W.3d at 650 (stating that under neutral principles, courts "defer to religious entities' decisions on ecclesiastical and church polity issues such as who may be members of the entities and whether to remove a bishop" while deciding issues like property ownership and the existence of a trust "on the same neutral principles of secular law that apply to other entities"). But whether the application of the neutral principles approach is unconstitutional depends on how it is applied. *Id.* at 651; *see also Westbrook*, 231 S.W.3d at 400, 403. *Milivojevich*, *Kedroff*, and *Hosanna-Tabor* warn us, at all costs, to avoid becoming unconstitutionally entangled in the parties' theological, hierarchical web of who is or can be the "real" bishop or diocese for religious purposes. We have translated these and other strictures into a flow chart.



103

*See* Young & Tigges, 47 Ohio St. L.J. at 498–99 ("[I]ndeed it is the presence of such a doctrinal issue which turns a case concerning church discipline, organization, or government into an ecclesiastical one calling for deference. Once a doctrinal question is present in a case, it cannot be avoided through neutral principles or any other approach." (footnote omitted)); *see also* Hyden, 44 Willamette L. Rev. at 569–70 (recommending that courts should ensure that churches wishing to disaffiliate have first exhausted all remedies available to them within the structure of the national and international church and, if so, then give the deference courts traditionally give to administrative agency decisions). *Compare Gonzalez v. Roman Catholic Archbishop of Manila*, 280 U.S. 1, 16, 50 S. Ct. 5, 7–8 (1929) (observing that in the absence of fraud or collusion, "the decisions of the proper church tribunals on matters purely ecclesiastical, although affecting civil rights, are accepted in litigation before the secular courts as conclusive, because the parties in interest made them so by contract or otherwise"), *and Singh v. Sandhar*, 495 S.W.3d 482, 490 (Tex. App.—Houston [14th Dist.] 2016, no pet.) ("While the Supreme Court left open the possibility that fraud or collusion claims may serve as vehicles for civil court review of ecclesiastical decisions, we have found no Texas case that has applied such an exception."), *with Libhart*, 949 S.W.2d at 794 (citing a Washington case for the proposition that when church proceedings are tainted by fraud, judicial review is appropriate).[71]

---

[71]In considering whether a former pastor fraudulently misrepresented material facts in selling church facilities, the *Libhart* court quoted the Supreme

### b. State Substantive Law

Within the neutral principles framework, we must consider our state's associations, corporations, and trust law as applicable to the case.

### (1) Associations Law

EDFW is a Texas nonprofit association governed by chapter 252 of the business organizations code. *See* Tex. Bus. Orgs. Code Ann. §§ 1.103, 252.001 (West 2012). These days, a nonprofit association may be the beneficiary of a trust, contract, or will. *See id.* § 252.015 (noting that until September 1, 1995, a nonprofit association could not hold an estate or interest in real or personal property, so the interest was held in trust by a fiduciary, but after September 1, 1995, the fiduciary could transfer the interest to the nonprofit association in the nonprofit's name). The nonprofit association is separate from its members for purposes of determining and enforcing its rights, duties, and liabilities in contract and tort. *Id.* § 1.002(57)–(58) (West Supp. 2017), §§ 3.002, 252.006(a) (West 2012). Under chapter 252, a "member" is a person who, under the association's rules or practices, may participate in the selection of persons authorized to manage association affairs or in the development of association policy. *Id.* § 252.001(1). "A member of, or a

---

Court of Washington as prohibiting the use of "chicanery, deceit, and fraud" to divert church property "to a purpose entirely foreign to the purposes of the organization[] for . . . selfish benefit." 949 S.W.2d at 794 (quoting *Hendryx v. People's United Church of Spokane*, 84 P. 1123, 1127 (Wash. 1906)). The parties in the instant case have not specified any fraud claims.

person considered as a member by, a nonprofit association may assert a claim against the nonprofit association," and vice versa. *Id.* § 252.006(d).

"It is generally held that the constitution and by-laws of a voluntary association, whether incorporated or not, are controlling as to its internal management." *Dist. Grand Lodge No. 25 Grand United Order of Odd Fellows v. Jones*, 160 S.W.2d 915, 922 (Tex. 1942); *Juarez v. Tex. Ass'n of Sporting Officials El Paso Chapter*, 172 S.W.3d 274, 279 (Tex. App.—El Paso 2005, no pet.) ("[T]he courts of this state recognize the right of a private association to govern its own affairs."). Texas courts have recognized that an association's bylaws constitute a contract between the parties. *Monasco v. Gilmer Boating & Fishing Club*, 339 S.W.3d 828, 838 n.14 (Tex. App.—Texarkana 2011, no pet.). *But see Westbrook*, 231 S.W.3d at 398 (quoting *Minton*, 297 S.W.2d at 621–22, for the proposition that church membership creates a different relationship from that of other voluntary associations); *Harden v. Colonial Country Club*, 634 S.W.2d 56, 60 (Tex. App.— Fort Worth 1982, writ ref'd n.r.e.) (stating that a suit on bylaws and policies is not the type of breach-of-contract suit contemplated by the legislature with regard to the recovery of attorney's fees). The constitution and bylaws of an association confer no legal rights on nonmembers. *Schooler v. Tarrant Cty. Med. Soc'y*, 457 S.W.2d 644, 647 (Tex. Civ. App.—Fort Worth 1970, no writ).

By becoming a member of an association, an individual "subjects himself, within legal limits, to the association's power to administer as well as its power to make its rules." *Harden*, 634 S.W.2d at 59. The actions of the association's

106

leadership are permissible and binding on the association's membership so long as they are not illegal, against some public policy, or fraudulent. *Id.* at 60 (refusing judicial intervention in association's internal dispute over rules pertaining to sale of country club membership); *see also Whitmire v. Nat'l Cutting Horse Ass'n*, No. 02-08-00176-CV, 2009 WL 2196126, at *4 (Tex. App.—Fort Worth July 23, 2009, pet. denied) (mem. op.) ("Judicial review is only proper when the actions of the organization are illegal, against some public policy, arbitrary, or capricious."). *But see Milivojevich*, 426 U.S. at 713, 96 S. Ct. at 2382 (disavowing an exception for arbitrariness as to religious associations). Legislative enactment dictates what is public policy in this state. *See Dist. Grand Lodge No. 25*, 160 S.W.2d at 920; *see also Dickey v. Club Corp. of Am.*, 12 S.W.3d 172, 177 (Tex. App.—Dallas 2000, pet. denied) (holding that membership in a golf club is not a valuable property right, particularly when plaintiffs did not allege gender inequity or discrimination and there was no claim of fraud or illegality, and that "[i]f the courts were to intervene each time members of a golf club felt that restrictions on tee times were unreasonable, operation of such clubs would become unmanageable and valuable judicial resources would be wasted"). Complaints that attract judicial review are those that "allege a wholesale deprivation of due process or the opportunity to be heard in violation of some civil or property right." *Whitmire*, 2009 WL 2196126, at *5; *see Stevens v. Anatolian Shepherd Dog Club of Am., Inc.*, 231 S.W.3d 71, 74–75 (Tex. App.—Houston [14th Dist.] 2007, pet. denied) (reciting that despite the general rule of noninterference with a voluntary association's internal

107

management, courts will interfere in a private association's inner-dealings if a valuable right or property interest is at stake or if association fails to accord members "something similar to due process").

The TEC parties assert that Appellees lost EDFW's property when they disassociated from TEC, and they refer us to several cases to support their position. *See Int'l Printing Pressman v. Smith*, 198 S.W.2d 729, 736 (Tex. 1946);[72] *Dist. Grand Lodge No. 25*, 160 S.W.2d at 920;[73] *see also Progressive Union of*

---

[72]In *International Printing*, Smith sued the parent union for his wrongful expulsion from the local union, a chartered subordinate organization, after it failed to follow the parent union's rules in expelling him. 198 S.W.2d at 731–32. After a jury trial, the trial court issued a JNOV for the union, but the supreme court rendered judgment for Smith. *Id.* at 731, 738. The court held that Smith's expulsion was illegal and void—the result of "a breach of the fundamental guarantees established by the union for the protection of the rights of the individual member," *id.* at 732, and while the parent union contended that it was not responsible for its subordinate unit's actions, the local union had acted as its agent and was "but the alter ego of the national organization" when it breached the contract—constitution and bylaws—between the organization and its members. *Id.* at 733–34, 736, 742–43. That is, while the local union could elect its own officers and adopt its own constitution and bylaws, the parent union's constitution and bylaws took precedence, regulating in detail how the local union could operate and its officers' performance of their duties. *Id.* at 733. The parent union could also forfeit the local union's charters, take over the administration of its affairs, and remove and expel its officers for a failure to perform their duties. *Id.* And while the parent union's constitution and bylaws did not contain any express promise to allow union members to remain members and enjoy the benefits thereof, the court held that there was an implied obligation to allow a member to enjoy the benefits of his membership "so long as he complies with the obligations imposed by the constitution and by-laws." *Id.* at 737–38.

[73]In *Grand Lodge*, the supreme court considered whether the property held by a defunct local fraternal lodge would go to its members or to the grand lodge of which the local lodge had been a constituent member. 160 S.W.2d at 920. Grand Lodge, a fraternal benefit society organized in 1890, sued members of the defunct local lodge in a trespass-to-try-title action involving three lots. *Id.* at 917–18. The

108

local lodge had been one of Grand Lodge's subordinate lodges when it acquired the lots but became "defunct" in 1936, paying no membership dues or assessments to either Grand Lodge or the national organization. *Id.* at 918. The lots, acquired between 1909 and 1920, were paid for by the local lodge's members, and none of Grand Lodge's or the national organization's funds were used directly or indirectly in purchasing the lots or making improvements upon them. *Id.* The deeds were executed to named members of the local lodge "*as trustees of said Local Lodge and to their successors in trust for said lodge.*" *Id.* In 1936, the self-described duly elected and qualified trustees of the local lodge executed general warranty deeds conveying the lots to thirty-four individuals (including themselves) as "all of the present qualified and paid up members" of the lodge, which "is contemplated to be dissolved." *Id.*

The court construed Grand Lodge's constitution and bylaws, which had been in effect since 1908 and which provided that title to all property acquired by subordinate lodges was as trustee for and for the benefit of Grand Lodge, that no property held by a subordinate lodge could be mortgaged, sold, or otherwise encumbered without written permission and consent from Grand Lodge, and that when a subordinate lodge became defunct, all of the property held in trust by the local lodge "shall be taken over . . . and re-possessed by the District Grand Lodge" and "shall vest absolutely in the District Grand Lodge." *Id.* at 918–19. The court then looked to the statutory provisions relating to incorporated lodges—even though Grand Lodge was not incorporated—to determine whether Grand Lodge's constitution and bylaws were contrary to the public policy stated therein and observed that the statutory language "is clear and unequivocal and plainly states what is to become of the property of a defunct local lodge"—i.e., it passes to and vests in the grand body to which it was attached. *Id.* at 920–21 (referring to the statute "merely as a legislative statement of the [underlying] public policy"). Accordingly, the court held that the applicable provisions in Grand Lodge's constitution and bylaws were not contrary to public policy, making Grand Lodge the lots' owner because its constitution and bylaws "became a part of the contract entered into by the defendants when they became members of the order and whatever rights defendants had in the lots in controversy were merely incidental to their membership and terminated absolutely with such membership." *Id.* at 920. While the local lodge had held superior equitable title based on the deeds' language, when it became defunct, it lost its interest in the lots. *Id.* at 920, 923; *cf. Simpson v. Charity Benevolent Ass'n*, 160 S.W.2d 109, 109–10, 112–13 (Tex. Civ. App.—Fort Worth 1942, writ ref'd w.o.m.) (holding claimants did not show title vested in them when local lodge purchased property three years before adoption of bylaws upon which claimants relied and entity under which claimants claimed title was not local lodge's parent organization).

*Tex. v. Indep. Union of Colored Laborers*, 264 S.W.2d 765, 768 (Tex. Civ. App.—

Galveston 1954, writ ref'd n.r.e.);[74] *see generally* Tex. Bus. Orgs. Code Ann.

§ 23.110(a) (West 2012) (providing that when a subordinate body attached to a

grand body is wound up and terminated, "all property and rights existing in the

subordinate body pass to and vest in the grand body to which it was attached,

subject to the payment of any debt owed by the subordinate body").

---

[74]In *Progressive*, the court observed that it "is well settled that when a person ceases to be a member of a voluntary association, his interest in its funds and property ceases and the remaining members become jointly entitled thereto," even when the majority secedes and organizes a new association. 264 S.W.2d at 768. In that context, 17 individual incorporators obtained a charter for a union in 1930 and became the union's supreme council, which supplied a franchise to Lodge No. 1, an unincorporated association. *Id.* at 766. The franchise authorized the organization of Lodge No. 1 and gave it a constitution, bylaws, and a password. *Id.* Lodge No. 1 collected dues and assessments from its members and regularly paid dues to the supreme council. *Id.* Lodge No. 1 subsequently acquired some property and purported to adopt a constitution and bylaws authorizing its officers to execute legal documents in connection therewith. *Id.* at 766–67. By 1951, Lodge No. 1 had over 1,000 members, had paid off the indebtedness on its land, and had around $8,500. *Id.* at 767. As resentment towards the supreme council festered, some of the officers of Lodge No. 1 became incorporators of the Progressive Union of Texas, to which the State of Texas issued a charter. *Id.* Those incorporators/officers executed a deed conveying Lodge No. 1's property to Progressive and withdrew Lodge No. 1's funds but continued to make reports to the supreme council as Lodge No. 1 for two or three months. *Id.* The majority of Lodge No. 1's members ultimately affiliated with Progressive, while 60 or 70 members of Lodge No. 1 continued to hold meetings separately. *Id.* Litigation ensued, and the remaining members of Lodge No. 1 prevailed in a jury trial. *Id.* Progressive appealed, complaining that the trial court's judgment affected the rights of 900 persons, representing 96% of Lodge No. 1's former membership, but to no avail. *Id.* at 768. The court likewise observed that the evidence was sufficient to support the jury's finding that the incorporator/officers had withdrawn as members from Lodge No. 1 before executing the deed, leaving them without the power to convey Lodge No. 1's property. *Id.*

The business organizations code has a separate chapter for "special-purpose" corporations. *See* Tex. Bus. Orgs. Code Ann. §§ 23.001–.110 (West 2012). This category applies to business development corporations, which are formed "to promote, develop, and advance the prosperity and economic welfare of this state," *id.* § 23.052, and to "Grand Lodges," such as the Free Masons, Knights Templar, Odd Fellows, or "similar institution or order organized for charitable or benevolent purposes."[75] *Id.* § 23.101; *see also CKB & Assocs., Inc. v. Moore McCormack Petroleum, Inc.*, 734 S.W.2d 653, 655 (Tex. 1987) (explaining the maxim *expressio unius est exclusio alterius* to mean "that the naming of one thing excludes another"); *Johnson v. Second Injury Fund*, 688 S.W.2d 107, 108–09 (Tex. 1985) ("The legal maxim *Expressio unius est exclusio alterius* is an accepted rule of statutory construction in this state" through which the express mention or

---

[75]In addition to the implied exclusion of other types of associations based on the list in the "special-purpose" statute, grand lodges can be fraternal benefit societies, subject to additional rules applicable to their unique character. *See* Tex. Ins. Code Ann. § 885.051 (West 2009) (defining "fraternal benefit society" in part as a corporation, society, order, or voluntary association that has a lodge system and representative form of government, with or without limiting its membership to a secret fraternity); *Wonderful Workers of the World v. Winn*, 31 S.W.2d 879, 881 (Tex. Civ. App.—Waco 1930, writ dism'd w.o.j.) ("The charter, constitution, by-laws, and rules of appellant offered in evidence show that it consists of a grand lodge with subordinate lodges, and is a fraternal benefit society as contemplated by articles 4820, 4821, 4822, 4823, 4824, and 4834 of the Revised Statutes."); *see also State v. The Praetorians*, 186 S.W.2d 973, 975–76 (Tex. 1945) (observing that respondent, a fraternal benefit association operating under a lodge system of government, was the type of association "dealt with in a separate chapter of the statutes . . . and . . . regulated by laws applicable to them alone," and "regarded by the Legislature as being different from ordinary insurance companies and all other organizations").

enumeration "of one person, thing, consequence or class is equivalent to an express exclusion of all others"). While the facial simplicity of comparing grand lodges to the types of associations here is alluring, we cannot conclude that the statutory principles applicable to grand lodges apply to entities that lack grand lodges' defining characteristics.[76]

Furthermore, labor unions and lodges—and the policies and law applicable to them—have more in common with each other than with hierarchical religious associations. *Compare Westbrook*, 231 S.W.3d at 398 (identifying distinction between church membership and that of other voluntary associations formed for business, social, literary, or charitable purposes), *with* Comment, *State Court Holds Union Must Reinstate & Compensate Members Wrongfully Expelled for Intra-Union Political Activity: Madden v. Atkins*, 59 Colum. L. Rev. 190, 190 (1959) ("Labor unions were early characterized as unincorporated associations not for profit and thus were governed by legal principles which had been formulated for

---

[76]For example, under section 23.104, "Subordinate Lodges," "[a] subordinate body is subject to the jurisdiction and control of its respective grand body, and the warrant or charter of the subordinate body may be revoked by the grand body." Tex. Bus. Orgs. Code Ann. § 23.104(c). But TEC's constitution and canons do not provide for the complete disassociation—voluntary or involuntary—of a diocese by somehow revoking its membership in the hierarchical church. Indeed, part of the problem in this case is that there was no established framework for disaffiliation. *See* Hassler, 35 Pepp. L. Rev. at 455 (observing "an integral part of the nature of the belief systems of religious communities is the hope that their shared beliefs will make their temporal unity lasting and secure").

social and benevolent organizations." (footnotes omitted)).  As one commentator

has noted,

> The explicitly stated purpose of limiting the local union's retention of its property is to strengthen the national labor organization and increase its bargaining power.  In the context of church property disputes, the goal of favoring and strengthening the religious hierarchy is not legitimate because it would clearly violate the establishment clause of the [F]irst [A]mendment.

Gerstenblith, 39 Am. U.L. Rev. at 570–71 (footnote omitted) (referencing *Int'l Bhd.*

*of Boilermakers v. Local Lodge D474*, 673 F. Supp. 199, 203 (W.D. Tex. 1987)

("Other courts have held that disaffiliation does justify a trusteeship since

disaffiliation would have a detrimental effect on the collective bargaining

process.")).

Accordingly, the law applicable to lodges, unions, or other special-purpose

corporations does not apply to the case before us, and we overrule this portion of

the TEC parties' issue 1(c).  We will address the remainder of their associations

sub-issue in our analysis below.

### (2) Corporations Law

The Corporation, formed under Texas law, came into existence when its

certificate of formation was filed.  *See* Tex. Bus. Orgs. Code Ann. § 1.002(22)

(explaining that one of the "filing" entities is a domestic entity that is a corporation),

§ 1.101 (West 2012) (stating that Texas law governs the formation and internal

affairs of an entity if the entity files a certificate of formation in accordance with the

provisions of the business organizations code), § 3.001(c) (West 2012)

("Formation and Existence of Filing Entities"). A nonprofit corporation must include in its certificate of formation whether it will have members and the number of directors constituting the initial board of directors and their names and addresses, among other things. *Id.* § 3.009(1)–(3). In a religious nonprofit corporation, as here, the board of directors may be affiliated with, elected, and controlled by "an incorporated or unincorporated convention, conference, or association organized under the laws of this or another state, the membership of which is composed of representatives, delegates, or messengers from a church or other religious association." *Id.* § 22.207(a).[77] The board of directors of such a corporation may be wholly or partly elected by one or more associations organized under state law if the corporation's certificate of formation or bylaws provide for that election and the corporation has no members with voting rights. *Id.* § 22.207(b).

A nonprofit corporation's board of directors is "the group of persons vested with the management of the affairs of the corporation, regardless of the name used to designate the group," and its bylaws are the rules adopted to regulate or manage the corporation. *Id.* § 22.001(1), (2) (West Supp. 2017). Unless a director of a nonprofit corporation resigns[78] or is removed, he or she holds office for the period

---

[77]Revised civil statute article 1396, section 2.14(B) contained the same provisions. *See* Act of Apr. 23, 1959, 56th Leg., R.S., ch. 162, art. 2.14, 1959 Tex. Gen. Laws 286, 294.

[78]Except as provided by the certificate of formation or bylaws, a director of a corporation may resign at any time by providing written notice to the corporation. Tex. Bus. Orgs. Code Ann. § 22.2111 (West 2012).

114

specified in the certification of formation or bylaws and until a successor is elected, appointed, or designated and qualified. *Id.* § 22.208(a)–(b) (West 2012). A director may be removed from office under any procedure provided by the certificate of formation or bylaws. *Id.* § 22.211(a) (West 2012). "In the absence of a provision for removal in the certificate of formation or bylaws, a director may be removed from office, with or without cause, by the persons entitled to elect, designate, or appoint the director." *Id.* § 22.211(b). If the director was elected to office, his or her removal requires an affirmative vote equal to the vote necessary to elect the director. *Id.* Unless otherwise provided by the certificate of formation or bylaws, a vacancy in the board of directors shall be filled by the affirmative vote of the majority of the remaining directors, regardless of whether that majority is less than a quorum. *Id.* § 22.212(a) (West 2012).

As to the general standards applicable to the directors of a nonprofit corporation's board, a director shall discharge his or her duties "in good faith, with ordinary care, and in a manner the director reasonably believes to be in the best interest of the corporation," and he or she "is not liable to the corporation, a member, or another person for an action taken or not taken as a director if the director acted in compliance with" section 22.221. *Id.* § 22.221(a), (b) (West 2012). A director is not considered to have the duties of a trustee of a trust with respect to the corporation or with respect to property held or administered by the

115

corporation, including property subject to restrictions imposed by the donor or transferor of the property.[79]  *Id.* § 22.223 (West 2012).

In construing bylaws, we apply the rules that govern contract interpretation. *In re Aguilar*, 344 S.W.3d 41, 49 (Tex. App.—El Paso 2011, orig. proceeding).  We also apply the general rules of contract construction, as expressed in Texas case law, to interpret a Texas corporation's articles of incorporation.  *Corcoran v. Atascocita Cmty. Improvement Ass'n*, No. 14-12-00982-CV, 2013 WL 5888127, at *2 (Tex. App.—Houston [14th Dist.] Oct. 31, 2013, pet. denied) (mem. op.) (citing *Highland Crusader Offshore Partners, L.P. v. Andrews & Kurth, L.L.P.*, 248 S.W.3d 887, 891 (Tex. App.—Dallas 2008, no pet.)).  We attempt to harmonize and give effect to every provision, and we presume that the parties intended to impose reasonable terms.  *Aguilar*, 334 S.W.3d at 50.  We examine the document as a whole in light of the circumstances present when it was written.  *Corcoran*, 2013 WL 5888127, at *2.  If the bylaw or article is written so that it can be given a definite interpretation, it is not ambiguous and the court will construe it as a matter of law. *See Aguilar*, 334 S.W.3d at 50.

Appellees refer us to *Chen v. Tseng*, No. 01-02-01005-CV, 2004 WL 35989, at *6 (Tex. App.—Houston [1st Dist.] Jan. 8, 2004, no pet.) (mem. op.), a corporation case, to support their argument that "[i]t is easy to separate

---

[79]Depending on a nonprofit corporation's federal tax qualification, the nonprofit corporation may also serve as the trustee of a trust.  Tex. Bus. Orgs. Code Ann. § 2.106(a) (West 2012).

ecclesiastical and property disputes in most cases." The TEC parties respond that the First court subsequently held that case irrelevant under the circumstances presented here, citing *Greanias v. Isaiah*, No. 01-04-00786-CV, 2006 WL 1550009, at *9 (Tex. App.—Houston [1st Dist.] June 8, 2006, no pet.) (mem. op.).

In *Chen*, the First court, citing our opinion in *Dean*, 994 S.W.2d at 395, noted—as set out above—that civil courts have jurisdiction over matters involving churches and their civil, contract, and property rights as long as neutral principles of law may be applied to decide the issues. 2004 WL 35989, at *6. The membership of a religious group had formed a corporation to build a temple; the corporation's bylaws set out the requirements for an annual meeting of the membership to elect directors, the length of their terms, how vacancies would be filled, and the date of the annual meeting. *Id.* at *1. In conducting corporate affairs, the directors frequently consulted with the religion's patriarch and generally followed his instructions. *Id.* at *2. After he died, a dispute arose with regard to the composition of the corporation's board. *Id.* at *2–3.

Chen, who had served as the patriarch's assistant and who subsequently attempted to reorganize the corporation outside the parameters of the corporation's bylaws, conceded that the trial court applied neutral principles of law in interpreting and applying the bylaws. *Id.* at *2, *6. After a four-day bench trial, the trial court "merely applied the bylaws to make a determination of the validity of the selection of directors of the [c]orporation." *Id.* at *3, *6. While the corporation's

117

board controlled the corporation's membership, it did not control membership in the religious group. *Id.* at *6.

In *Greanias*, the court considered a plea to the jurisdiction brought in a suit to determine the rightful board of trustees (parish council) of the Annunciation Greek Orthodox Cathedral, organized as a Texas nonprofit corporation, after the hierarch of the regional division of the Greek Orthodox Archdiocese of America removed some of the trustees (10 of 15 total, elected to three-year, staggered terms, from 2000–2002) from office. 2006 WL 1550009, at *1. Prior to the trustees' removal from the board, the Cathedral had adopted its own bylaws rather than the Archdiocese's uniform parish regulations. *Id.*

Internal strife occurred in 2001, with the appointment by the hierarch of a priest with whom the subsequently removed board members did not get along. *Id.* at *2–3 (recounting that the board members had the priest followed by a private investigator and twice notified the IRS about his personal finances). In 2002, the hierarch refused to ratify the purported election of new board members because the priest had refused to sign the election results, as required by the local bylaws. *Id.* at *2. The board members also ignored the hierarch's request that they amend the local bylaws to conform to the archdiocese's uniform parish regulations. *Id.* at *1. In 2003, the hierarch demanded that board members with uncompleted terms submit their resignations. *Id.* at *2. When only three did so, he rescinded his ratification of the remaining original board members' elections. *Id.* at *2–3 (quoting the hierarch's statement that "[i]t does not take a rocket scientist to see that there

118

is no working cooperation between the spiritual head of the parish and those who took the oath to assist him in his work"). The hierarch and the local priest organized an interim council, which elected officers and assumed control of the Cathedral—actions that ultimately led to a lawsuit seeking a declaratory judgment that the corporation's bylaws were the controlling document governing the Cathedral's affairs. *Id.* at *3. The trial court granted the hierarch's plea to the jurisdiction. *Id.* at *4.

On appeal, the board members complained that under the local bylaws, the hierarch lacked the power to dismiss them and to create an interim council and that only they—as the original parish council—had the right to serve and act on the Cathedral's behalf. *Id.* The court recited the neutral-principles template before noting that "if an issue—even one that is claimed to be based solely on neutral principles of law—cannot be decided without determining prohibited religious matters, the court must defer to the ecclesiastical authority's resolution of that issue." *Id.* at *5. Accordingly, the court had to examine the substance and effect of the plaintiff's petition, without considering the technical claims asserted, to determine the suit's ecclesiastical implications. *Id.*

The Cathedral's bylaws set out a corporate purpose that included maintaining, conducting, and operating "a church in conformity with the doctrine, canons, worship, discipline, usages and customs of the Greek Orthodox Church," and required that candidates for parish council be members of the Cathedral in good standing for at least a year before the election. *Id.* at *7. To be in good

119

standing, the member was required to, among other things, live "according to the faith and canons of the [Greek Orthodox] Church." *Id.* The bylaws also required newly elected parish council members to have their election ratified by the hierarch and to be administered the oath of office by the parish priest. *Id.* And they required the parish council to conduct the Cathedral's secular business "in furtherance of the aims and purposes of the [Greek Orthodox] Church and in accordance with . . . the constitution, canons, discipline, and regulations of the Archdiocese," and to refer all spiritual questions to the hierarch. *Id.*

Although the board members argued that the controversy involved a simple determination of which bylaws applied and the application of the nonprofit corporation act's provisions to the corporate organization, the First court observed that "[t]he controversy inherently and inextricably involves a presiding hierarch's power to discipline a local parish council; his power to determine whether that council's members have violated their oath to obey the church's hierarchy, discipline, and canons; and an archdiocese's right to insist on what by-laws may be adopted by its subordinate parishes," all of which constituted ecclesiastical matters inextricably intertwined with the board members' request for a declaration that the local bylaws controlled. *Id.* at *7–8. And such inextricable intertwining prevented the court from resolving the dispute on purely neutral principles. *Id.* at *8.

Specifically, in affirming the trial court's judgment granting the plea to the jurisdiction, the court observed that there was a question as to whether the local

120

bylaws or the uniform parish regulations controlled when the uniform regulations provided that the mere assignment of a parish priest would bind the parish to the regulations—"[t]hose matters are at the heart of this dispute, and they are inextricably intertwined with ecclesiastical issues of church governance, polity, and doctrine that we may not determine." *Id.* The court distinguished *Chen* in part based on the lack of a preserved challenge in that case concerning which bylaws applied and what they required, pointing out that the *Chen* dispute had only involved whether various elections and appointments had been lawful under those bylaws. *Id.* at *9. The court observed that *Chen* did not involve a situation "in which a higher authority, external of the local congregation, was disputing what the document governing the local congregation was" and that the evidence in *Chen* showed that membership in the religious corporation was not co-extensive with membership in the religion. *Id.*

*Chen* and *Greanias* were both decided before the supreme court fleshed out the neutral principles analysis in *Episcopal Diocese* and *Masterson* but, to some extent, they represent the range of religious corporation cases, from the most neutral—was there compliance with the bylaws?—to the most inextricably intertwined—which bylaws apply and do they involve a religious test or religious governance? When we review the Corporation's bylaws in our analysis below, we will consider these questions to determine where the case before us rests on that spectrum. *See Mouton v. Christian Faith Missionary Baptist Church*, 498 S.W.3d 143, 150 (Tex. App.—Houston [1st Dist.] 2016, no pet.) (concluding that *Masterson*

121

did not alter the principle for which *Westbrook* stands: courts may apply neutral principles of law in cases involving religious entities only if doing so does not implicate inherently ecclesiastical concerns).  Whether neutral principles may be applied to a claim turns on the substance of the issues it raises.  *Id.*

### (3) Trust Law

In addition to the questions of association and corporate control, at issue is whether the property claimed by both parties is held in trust and if so, for whom.  *See Perfect Union Lodge No. 10, A.F. & A.M., of San Antonio v. Interfirst Bank of San Antonio, N.A.*, 748 S.W.2d 218, 220 (Tex. 1988) ("It is well established that the legal and equitable estates must be separated; the former being vested in the trustee and the latter in the beneficiary.  This separation of legal and equitable estates in the trust property is the basic hallmark of the trust entity." (citations omitted)); *see also* Tex. Prop. Code Ann. § 111.004(4) (West 2014) (stating that an express trust "means a fiduciary relationship with respect to property which arises as a manifestation by the settlor of an intention to create the relationship and which subjects the person holding title to the property to equitable duties to deal with the property for the benefit of another person").  When an express trust fails, the law implies a resulting trust with the beneficial title vested in the settlor,

to prevent unjust enrichment. *Pickelner v. Adler*, 229 S.W.3d 516, 526–27 (Tex. App.—Houston [1st Dist.] 2007, pet. denied).[80]

### (a) Law of Situs

Texas law governs the transfer of Texas land. *Welch v. Trs. of Robert A. Welch Found.*, 465 S.W.2d 195, 198, 200 (Tex. Civ. App.—Houston [1st Dist.] 1971, writ ref'd n.r.e.) (op. on reh'g) (stating that "[t]he general rule that the law of the state in which real estate is situated governs its descent, alienation, and transfer is not questioned," and that "the law of this state controls and governs the transmission by will of real estate located therein and the construction and effect of all instruments intended to convey such real estate"); *see Toledo Soc'y for Crippled Children v. Hickok*, 261 S.W.2d 692, 694, 697 (Tex. 1953) ("[T]he law of the situs governs the matter of testamentary or intestate succession to land."), *cert. denied*, 347 U.S. 936 (1954).

### (b) Standard of Review

The construction of a trust instrument is a question of law for the court. *Eckels v. Davis*, 111 S.W.3d 687, 694 (Tex. App.—Fort Worth 2003, pet. denied).

---

[80]If fraud is involved, a constructive trust—an equitable remedy implied by operation of law to prevent unjust enrichment—may be imposed, under the theory that equitable title should be recognized in someone other than the holder of legal title. *Pickelner*, 229 S.W.3d at 527; *see also Kinsel v. Lindsey*, 526 S.W.3d 411, 426 (Tex. 2017) (noting that the specific instances in which equity may impress a constructive trust are as numberless as the modes by which property may be obtained through bad faith and unconscientious acts); *KCM Fin. LLC v. Bradshaw*, 457 S.W.3d 70, 87 (Tex. 2015) (observing that constructive trusts have historically been applied to ameliorate harm arising from a wide variety of misfeasance).

We look to the law that was in effect at the time that the trust became effective. *See Carpenter v. Carpenter*, No. 02-10-00243-CV, 2011 WL 5118802, at *3 (Tex. App.—Fort Worth Oct. 27, 2011, pet. denied) (mem. op.); *see also* Act of May 26, 1983, 68th Leg., R.S., ch. 576, § 7, 1983 Tex. Gen. Laws 3475, 3730 (stating that the 1984 Act was intended only as a recodification and that no substantive change was intended); *Perfect Union Lodge No. 10*, 748 S.W.2d at 220 (stating that the new trust code provides that the Texas Trust Act, which was repealed in 1984, will govern the creation of trusts entered into while the Act was in effect); *Cutrer v. Cutrer*, 345 S.W.2d 513, 519 (Tex. 1961) ("It would be quite strange to ascertain th[e settlor's] intention by looking to the provisions of statutes enacted after the trust instruments became effective or considering changes in public policy as reflected thereby."). Accordingly, we review our trust statutes and case law for the defining characteristics of trusts.

Trust statutes were "framed to supplement rather than to supplant the desires of a trustor." *St. Marks Episcopal Church, Mt. Pleasant, Tex. v. Lowry*, 271 S.W.2d 681, 684 (Tex. Civ. App.—Fort Worth 1954, writ ref'd n.r.e.). Thus, we look to the words of the instrument first, seeking to uphold rather than destroy a trust, and then turn to statutory provisions to fill in any gaps. *See id.* at 684–85 (construing will to determine deceased's intent with regard to trust income); *see also Runyan v. Mullins*, 864 S.W.2d 785, 789 (Tex. App.—Fort Worth 1993, writ denied) ("[W]hen the terms of a trust set out a specific method or manner in which to amend the trust, the Texas Trust Code indicates that those terms are controlling

124

and must be followed."); *Commercial Nat'l Bank in Nacogdoches v. Hayter*, 473 S.W.2d 561, 565 (Tex. Civ. App.—Tyler 1971, writ ref'd n.r.e.) ("Since the Testator did not choose to direct the manner of apportionment, it would seem to follow that he intended the Texas Trust Act to govern."); *see generally* Tex. Prop. Code Ann. § 111.002 (West 2014) ("This subtitle and the Texas Trust Act, as amended . . . shall be considered one continuous statute, and for the purposes of any statute or of any instrument creating a trust that refers to the Texas Trust Act, this subtitle shall be considered an amendment to the Texas Trust Act."), § 111.0035(b) (West Supp. 2017) (stating that the trust's terms prevail over statutory provisions except as to items such as illegal purposes, exculpation for breaches of trust, limitations periods, and a court's jurisdiction to take certain actions, including modifying or terminating a trust or removing a trustee).[81]   But "under general rules of construction[,] we avoid strictly construing an instrument's language if it would lead to absurd results." *Hemyari v. Stephens*, 355 S.W.3d 623, 626–27 (Tex. 2011).

---

[81]Section 111.0035 was added in 2005 and became effective January 1, 2006. *See* Act of May 12, 2005, 79th Leg., R.S., ch. 148, §§ 2, 32, 2005 Tex. Gen. Laws 287, 287–88, 296, *amended by* Act of May 11, 2007, 80th Leg., R.S., ch. 451, § 2, 2007 Tex. Gen. Laws 801, 801–02, *amended by* Act of May 21, 2009, 81st Leg., R.S., ch. 414, § 2, 2009 Tex. Gen. Laws 995, 995, *and amended by* Act of May 9, 2017, 85th Leg., R.S., ch. 62, § 1, 2017 Tex. Sess. Law Serv. 135, 135 (West).  For trusts existing on January 1, 2006, that were created before that date, the 2005 changes apply only to an act or omission relating to the trust that occurred on or after January 1, 2006.  Act of May 12, 2005, 79th Leg., R.S., ch. 148, § 31(b), 2005 Tex. Gen. Laws at 296.

### (c) Trust Formation

"We look to the settlor's intent to determine whether a trust was created." *Hubbard v. Shankle*, 138 S.W.3d 474, 484 (Tex. App.—Fort Worth 2004, pet. denied). "The intent of the settlor must be ascertained from the language used within the four corners of the instrument," and we must harmonize all terms to properly give effect to all parts of the trust instrument and construe it to give effect to all provisions so that none is rendered meaningless.[82] *Eckels*, 111 S.W.3d at 694.

There are no particular words required to create a trust if there exists reasonable certainty as to the intended property, the subject to which the trust

---

[82]Although a settlor's manifestation of intent to create a trust was not an express statutory requirement until the legislature's replacement of the Texas Trust Act with the Texas Trust Code in 1983 (effective January 1, 1984), *see* Act of May 24, 1983, 68th Leg., R.S., ch. 576, art. 2, § 2, 1983 Tex. Gen. Laws at 3654–3731 (current version at Tex. Prop. Code Ann. §§ 111.001–117.012 (West 2014 & Supp. 2017)), the requirement that the settlor clearly express the intention to create a trust had already long been embedded in our case law. *See Mills v. Gray*, 210 S.W.2d 985, 987 (Tex. 1948) (quoting 54 Am. Jur. 22, sec. 5, for the proposition that a trust "intentional in fact"—i.e., one in which the "execution of an intention" occurs—is an express trust); *see also Omohundro v. Matthews*, 341 S.W.2d 401, 405 (Tex. 1960) (stating that an express trust arises because of a manifestation of intention to create it); *Fitz-Gerald v. Hull*, 237 S.W.2d 256, 260 (Tex. 1951) ("[W]e believe that the Texas cases hold that an express trust 'can come into existence only by the execution of an intention to create it by the one having legal and equitable dominion over the property made subject to it.'" (quoting *Mills*, 210 S.W.2d at 987)). The 1983 Texas Trust Code repeated the requirement that a settlor could revoke a trust "unless it is irrevocable by the express terms of the instrument creating it or of an instrument modifying it." *See* Act of May 24, 1983, 68th Leg., R.S., ch. 576, art. 2, § 2, 1983 Tex. Gen. Laws at 3659 (current version at Tex. Prop. Code Ann. § 112.051); *see also Ayers v. Mitchell*, 167 S.W.3d 924, 931 (Tex. App.—Texarkana 2005, no pet.) (observing that when there is only one settlor and he or she dies, the trust becomes irrevocable but that when one of

obligation relates, and the beneficiary, *Hubbard*, 138 S.W.3d at 483–84, but "[t]o create a trust by a written instrument, the beneficiary, the *res,* and the trust purpose must be identified." *Perfect Union Lodge No. 10*, 748 S.W.2d at 220 (construing trust created by will); *Alpert v. Riley*, 274 S.W.3d 277, 286 (Tex. App.—Houston [1st Dist.] 2008, pet. denied) (op. on reh'g) ("[T]he person intended to be the beneficiary must be certain."); *see* Tex. Prop. Code Ann. § 112.001(1) (stating that a trust may be created by a property owner's declaration that the owner holds the property as trustee for another person). The mere designation of a party as "trustee" does not create a trust. *Nolana Dev. Ass'n v. Corsi*, 682 S.W.2d 246, 249 (Tex. 1984). If the trust's language is unambiguous and clearly expresses the settlor's intent, it is unnecessary to construe the instrument because it speaks for itself. *Eckels*, 111 S.W.3d at 694.

A trust in real property is enforceable only if there is written evidence of the trust's terms bearing the signature of the settlor or the settlor's authorized agent. *See* Tex. Prop. Code Ann. § 112.004; Act of April 15, 1943, 48th Leg., R.S., ch. 148, § 7, 1943 Tex. Gen. Laws 232, 234, *repealed by* Act of May 24, 1983, 68th Leg., R.S., ch. 576, §§ 6, 8, 1983 Tex. Gen. Laws at 3729–30 (rev. civ. stat. art. 7425b-7). And an entity cannot unilaterally name itself as the beneficiary of a trust involving another entity's property. *See Best Inv. Co. v. Hernandez*, 479

---

multiple settlors dies and there are purposes of the trust yet unfulfilled, the trust does not become irrevocable).

127

S.W.2d 759, 763 (Tex. Civ. App.—Dallas 1972, writ ref'd n.r.e.) (reciting the requirement of a written instrument for a real property trust and that "[d]eclarations of the purported beneficiary of the trust are not competent to establish the trust"). So while a person can establish a trust for his or her own benefit, he or she must own the property that is transferred in order to create the trust. *See Lipsey v. Lipsey*, 983 S.W.2d 345, 351 n.7 (Tex. App.—Fort Worth 1998, no pet.) (citing Tex. Prop. Code Ann. § 112.001); *see also Elbert v. Waples-Platter Co.*, 156 S.W.2d 146, 152 (Tex. Civ. App.—Fort Worth 1941, writ ref'd w.o.m.) (citing *Wise v. Haynes*, 103 S.W.2d 477, 483 (Tex. Civ. App.—Texarkana 1937, no writ), for the proposition that the declarations of a beneficiary are not competent to establish a trust).

### (d) Trust Statutes

In 1943, the legislature enacted the Texas Trust Act to govern express trusts. *See* Act of Apr. 15, 1943, 48th Leg., R.S., ch. 148, § 48, 1943 Tex. Gen. Laws 232, 232–47 (effective as of April 19, 1943, as revised civil statute articles 7425b-1–b-47); *see also* Tex. Prop. Code Ann. § 111.003 (stating that trust statutes do not govern resulting, constructive, or business trusts or security instruments). Under the 1943 Act, a trust "in relation to or consisting of real property" was invalid unless created, established, or declared by a written instrument "subscribed by the trustor or by his agent" or by any other instrument under which the trustee claimed the affected estate. Act of Apr. 15, 1943, 48th Leg., ch. 148, § 7, 1943 Tex. Gen. Laws at 234. And "[e]very trust shall be

128

revocable by the trustor during his lifetime, unless expressly made irrevocable by the terms of the instrument creating the same or by a supplement or amendment thereto." *Id.* § 41, 1943 Tex. Gen. Laws at 246.[83]

The 1945 amendments to the Texas Trust Act did not affect the above provisions. *See generally* Act of Apr. 5, 1945, 49th Leg., R.S., ch. 77, 1945 Tex. Gen. Laws 109, 109–14. Likewise, although the Dennis Canon—one of the trust provisions to which we are referred—was added by TEC to its canons in September 1979, the above provisions were not substantially modified during the intervening decades. *See* Tex. Rev. Civ. Stat. Arts. 7425b-2, b-7, b-41, Texas Historical Statutes Project, West's Texas Statutes 1979 Supp. vol. 2, https://www.sll.texas.gov/assets/pdf/historical-statutes/1979-2/1979-2-supplement-to-1974-wests-texas-statutes-and-codes.pdf; *id.*, West's Texas Statutes 1974, vol. 5, https://www.sll.texas.gov/assets/pdf/historical-statutes/1974-5/1974-5-wests-texas-statutes-and-codes.pdf.

---

[83]Prior to April 19, 1943, trusts in Texas were considered irrevocable unless an expressed power of revocation was reserved in the trust's terms. *See Citizens Nat'l Bank of Breckenridge v. Allen*, 575 S.W.2d 654, 657 (Tex. Civ. App.—Eastland 1978, writ ref'd n.r.e.).

### (e) Trespass to Try Title and Adverse Possession

The TEC parties brought a trespass-to-try-title claim, while Appellees argued, to the contrary, that they adversely possessed any interest that might otherwise exist for the TEC parties.

An action of trespass to try title may be brought on an equitable title. *Longoria v. Lasater*, 292 S.W.3d 156, 165 (Tex. App.—San Antonio 2009, pet. denied) (op. on reh'g) ("A suit to resolve a dispute over title to land is, in effect, a trespass to try title action regardless of the form the action takes and whether legal or equitable relief is sought."). An owner of a superior equitable title may recover in a trespass-to-try-title action if the record shows the equitable title is superior to the defendant's bare legal title. *Id.* (citing *Binford v. Snyder*, 189 S.W.2d 471, 474 (Tex. 1945)). And, of course, here we must look to any subsequent arrangements—such as the 1984 consent judgment—to determine whether any equitable interests were modified. *See*, *e.g.*, *Allstate Ins. Co. v. Clarke*, 471 S.W.2d 901, 907–08 (Tex. Civ. App.—Houston [1st Dist.] 1971, writ ref'd n.r.e.) (considering whether earlier trust agreement was superseded by a subsequent one based on the clear intention of the parties).

The plaintiff in a trespass-to-try-title suit must recover on the strength of his own title and not on the weakness of the defendant's title. *Bellaire Kirkpatrick Joint Venture v. Loots*, 826 S.W.2d 205, 209 (Tex. App.—Fort Worth 1992, writ denied) (citing *Adams v. Rowles*, 228 S.W.2d 849, 853 (Tex. 1950)). When title is controverted, the defendant admits possession of the subject property but claims

130

better title, and the burden of proof is on the plaintiff to establish a superior title in himself by an affirmative showing. *Id.*

When a trustee's legal title is adversely possessed, the equitable interest goes with it. *See Capps v. Gibbs*, No. 10-12-00294-CV, 2013 WL 1701772, at *7 (Tex. App.—Waco Apr. 18, 2013, pet. denied) (mem. op.) (concluding legal and equitable title obtained by adverse possession); *Broussard Tr. v. Perryman*, 134 S.W.2d 308, 313 (Tex. Civ. App.—Beaumont 1939, writ ref'd) (stating that "when the bar of the statute is complete against the legal title vested in the trustee, it applies also to the equitable title of the cestui que trust").

The applicable adverse possession standard depends on whether the person claiming to have adversely possessed the interest is a stranger or a cotenant. *See Rife v. Kerr*, 513 S.W.3d 601, 616 (Tex. App.—San Antonio 2016, pet. denied). For example, "[c]otenants must surmount a more stringent requirement because acts of ownership 'which, if done by a stranger, would per se be a disseizin,' are not necessarily such when cotenants share an undivided interest." *BP Am. Prod. Co. v. Marshall*, 342 S.W.3d 59, 70 (Tex. 2011) (quoting *Todd v. Bruner*, 365 S.W.2d 155, 160 (Tex. 1963)). Under such circumstances, the proponent must prove ouster—unequivocal, unmistakable, and hostile acts the possessor took to disseize the other cotenants. *Id.*

### 2. Ownership of Equitable Title

In response to the TEC parties' issues, Appellees assert that they hold both legal and beneficial title and are the Corporation's and EDFW's rightful officers.

131

They argue that the TEC parties' case is based on revoked trusts, superseded deeds, repealed bylaws, and oral statements and that the TEC parties' "scattershot defenses don't annul neutral principles" because this is not an ecclesiastical dispute. They urge that associations are governed by neutral principles and that a Fort Worth case (*Shellberg*) from almost 50 years ago is no basis for defying the supreme court's mandate.

As previously stated, no one disputes that the Corporation holds *legal* title to the various items of property at issue. *See Houston First Am. Sav. v. Musick*, 650 S.W.2d 764, 767 (Tex. 1983) ("Assertions of fact, not pled in the alternative, in the live pleadings of a party are regarded as formal judicial admissions."). The crux of the parties' dispute, however, is ownership of *equitable* title. We therefore turn, as directed by the supreme court, to the application of our state law on trusts, corporations, and associations to the deeds and the various entities' formative documents, to determine the property ownership issue before us.

### a. Trust Law Application

The TEC parties argue that the Dennis Canon sets forth an enforceable, irrevocable trust for TEC under Texas trust law, as well as under *Jones v. Wolf* irrespective of state law requirements, and under this court's *Shellberg* opinion as a contractual trust. They further argue that even if a trust was not established for

132

TEC in the Dennis Canon, the deeds of various properties set forth trusts for EDFW

or the congregations.

### (1) Dennis Canon

Although the TEC parties "contend that the Dennis Canon is enforceable

under Texas trust law," we disagree.

The Dennis Canon was adopted in 1979 and purports to impose a trust for

TEC and TEC's diocese on parish, mission, and congregation real and personal

property, stating,

> All real and personal property held by or for the benefit of any Parish, Mission or Congregation is held in trust for this Church and the Diocese thereof in which such Parish, Mission o[r] Congregation is located. The existence of this trust, however, shall in no way limit the power and authority of the Parish, Mission or Congregation otherwise existing over such property so long as the particular Parish, Mission or Congregation remains a part of, and subject to, this Church and its Constitution and Canons.

The section that follows essentially provides that no other action need be taken for

the trust to be enforceable but that dioceses can take additional action, stating,

> The several Dioceses may, at their election, further confirm the trust declared under the foregoing Section 4 by appropriate action, but no such action shall be necessary for the existence and validity of the trust.

But Texas law requires a writing signed by the *settlor* or the settlor's agent

to create a trust with regard to real property. *See* Tex. Prop. Code Ann. § 112.004;

Act of Apr. 15, 1943, 48th Leg., R.S., ch. 148, § 7, 1943 Tex. Gen. Laws at 234,

*repealed by* Act of May 24, 1983, 68th Leg., R.S., ch. 576, §§ 6, 8, 1983 Tex. Gen.

Laws at 3729–30 (rev. civ. stat. art. 7425b-7). As stated above, a proposed

133

beneficiary cannot unilaterally name itself as the beneficiary of a trust involving another entity's property. *See Lipsey*, 983 S.W.2d at 351 n.7; *Best Inv. Co.*, 479 S.W.2d at 763; *see also* Tex. Prop. Code Ann. § 111.004(14) (defining "settlor" as a person who creates a trust or contributes property to a trustee of a trust; "settlor" means the same as "grantor" and "trustor"), § 112.001 (defining the methods of creating a trust: through a property owner's declaration, intervivos transfer, or testamentary transfer, through the power of appointment to another person as trustee for the donee of the power or for a third person, or through a promise to another person whose rights under the promise are to be held in trust for a third person), § 112.005 ("A trust cannot be created unless there is trust property."); McConnell & Goodrich, 58 Ariz. L. Rev. at 322, 335 (reasoning that "[d]enominations cannot create a trust in favor of themselves in property they did not previously own" and that "[c]hurches can adopt any internal rules they wish, but those rules do not have legal force unless they are embodied in the forms required by state law"). Because under Texas law, an entity that does not own the property to be held in trust cannot establish a trust for itself simply by decreeing that it is the beneficiary of a trust,[84] the Dennis Canon, by itself, did not establish a

---

[84] *See also* Gerstenblith, 39 Am. U. L. Rev. at 566 (explaining that implied trusts serve to obfuscate land titles and may discourage productive use of the land because "any investment in the property would be lost if the local entity chose to disaffiliate").

trust under Texas law,[85] and we overrule this portion of the TEC parties' argument.

## (2) Application of *Jones v. Wolf*

The TEC parties also argue that regardless of the content of our state law requirements, a trust is enforceable by virtue of the Dennis Canon, contending that *Jones* requires the enforcement of express trusts recited in governing church documents irrespective of state law. But in *Jones*, the Court merely referenced the need for "some legally cognizable form." 443 U.S. at 603–04, 606, 99 S. Ct. at 3025–26, 3027. And our supreme court has already stated, "We do not read *Jones* as purporting to establish substantive property and trust law that state courts must apply to church property disputes." *Masterson*, 422 S.W.3d at 612. That is, in Texas, the required legally cognizable form is the one provided by our statutes and case law.[86] We overrule this portion of the TEC parties' argument. Having

---

[85]In *Masterson*, the supreme court did not determine whether the Dennis Canon imposed a trust but stated that even assuming that it had created one, its terms did not make it expressly irrevocable. 422 S.W.3d at 613. Based on our resolution here, we do not reach the question of irrevocability with regard to the Dennis Canon.

[86]The Supreme Court of Tennessee recently reviewed the two schools of thought that interpret what the Court meant by its "legally cognizable form" phraseology, characterizing them as the "Strict Neutral-Principles Approach" and the "Hybrid Neutral-Principles Approach." *See Church of God in Christ, Inc. v. L.M. Haley Ministries, Inc.*, 531 S.W.3d 146, 168 (Tenn. 2017) (observing that most neutral-principles-related litigation has arisen "where a hierarchical religious organization includes a provision in its constitution and/or other governing documents providing that local church property is held in trust for the hierarchical organization and a local church fails or declines to include the trust provision in deeds or other documents of conveyance"). The Tennessee court described the strict approach as only giving effect to provisions in church constitutions and governing documents of hierarchical religious organizations "if the provisions

concluded that a trust—revocable or not—was not imposed for TEC through the Dennis Canon, we do not reach the TEC parties' *Shellberg* argument.  *See* Tex. R. App. P. 47.1.

### (3) Other Trusts

The TEC parties complain about the misallocation of 55 properties that contain what they describe as express trusts in favor of TEC, EDFW, and the congregations, "with similar language" to the following set out in their brief:

> This Conveyance, however, is in trust for the use and benefit of the Protestant Episcopal Church, within the territorial limits of what is now known as the said Diocese of Dallas, in the State of Texas . . . .

But in their brief, they point to only one deed of dubious legibility appearing in the record to support this assertion.[87]  Additionally, the TEC parties fail to inform us as

---

appear in civil legal documents or satisfy the civil law requirements and formalities for imposition of a trust."  *Id.* (citing McConnell & Goodrich, 58 Ariz. L. Rev. at 324–25, defining strict approach's construction of "legally cognizable form" as complying with the formalities of property, trust, or contract law).  The court described the hybrid approach—which the majority of states addressing the issue have followed—as deferring to and enforcing trust language contained in the constitutions and governing documents even if the language would not satisfy the civil law formalities normally required to create a trust but recognized that Texas has adopted the strict approach.  *Id.* (citing *Masterson*, 422 S.W.3d at 611–12).

[87]In their brief, the TEC parties do refer us to "Table E—'In Trust for The Episcopal Church'" appearing on 23 pages in volume 30 of the clerk's record.  The footnote to Table E states that it covers "Episcopal Property held in trust for The Episcopal Church, held in trust for The Episcopal Church and its Constituent Diocese, held in trust for a Congregation, and/or held outright by a Congregation or a related entity but is not limited to the properties listed in Table E."  While Table E contains references to the Bates numbers of the joint appendix created by the parties during the summary judgment phase in which the deeds themselves

136

to the degree of similarity they contend this one deed bears to the 54 others. Therefore, in our analysis and application of the law, we will consider only the language of (1) this deed, as discussed by the TEC parties in their brief, which is to one of the properties claimed by All Saints; (2) the other All Saints deed, also discussed by the TEC parties in their brief; and (3) any other documents related to these two deeds.

---

can be found, it does not recite the trust language at issue for any of the deeds listed therein. Rather, it contains the legal description of each property.

Appellees argue in this appeal that 35 deeds that "placed title in the bishop of Dallas 'for the use and benefit of the Protestant Episcopal Church, within the territorial limits of what is now known as the said Diocese of Dallas, in the State of Texas,'" imposed a trust for the Diocese of Dallas, not TEC, and that EDFW and its congregations "inherited all those rights upon division" in the 1984 judgment. They refer us to a chart in one of the supplemental volumes of the clerk's record that identifies various deeds in the joint appendix. The chart contains property descriptions, identifies the grantee of each deed, and contains Appellees' opinion of whether a trust is stated in each deed, along with their statement of which church uses the property.

We decline the parties' invitation to parse through this voluminous record on their behalf to confirm that the conveyance instruments for 35–55 properties contain "similar language" and do or do not create trusts. *See Rogers v. Ricane Enters., Inc.,* 772 S.W.2d 76, 81 (Tex. 1989) ("[A] general reference to a voluminous record which does not direct the trial court and parties to the evidence on which the movant relies is insufficient."). In light of our disposition below, the parties will have the opportunity to sort out and present these arguments to the trial court on remand.

137

### (a) Deeds, Judgment, and Trust Language

### (i)    1947 Warranty Deed

The snippet of language that the TEC parties claim is similar to 54 other properties is contained in a 1947 warranty deed transferring "[a]ll of Block 14, Chamberlain Arlington Heights"[88] from John P. King and J. Roby Penn to Charles Avery Mason, as Bishop of the Protestant Episcopal Church for the Diocese of Dallas, his successors, and assigns, "for and in consideration of the sum of" $5,000.  This deed states, in pertinent part,

> TO HAVE AND TO HOLD, all and singular the above described premises until the said CHARLES AVERY MASON, as aforesaid, his successors in said office of Bishop aforesaid and his and their assigns forever, upon condition and in trust, however, for the purposes declared and set forth.
>
> . . . .
>
> It being expressly agreed between the grantors aforesaid and the grantee aforesaid, and binding upon his successors in office and assigns, that the above described land shall be used only for the building site of a church and/or for the erection of buildings appertaining to a church, subject however to the following conditions . . . .
>
> . . . .
>
> *This Conveyance, however, is in trust for the use and benefit of the Protestant Episcopal Church, within the territorial limits of what[] is now known as the Diocese of Dallas, in the State of Texas, and for this purpose the said CHARLES AVERY MASON, as aforesaid, and his successors in office, shall hold, use, improve, manage and control the above described property in such manner as to him or them, may seem best for the interest of said Church within said Diocese.*  And

---

[88]This corresponds to the All Saints property at 5001 Crestline (sanctuary).

138

the said CHARLES AVERY MASON, as aforesaid, and his successors in office, shall have, and by these presents, do have, the right, power, and authority, whenever it may to him or them seem best for the interest of said Church within said Diocese so to do, lease, mortgage, sell and otherwise encumber or dispose of the aforesaid premises, upon such terms, for such prices and in such manner as to him or them may seem best.  And for this purpose he or they may make, execute and deliver all such leases, mortgages, deeds of trust, deeds and other written instruments, as the circumstances of the case may render necessary and expedient.  But neither the said CHARLES AVERY MASON nor any one else shall ever have any right, power or authority during the continuance of this trust to in anywise encumber or create a lien upon or any liability against the above described premises except by an instrument in writing expressly giving a lien upon said premises, and duly signed and acknowledged by the said CHARLES AVERY MASON, as aforesaid, or by some one of his successors in said office of Bishop.[89]

*And in the event of death, resignation, suspension, deposition or removal from office for any cause of any Bishop in whom may at the time of such death, resignation, suspension, deposition or other removal from office, be vested the title to the above described premises, as trustee under this instrument, then, and in that event, the senior Bishop of the Protestant Episcopal Church in the United States of America shall be held and deemed to be, for the purpose of sustaining and p[e]rp[e]tuating this trust, the successor in office of said Bishop, until vacancy shall have been regularly filled; provided, however, that said senior Bishop of the Protestant Episcopal Church in the United States of America shall have no power while thus temporarily holding the title as trustee to the above described property to sell, mortgage, lease or in any manner encumber or dispose of said property.*  [Emphasis added.]

### (ii)    1950 Warranty Deed

The record also contains the June 1950 deed for 5003 Dexter, the other All

Saints property, which Robert McCart Jr., his wife Alice W. McCart, Fannie Belle

---

[89] *See, e.g.*, McConnell & Goodrich, 58 Ariz. L. Rev. at 342–43 ("Placing title in a denominational official ensures that the property will always remain within the denomination.").

Hackney, her husband T.E.D. Hackney, and John Lee McCart conveyed to C. Avery Mason, "Bishop of the Protestant Episcopal Church, Diocese of Dallas, in the State of Texas, and his successors in office" for $4,000. It contains no trust language.

### (iii)    1984 Judgment

The 1984 judgment transferred legal title to both properties to the Corporation. In the 1984 judgment, the trial court stated,

> [L]egal title to the following real and personal property shall be as follows . . . [w]ith respect to the Diocese of Fort Worth, title to the following assets and property shall be vested by this declaratory judgment in Corporation . . . [a]ll real property which as of December 31, 1982, stands in the name of Episcopal Diocese of Dallas or in the name of any of its Bishops as Bishop of Dallas, including . . . Bishop Charles Avery Mason . . . which is physically located within the Count[y] of . . . Tarrant . . . described on Exhibit B attached hereto and incorporated herein by reference . . . .

The trial court further stated, "Nothing in this judgment shall be deemed to deal with, or otherwise affect, properties, real or personal, disposed of under testamentary or inter vivos gift executed or effective prior to December 31, 1982, which bequest is to the Diocese of Dallas or the Bishop thereof."

### (iv)    EDFW's Constitutional and Canonical Trust Provisions

EDFW's constitution states that title to all real property acquired "for the use of the Church in this Diocese," including the real property of all parishes, missions,

140

and diocesan institutions, shall be held "subject to control of the Church in the[90] Episcopal Diocese of Fort Worth acting by and through a corporation known as 'Corporation of the Episcopal Diocese of Fort Worth.'"  The Corporation is to hold real property acquired for the use of a particular parish or mission in trust for that parish or mission's use and benefit, but if that mission or parish were to dissolve, the property would revert to the Corporation for EDFW's use and benefit.

EDFW's canon 18.2 (previously canon 12.4), revised in 1989, provides that real property acquired by the Corporation for the use of a particular parish, mission, or diocesan school would be held in trust for the use and benefit of such entities and that it was "immaterial whether said acquisition is by conveyance to the Corporation by a Parish, Mission or Diocesan School now holding title, by the Bishop now holding title as a corporate sole, by a declaratory judgment upon division from the Diocese of Dallas, or by subsequent conveyance to the Corporation, so long as such property was initially acquired by a Parish, Mission or Diocesan School by purchase, gift or devise to it, as a Parish, Mission or Diocesan School."  Canon 18.4, added by 1989, states that all other property of the Corporation held for EDFW is held for exempt religious purposes—as defined

_____

[90]By 2006, the word "the" was capitalized, reciting that the property would be held "subject to control of the Church in The Episcopal Diocese of Fort Worth."

141

by the Internal Revenue Code and determined by EDFW's convention "and the appropriate officers elected by it."[91]

Since EDFW's inception, under EDFW's canons, a parish can organize a corporation "to use in connection with the administration of its affairs," but it is "merely an adjunct or instrumentality," because the parish itself, "being the body in union with Convention, shall not be incorporated." The adjunct corporation "shall not hold title to real estate acquired for the use of the Church in the Diocese, which title must be vested and dealt with in accordance with the provisions" in EDFW's constitution.

### (v)     All Saints Episcopal Church, Inc.

All Saints Episcopal Church incorporated an entity, and in its 1991 bylaws, it added a clause as follows with regard to property:

> All real and personal property held by or for the benefit of All Saints' Episcopal Church *is held in trust for The Episcopal Church and the Diocese thereof in which the Church is located.* The existence of this trust, however, shall in no way limit the power and authority of All Saints' Episcopal Church otherwise existing over such property so long as the Church remains a part of, and subject to The Episcopal Church General Convention Constitution and Canons. *Title I, Canon 7, Section 4* [the Dennis Canon] *of the General Convention Canons is hereby ratified and confirmed in its entirety.* [Emphasis added.]

These amendments were signed by All Saints's clerk and rector. All Saints subsequently deleted the last sentence, "Title I, Canon 7, Section 4 of the General

---

[91]Pursuant to the 1989 revisions, section 18.4 also expressly disclaims any beneficial interest for TEC.

Convention Canons is hereby ratified and confirmed in its entirety," in 2001, but the remainder went unchanged.

### (b) Identification of Beneficiaries

### (i) Other Summary Judgment Evidence

We have previously set out the history of TEC's presence in Texas, beginning in 1849 with the formation of the Diocese of Dallas, which gave birth to EDFW, which in 1982 received approval from TEC and acceded to TEC's constitution and canons.

### (A) TEC's Constitution and Canons

There was no substantive change in TEC's relevant constitutional and canonical provisions between 1979 and 2006. The preamble to TEC's constitution states that the association's name is the Protestant Episcopal Church in the United States of America, "otherwise known as The Episcopal Church (which name is hereby recognized as also designating the Church)." The constitution also sets out the method that EDFW followed in becoming a TEC diocese. Other provisions explain how two dioceses can be reunited into one (essentially, the dissolution of one of two dioceses into its originating diocese) and that for missionary dioceses *outside* the territory of the United States of America, TEC's presiding bishop can consult "with the appropriate authorities in the Anglican Communion" and "take such action as needed for such Diocese to become a constituent part of another Province or Regional Council in communion with" TEC. There is no corresponding

provision in TEC's constitution and canons for a diocese—missionary or not—within the United States to separate from TEC.

Although the Dennis Canon did not set forth a valid express trust under Texas law, its language provides some indication of how TEC views Church property: parish property is held for "this Church and the Diocese thereof in which such Parish, Mission or Congregation is located." Likewise, TEC's canons provide that "[n]o Church or Chapel shall be consecrated until the Bishop shall have been sufficiently satisfied that the building and the ground on which it is erected are secured for ownership and use by a Parish, Mission, Congregation, or Institution affiliated with this Church and subject to its Constitution and Canons."

### (B) EDFW's Constitution and Canons

### (I) EDFW's Geographic Description

EDFW's constitution and canons, as adopted by conventions from 1982 to 2006, included the following geographic description of EDFW:

> The Diocese of Fort Worth shall consist of those Clergy and Laity of the Episcopal Church in the United States of America resident in that portion of the State of Texas including the twenty-three (23) Counties of Archer, Bosque, Brown, Clay, Comanche, Cooke, Dallas (only that portion of the County that includes the City of Grand Prairie), Eastland, Erath, Hamilton, Hill, Hood, Jack, Johnson, Mills, Montague, Palo Pinto, Parker, Somervell, Stephens, Tarrant, Wichita, Wise, and Young.

This provision was omitted in the 2008 constitution and canons.

Pursuant to the 1982 constitution, every parish and mission in EDFW

> *in existence at the time of the organization of the Diocese* and every Parish and Mission which shall have been created and admitted in

accordance with the Constitution and Canons of this Diocese, shall be deemed to be in union with and entitled to representation in the Convention of the Diocese, unless deprived of such right either through suspension or dissolution. [Emphasis added.]

By 2006, the provision about existence at the time of EDFW's organization had been deleted and was modified to read, "Every Parish and Mission which shall have been created *or* admitted in accordance with the Constitution and Canons of this Diocese . . . ." [Emphasis added.] There was no substantive change between 2006 and 2008 as to the definition of who would be considered "in union with" EDFW.

### (II)    1982

On November 13, 1982, "pursuant to the approval of the 67th General Convention of The Episcopal Church," EDFW acceded to TEC's constitution and canons and adopted its own constitution and canons. The preamble of that constitution states, "We, the Clergy and Laity of the Episcopal Church, resident in that portion of the State of Texas, constituting what is known as the Episcopal Diocese of Fort Worth, do hereby ordain and establish the following constitution[.]" The original governing EDFW documents consisted of 18 articles and 39 canons. They set out recognition of the authority of TEC's General Convention by "The Church in this Diocese," and set out governing procedures for EDFW's

145

conventions, its annual meeting, voting,[92] and amending the constitution.[93]

Canons that were "not inconsistent" with the diocesan convention or with TEC's

constitution and canons could be adopted, altered, amended, or repealed at any

annual convention by a majority vote, subject to notice requirements. We have

already set out above the constitutional and canonical provisions dealing with real

property.

### (III)   2006

By 2006, over two decades later, EDFW's constitution increased from 18 to

19 articles, and its number of canons increased to 42. There was no change to

the preamble, but the first article, "Authority of General Convention," was modified

to state,

> The Church in this Diocese accedes to the Constitution and Canons of The Episcopal Church, and recognizes the authority of the General Convention of said Church *provided that no action of General Convention which is contrary to Holy Scripture and the Apostolic Teaching of the Church shall be of any force or effect in this Diocese.* [Emphasis added.]

Additionally, the article on canons saw a rephrasing that allowed greater latitude

in EDFW's discretion, from the earlier, "Canons *not inconsistent* with this

---

[92]The constitution provided for majority rule "[u]nless a vote by orders is determined or required or otherwise provided by the Constitution or Canons" or where the constitution or canons require a two-thirds vote.

[93]The constitution provided for majority vote in the first year of the constitutional amendment's consideration by the annual convention, and then a concurrent majority of the vote of both orders in the second year of its consideration by the annual convention.

Constitution, or the Constitution and Canons of the General Convention, may be adopted, altered, amended, or repealed at any Annual Convention by a majority vote of the Convention," to "Canons *consistent* with this Constitution, and the Constitution and Canons of the Episcopal Church, may be adopted, altered, amended, or repealed at any Annual Convention by a majority vote of the Convention."  [Emphasis added.]

## (IV)   2008

In 2008, EDFW's constitution retained 19 articles but the number of canons increased from 42 to 44, and the diocese's geographic description was deleted. The constitution and canons were significantly modified, beginning with the preamble, from the original, "We, the Clergy and Laity *of The Episcopal Church, resident in that portion of the State of Texas, constituting what is known as The Episcopal Diocese of Fort Worth*," from 1982–2006, to "We, the Clergy and Laity *of The Episcopal Diocese of Fort Worth*."  [Emphasis added.]

Article 1, previously "Authority of General Convention," was replaced with "Anglican Identity," stating,

> The Episcopal Diocese of Fort Worth is a *constituent member of the Anglican Communion*, a Fellowship within the Only Holy Catholic and Apostolic Church, consisting of those duly constituted Dioceses, Provinces and regional Churches in communion with the See of Canterbury, upholding and propagating the historic Faith and Order as set forth in the Old and New Testaments and expressed in the Book of Common Prayer.  [Emphasis added.]

147

Article 18, "Canons," was amended to delete reference to the Constitution and Canons of TEC's General Convention.[94]  Most of EDFW's canons that contained references to "The Episcopal Church in the United States of America" were amended to remove those references,[95] although the express denial of a beneficial interest in TEC in property held by the Corporation in canon 18 was retained.[96]

_____

[94]The new provision stated, "Canons consistent with this Constitution may be adopted, altered, amended, or repealed at any Annual Convention of the Episcopal Diocese of Fort Worth by a majority vote of the Convention."

[95]For example, whereas the 2006 canons on missions and new parishes required in the application to join EDFW that aspirant members of missions or parishes "promise to abide by and to conform to the Constitution and Canons of the General Convention, and of the Diocese of Fort Worth," the 2008 canons required that they "promise to abide by and to conform to the Constitution and Canons of the Episcopal Diocese of Fort Worth."  The annual parochial report that every parish and mission was required to prepare "upon the form provided by The Executive Council of The Episcopal Church in the United States of America" was changed in the 2008 amendments to "upon the form provided by The Episcopal Diocese of Fort Worth."  The 2006 canons provided that books and accounts in every congregation in EDFW "shall conform to *THE MANUAL OF BUSINESS METHODS IN CHURCH AFFAIRS* of The Episcopal Church in the United States of America."  This requirement was changed in 2008 to require conformance "to generally accepted accounting principles."

[96]Article 17, "Election of Bishops and Calling of an Assistant Bishop," in an apparent oversight, continued to provide that the bishop "may call an Assistant Bishop *in accordance with the Constitution and Canons of the Episcopal Church.*"  [Emphasis added.]  The standing rules of procedure of the annual convention with regard to appointments, in another apparent oversight, continued to provide that

> The Bishop shall have the authority to appoint all Board members, Trustees, Committee members, and fill other positions which are not required to be elected or otherwise selected *by the Constitution or Canons of the Episcopal Church in the United States of America*, the Constitution or Canons of the Diocese of Fort Worth or any other lawful authority.  [Emphasis added.]

A new constitutional article was added to provide for deputies or delegates to "extra-diocesan conventions or synods." Canon 32, previously entitled "Controversy between Rector and Vestry," was amended to cover controversies "between a Parish and the Diocese."

The record reflects that on three occasions during 2008—January 9, February 12, and September 8—Bishop Iker and the standing committee presented reports to EDFW on the constitutional and canonical implications and means of becoming a member diocese of the Anglican Province of the Southern Cone. The third report recommended that EDFW affiliate with the Anglican Province of the Southern Cone as a member diocese "until such time as an orthodox Province of the Anglican Communion can be established in North America." Bishop Iker likewise issued a statement entitled, "10 Reasons Why Now Is the Time to Realign," which included observing that "[a]t this time there is nothing in the Constitution or Canons of TEC that prevents a Diocese from leaving . . . [s]o we have this window of opportunity to do what we need to do" before TEC's General Convention could adopt amendments making it more difficult to separate.

### (ii) Associations Law versus Identity

### (A) The Parties' Arguments

The TEC parties apply a macro-level approach to the associative relationship between TEC and EDFW by arguing that the First Amendment forbids us from overriding TEC on the question of who can represent an Episcopal diocese or congregation and that under associations law, only the TEC parties are entitled

149

to control EDFW.  That is, the TEC parties view Appellees' claimed disaffiliation as void under the larger association's rules and the General Convention's determination that the alleged disaffiliation was a nullity.  They also argue that the All Saints properties are held in trust for TEC and for the All Saints Church affiliated with TEC.

Appellees respond that this is not an ecclesiastical dispute and claim that "[s]ince a dispute about the officers of a Texas corporation is not ecclesiastical, then a dispute about the officers of a Texas unincorporated association isn't either."  They also argue that the highest authority on property issues—within or outside of TEC—is the local bishop, not TEC's administrative officers, reciting terminology from TEC's Canons, Title IV, "Ecclesiastical Discipline," which defines "ecclesiastical authority" as the diocese's bishop or standing committee "or such other ecclesiastical authority established by the Constitution and Canons of the Diocese."

Appellees further argue that "[t]he founders of TEC had made similar solemn engagements to the Church of England – but they certainly didn't forfeit church property in America when those churches separated."[97]  And they argue, "[N]one of the property documents incorporate religious tests, and neither side has asked the courts to decide who can lead worship or attend church conventions," nor have

---

[97]Appellees conveniently ignore the revolutionary reason for the separation and the geopolitical and logistical complexity in the 1700s that recuperating such property would have entailed.

the courts been asked "to decide who can lead any religious body, or whether dioceses can withdraw from TEC."[98]

Appellees point out that Texas law dictates how the association's and corporation's officers can be elected or replaced, and Texas law governs the Corporation's and EDFW's amendments to drop any reference to TEC. Appellees rely on the Corporation's holding legal title and their defendant-congregations holding beneficial title based on their union with the diocesan convention. They argue: (1) EDFW's constitution and canons define missions and parishes as unincorporated associations in union with the diocesan convention; those not "in union" are not entities for which the Corporation holds property and those "in union" are those who send delegates to the convention's annual meeting; (2) Texas law makes EDFW's constitution and bylaws controlling, and the annual convention elected Bishop Iker and opted to disaffiliate; and (3) TEC's "newly formed" diocese did not inherit the property of the existing diocese simply by adopting the same name.[99]

---

[98]As noted by the court in *Diocese of San Joaquin*, we do not have to decide whether a diocese can leave TEC to resolve this property-based dispute. *See* 202 Cal. Rptr. 3d at 63–64. And per *Westbrook*, we cannot decide whether a diocese can leave TEC. *See* 231 S.W.3d at 403 (referring to the spirit of freedom for religious organizations "even if that freedom comes at the expense of other interests of high social importance").

[99]Perhaps learning from other dioceses' experience, one of Appellees' theories appears to be "Keep the name, keep the stuff." *See Diocese of San Joaquin*, 202 Cal. Rptr. 3d at 66–67 (holding attempts to transfer property from The Protestant Episcopal Bishop of San Joaquin to The Anglican Bishop of San Joaquin invalid). They also argued in the trial court that turning churches over to

The TEC parties reply that Appellees' own theory concedes that the neutral principles analysis establishes legally-enforceable trusts for EDFW and its congregations, which leads to the ecclesiastical question of who may control these religious entities and puts the case squarely within the exception *Masterson* and *Episcopal Diocese* detailed (i.e., ecclesiastical structure determines property dispute). They further argue that the All Saints properties are in trust for the TEC-affiliated All Saints based on All Saints's governing documents, particularly the All Saints 2001 bylaws.

## (B)    Analysis

We must initially determine whether this is an associations-law question or an identity question.[100] To do so, we must look at the substance and effect of the TEC parties' live pleading. In their live pleading, the TEC parties intermingled a number of claims seeking legal and equitable relief with others seeking relief based

---

congregations that do not use them would violate the express trust in EDFW's charters for the benefit of those who actually use them and that to hold against them would unjustly enrich a minority group "too small to impose its will" during the schism.

[100]If it is an identity question—i.e., whether Appellees are "Episcopal" (capital-E) or merely "episcopal" (lowercase-e) as pertains to "of, being, or suited to a bishop," *see* episcopal, Webster's 3rd New Int'l Dictionary 764 (3rd ed. 2002)—then the First Amendment bars our consideration of this religious issue within the limits set out by U.S. Supreme Court jurisprudence. Webster's second definition of "episcopal" has two parts: (a) "of, advocating, or governed by an episcopacy," and (b) "of or relating to the Protestant Episcopal Church or the Episcopal Church in Scotland." *Id.* at 764–65. Webster's defines "episcopalian" as (1) an adherent to the episcopal form of church government and (2) "a member of an episcopal church (as the Protestant Episcopal Church)." *See id.* at 765.

on doctrine and internal procedures. Some of their claims, particularly as beneficiaries of trusts—as set out above—are claims that we may legitimately consider in our neutral-principles review. Based on the above, we have determined that there is a question about who is the "Protestant Episcopal Church, within the territorial limits of what is now known as the said Diocese of Dallas, in the State of Texas," referred to in the 1947 deed.

With that in mind, we note that our supreme court has already identified TEC as a hierarchical organization and has stated that whether TEC's appointed bishop can take such actions as forming a parish, recognizing membership, and authorizing the establishment of a vestry "are ecclesiastical matters of church governance" over which the court lacks jurisdiction. *Masterson*, 422 S.W.3d at 608. Our supreme court has also acknowledged that TEC's appointed bishop could, "as an ecclesiastical matter, determine which faction of believers was recognized by and was the 'true' church loyal to the Diocese and TEC." *Id.* at 610. TEC has recognized the TEC parties as the Episcopal Diocese of Fort Worth.

And notwithstanding any ecclesiastical implications, where the internal actions of TEC and EDFW are not illegal in the nonecclesiastical sense, fraudulent, against public policy, or a threat to public health and safety, judicial review of these actions would be improper. *See Westbrook*, 231 S.W.3d at 392, 402, 404; *Whitmire*, 2009 WL 2196126, at *4–5; *Harden*, 634 S.W.2d at 59–60. One of the questions before us, then—to the extent we can consider it—is whether this record reflects that their actions were illegal, against public policy, fraudulent, or a threat

153

to public health and safety, or whether, instead, they were proper actions that were permissible and binding on their members under their internal rules. To the limited extent that we can consider these organizations' internal actions, we do not think that the record affirmatively reflects any activities that were per se illegal in a nonecclesiastical sense or against public policy, fraudulent, or against public health and safety.

Although Appellees argue that under state associations law they were within their rights to remove the diocese and diocesan property from TEC, such law applies to the rules used by associations to regulate, within legal limits, their *own* internal affairs, not to the question of an association's identity. *Compare Juarez*, 172 S.W.3d at 279 (private association's right to govern its affairs), *with Jones*, 443 U.S. at 604, 99 S. Ct. at 3026 (stating that if the interpretation of an ownership instrument requires resolution of a religious controversy, the court must defer to resolution of the doctrinal issue by the authoritative ecclesiastical body), *and Westbrook*, 231 S.W.3d at 398, 400 (quoting *Minton,* 297 S.W. at 621–22, to explain why courts must decline jurisdiction over disputes concerning church membership and holding that while neutral principles may *define* a dispute, their *application* may impinge on a church's ability to manage its internal affairs). Further, their assertion ignores the fact that EDFW was part of the larger,

hierarchical association and subject to the larger association's constitution and canons until disaffiliation.[101]

Under associations law, while the members of EDFW were within their rights to modify their governing documents however they saw fit as long as they did so by following their own internal rules, EDFW was also a member entity of a larger association, and its actions in modifying its governing documents directly conflicted with the larger association's governing documents. When it defied the governing strictures of the association of which it was a member, and particularly when it declared itself apart from that organization, it lost its identity as a part of *that* larger association.[102] *See Green*, 808 S.W.2d at 550–51 (listing factors courts consider to identify whether a church is hierarchical); *Templo Ebenezer, Inc.*, 752 S.W.2d at 198 (distinguishing hierarchical churches from congregational churches based on the congregational-type church's independence and ability to "totally control[] its own destiny").

TEC's dioceses are members of TEC, identified by the dioceses' accession to TEC's governing rules, just as parishes simultaneously accede both to TEC's

---

[101]Representatives from each parish and mission voted in EDFW's conventions; EDFW representatives, until 2008, voted in TEC conventions. TEC set up rules over EDFW, and EDFW set up rules over parishes, missions, and other congregations, which were also governed by TEC's rules until 2008.

[102]The obedience or disobedience of TEC to an even larger body—the Anglican Communion—is not a question before us and not one that we could address even if it were.

155

governing rules and to their governing diocese's rules. Individual members of a parish may decide to worship elsewhere; a majority of individual members of a parish or diocese may decide to do so. But when they leave, they are no longer "Episcopalians" as identified by TEC;[103] they become something else. And that something else is not entitled to retain property if that property, under the terms of the deed, is held in trust for a TEC-affiliated diocese or congregation. By rejecting TEC, Appellees also rejected any claim to items and property affiliated with TEC or with being a TEC-affiliated diocese to the extent that the instruments of ownership spell out an express interest. While a decision to disaffiliate is an ecclesiastical matter, what happens to the property is not, unless the affairs have been ordered so that the ecclesiastical decisions effectively determine the property issue, *see Masterson*, 422 S.W.3d at 607, and the macro-level view of the associations' relationship is consistent with the deference we are required to give to the ecclesiastical determination by a hierarchical church. *See id.* ("Civil courts are constitutionally required to accept as binding the decision of the highest authority of a hierarchical religious organization to which a dispute regarding internal government has been submitted.").

The plain language of the 1947 deed sets forth a trust with the identified beneficiary as "the Protestant Episcopal Church" as it was located within the

---

[103]Under article V of TEC's constitution, there are only three ways to create a new diocese, voiding Appellees' argument that the TEC-affiliated diocese is a "new" diocese.

territorial limits of what was formerly the Diocese of Dallas. As set out above, it was within those territorial limits that the Diocese of Dallas gave birth to EDFW. From the various documents in the record of this case, the "Protestant Episcopal Church" identified in the deed at the time of the deed's making is TEC, thus making TEC's local Fort Worth affiliate the beneficiary of the trust. That is, the trust did not make TEC itself the beneficiary; rather, by its language, the trust identified the diocese *affiliated with TEC as located within that territory* as the beneficiary. This is most clear when considering that the 1984 judgment did not actually touch the property's equitable title, which was vested in the Church in a diocese whose name and geographic configuration might change as, anticipated since 1910, the giant Diocese of Dallas would—and subsequently did—pursuant to its division into two TEC dioceses. TEC continues to exist and has identified its affiliate within the territory. *See Episcopal Diocese*, 422 S.W.3d at 652 ("[D]etermination of who is or can be a member in good standing of TEC or a diocese is an ecclesiastical decision.").

Plugging these answers into our flow chart leads us to the conclusion that the TEC-affiliated EDFW holds the equitable interest under the 1947 deed.[104] That

---

[104]Although EDFW's canon on real property purported to create a trust on real property acquired by the Corporation "for the use of a particular parish or mission," neither the 1947 deed nor the canon itself identifies All Saints as the beneficiary of the trust, and there is no indication that the property "was initially acquired by" All Saints Parish "by purchase, gift or devise to it" as a parish. Accordingly, no trust was expressly created for All Saints by EDFW in its governing documents.

is, because there is a question about who is "the Protestant Episcopal Church, within the territorial limits of what is now known as the Diocese of Dallas," we must ask whether TEC is a hierarchical church. Because our supreme court has already determined that TEC is a hierarchical church, *see Masterson*, 422 S.W.3d at 608, we must defer to TEC's identification of its affiliated diocese when no claim of fraud or collusion for secular purposes, or a threat to public health and safety, has been raised.

Apply neutral principles:
- Legal title in the Corporation;
- Equitable title for "the Protestant Episcopal Church, within the territorial limits of what is now known as the Diocese of Dallas."

There is a question about who is "the Protestant Episcopal Church, within the territorial limits of what is now known as the Diocese of Dallas."

Per *Masterson*, 422 S.W.3d at 608, TEC is a hierarchical church.

TEC has decided who its affiliated diocese is.

There is no claim of fraud or collusion for secular purposes (or a threat to public health and safety) pertaining to the parties' actions.

Defer to TEC's decision on identity.

159

As to the 1947 deed presented to us for review, we cannot say—because we may not delve into questions of theology—whether the group that left TEC shares the same beliefs as the original EDFW's membership at the time of the deed. We may not consider the religious beliefs of anyone when making a legal determination under neutral principles. *See Jones*, 443 U.S. at 604, 99 S. Ct. at 3026 (stating that when the deed incorporates religious concepts in the provisions relating to the ownership of property, if the interpretation of the ownership instrument requires the court to resolve a religious controversy, "then the court must defer to the resolution of the doctrinal issue by the authoritative ecclesiastical body"); *Presbyterian Church*, 393 U.S. at 450, 89 S. Ct. at 606–07 (stating that the First Amendment forbids civil courts from considering whether general church's actions constitute a substantial departure from the tenets of faith and practice existing at the time of the local churches' affiliation); *Brown*, 116 S.W. at 364–65 ("[T]he church to which the deed was made still owns the property, and . . . whatever body is identified as being the church to which the deed was made must still hold the title."); *cf. Diocese of Quincy*, 2014 IL App (4th) 130901, ¶ 47, 14 N.E.3d at 1256 (concluding deference does not apply when hierarchical structure is not discernible). All we have done here is apply the binding precedent of the United States and Texas Supreme Courts to the plain language of the instruments of title.

As to the 1950 deed, although EDFW attempted to impose a trust for All Saints in its governing documents, per *Masterson*, based on the plain language of

the deed and the 1984 judgment, the Corporation holds both legal and equitable title to this property. *See* 422 S.W.3d at 610 ("Under neutral principles of law, the deeds conveying the property to Good Shepherd corporation 'expressed no trust nor limitation upon the title,' and therefore the corporation owns the property."). As such, EDFW could not declare itself or anyone else as the beneficiary of property to which it held neither a legal nor equitable interest.[105]  *See Lipsey*, 983 S.W.2d at 351 n.7; *Best Inv. Co.*, 479 S.W.2d at 763.

We sustain the TEC parties' subissues 1(a) and 1(b) and part of subissue 1(c), and we sustain TEC's sole stand-alone issue with regard to whether the trial court erred as a matter of law in its application of neutral principles by failing to defer to TEC's ecclesiastical determination of which entity constitutes EDFW.

### (c) Adverse Possession

Appellees argue that 1989's canon 18 expressly disclaimed any beneficial interest for TEC and that because EDFW was a separate legal entity controlled by its own convention, TEC's claim for a trust interest was barred by limitations. But we have already held that TEC has no trust interest in the two properties at issue.

With regard to a trust interest by the remaining TEC parties, until 2008, when Appellees formally severed ties to TEC, Appellees' possession of the properties

---

[105]All Saints likewise attempted to impose a trust on this property for EDFW and TEC, but it held no interest that would have allowed it to do so. Further, it did so through its incorporated entity, which also held neither a legal nor an equitable interest. Therefore, its attempted trust also failed.

was not adverse—"hostile," under a claim of right inconsistent with another's claim—to them. *See* Tex. Civ. Prac. & Rem. Code Ann. § 16.021(1) (West 2002). Accordingly, the trial court erred by granting summary judgment for Appellees on the two pieces of property at issue if it granted summary judgment on this basis, and we sustain the TEC parties' subissue 1(i).

### (d) Conclusion

To avoid delving into ecclesiastical matters—considerations forbidden to us by the First Amendment and U.S. Supreme Court and Texas Supreme Court precedent—we conclude that the Corporation holds the property identified in the 1947 deed in trust for the TEC-affiliated EDFW and holds legal and equitable title to the property identified in the 1950 deed. We sustain the TEC parties' subissue 1(e) as it relates to the 1947 deed and their subissue 1(k) as to the 1947 deed and remand this portion of the case for reconsideration of the other deeds containing the language "similar" to that identified above.

### 3. Control of the Corporation

We must now determine who controls the Corporation.[106] As stated by the supreme court in *Masterson*, the principles set out in our business organizations code govern because the Corporation "was incorporated pursuant to secular Texas corporation law and Texas law dictates how the corporation can be

---

[106]This issue will determine standing for the ownership issue as to the 1950 deed.

162

operated, including how and when corporate articles and bylaws can be amended and the effect of the amendments."  422 S.W.3d at 613; *see* Tex. Bus. Orgs. Code Ann. §§ 1.002(59), 22.001(3); *see also id.* § 2.002(1) (West 2012).

### a.  The Corporation's Formation and Governance

#### (1) Articles and Bylaws

As set out in our factual recitation, the Corporation's articles of incorporation were filed in the Texas Secretary of State's Office on February 28, 1983, and established that the Corporation's purpose was "[t]o receive and maintain a fund or funds or real or personal property, or both, from any source including all real property acquired *for the use of the Episcopal Diocese of Fort Worth as well as the real property of all parishes, missions and diocesan institutions.*"   [Emphasis added.]  Property held by the Corporation was to be "administered in accordance with the Constitution and Canons of the Episcopal Diocese of Fort Worth as they now exist or as they may hereafter be amended."  The Corporation's articles also set out that its bylaws would address the election of its board of directors and their terms of office.

The 1983 bylaws specified that the Corporation's affairs would be "conducted in conformity with the Constitution and Canons of the Episcopal Church in the United States of America and the Constitution and Canons of the Episcopal Diocese of Fort Worth, as they may be amended or supplemented from time to time by the General Convention of the Church or by the Convention of the

Diocese," and that any conflict between the bylaws and the constitution and canons would be resolved in favor of the constitution and canons.

With regard to the number, election, and term of office of trustees for the "Diocesan Corporation," the bylaws provided for EDFW's bishop to be the chairman, plus five elected trustees serving five-year terms, with one trustee to be elected every year at the annual convention. Each of the elected trustees would serve until his successor's election and qualification or "until his death, resignation, disqualification or removal." The bylaws specified that to be qualified, a trustee "may be either lay persons in good standing of a parish or mission in the Diocese of Fort Worth, or members of the Clergy canonically resident within the Diocese." Any trustee at that time could be removed by EDFW's bishop. The bylaws also provided for amendment "by the affirmative vote of a majority of the total number of Trustees at any regular or special meeting of the Board, if notice of the proposed change is included in the notice of such meeting."

The 2006 bylaw amendments provided that the Corporation's affairs

shall be conducted in conformity with the body *now known as the Episcopal Diocese of Fort Worth*'s acknowledgment of and allegiance to the One, Holy, Catholic and Apostolic Church of Christ; recognizing the body known as the Anglican Communion to be a true branch of said Church; with all rights and authority to govern the business and affairs of the Corporation being solely in the board of trustees (as hereinafter defined, the "Board") of the Corporation. [Emphasis added.]

164

This amendment deleted prior reference to "the Constitution and Canons of the Episcopal Church in the United States of America and the Constitution and Canons of the Episcopal Diocese of Fort Worth."

A new section was added to facilitate identification of the EDFW bishop as chairman of the board, stating, in pertinent part, "The bishop recognized by the body *now known as the Episcopal Diocese of Fort Worth* (the "Bishop") shall be a trustee and a member of the Board." [Emphasis added.]

There was no change to the number, election, or term of office for trustees other than to clarify that the trustees, who were elected at a rate of one per annual meeting, could be either lay persons in good standing of a parish or mission "in the body *now known as* the Episcopal Diocese of Fort Worth" or members of the clergy "canonically resident within the geographical region of the body *now known as* the Episcopal Diocese of Fort Worth." [Emphasis added.] The rest of the sections remained substantively unchanged except for the section pertaining to removal of trustees—while the previous section provided that any trustee could be removed by the bishop, the amended section stated that any elected trustee could be removed by a majority of the remaining members of the board.

The Corporation's September 2006 amended and restated articles of incorporation deleted the portion of the earlier article with regard to real property acquired for the use of the diocese, parishes, missions, and diocesan institutions and stated that the Corporation was organized "[t]o receive and maintain a fund or funds or real or personal property, or both, from any source." The articles were

165

also amended to delete reference to EDFW's constitution and canons with regard to the administration of the property held by the Corporation. The articles incorporated the same provision as the amended bylaws to identify the Corporation's chairman.

### (2) Corporate Records

Virden, who had been the Corporation's secretary since 1983, averred in his affidavit that he was the custodian of the Corporation's business records. He sponsored excerpts from the Corporation's official minutes, which showed that on August 15, 2006, the board of trustees voted to amend the Corporation's articles and bylaws. Between February 1, 2005 and 2014, the record reflects no change in the Board's composition of Bishop Iker, Salazar, Patton, Bates, Barber, and Virden. None of the Corporation's minutes reflect the removal or resignation of any trustee nor the election of any other trustees.

At the August 15, 2006 meeting, all of the trustees—Bishop Iker, Salazar, Patton, Bates, Barber, and Virden—were present. Bishop Iker requested that the minutes "reflect that due notice was given to all trustees that the meeting would include consideration and voting on the adoption of Amended and Restated Articles of Incorporation for the Corporation . . . and proposed amendments to the bylaws of the [C]orporation." Bates moved to adopt the proposed amendments to the bylaws, Patton seconded the motion, and the motion passed unanimously. Patton moved to approve the amended and restated articles of incorporation, Bates seconded her motion, and the motion passed unanimously.

### (3) Other Documents

EDFW's constitution and canons provided for the establishment of the Corporation. Article 13 of the 1982 Constitution, "Title to Church Property," provides—in pertinent part to the corporations law question before us—that title to the real property of all parishes, missions, and diocesan institutions "acquired for the use of the Church in this Diocese" before or after the constitution's adoption, would be vested in the Corporation and "shall be held subject to control of the Church in the Episcopal Diocese of Fort Worth acting by and through" the Corporation. The Corporation, in turn, would hold real property acquired "for the use of a particular parish or mission in trust for the use and benefit of such parish or mission." The Corporation could not convey, lease, or encumber such property without the consent of the rector, wardens, and vestry of such parish or mission. If a parish or mission were dissolved, the property held in trust by the Corporation "shall revert to said Corporation for the use and benefit of the Diocese, as such." The same article in the 1989, 2006, and 2008 EDFW constitution and canons reflects no change other than renumbering. The corresponding canon, "Corporation of the Episcopal Diocese of Fort Worth," established the Corporation's purposes and management of its affairs.

### b. Application

#### (1) The Parties' Arguments

The TEC parties argue that either the TEC parties control the Corporation or Appellees are in breach. Specifically, they complain that the trial court failed to

167

apply the portion of the 2006 corporate bylaws requiring each director to be a member in good standing of a parish in the diocese when, by December 5, 2008 (or February 2009 at the latest), Appellees held no role in the diocese, making them "disqualified." They refer us to *Byerly v. Camey*, 161 S.W.2d 1105, 1111 (Tex. Civ. App.—Fort Worth 1942, writ ref'd w.o.m.),[107] to support this proposition. They further argue that the Corporation is bound by its fiduciary duties as a trustee to EDFW and its congregations so, if we find that Appellees legitimately control the Corporation, then the Corporation should be removed as trustee, citing *Ditta v. Conte*, 298 S.W.3d 187, 192 (Tex. 2009).[108]

Appellees respond that the articles and bylaws provide for trustees to be elected one per year at EDFW's annual convention and identify their qualifications.

---

[107]In *Byerly*, we observed that the absence of a corporation's directors was insufficient to dissolve the corporation or show that it had ceased to exist. 161 S.W.2d at 1111 ("[N]o court would declare the corporation out of existence simply because it found itself without directors."). Instead, under general principles of corporation law, the stockholders either would have the inherent power to elect new directors or a court could bring about the selection of new directors "as may be done in certain cases where a trust estate finds itself without a trustee." *Id.* The appeal was brought from a dismissal, though, and the observations about corporate law had no bearing on the case's ultimate affirmance. *Id.* at 1106–11. A treatise has indicated that our 1942 observation was a reflection of the common law for when a corporation's charter or bylaws made no provision for filling a board vacancy in the event of death below the minimum number prescribed by the charter. *See* 2 Fletcher Cyc. Corp. § 286. *By whom directors and officers are to be nominated, elected or appointed—In case of vacancies on the board of directors* (Sept. 2017).

[108]In *Ditta*, the supreme court held that no statutory limitations period restricts a court's discretion to remove a trustee. 298 S.W.3d at 188, 191 (observing that a removal decision turns on the special status of the trustee as a fiduciary and the ongoing relationship between trustee and beneficiary, not on any

168

They further respond that courts cannot just remove trustees for good-faith disagreements about trust management. To support these arguments, they refer us to *Hill v. Boully*, No. 11-08-00289-CV, 2010 WL 2477868, at *4 (Tex. App.—Eastland June 17, 2010, no pet.) (mem. op.),[109] *Kappus v. Kappus*, 284 S.W.3d

---

particular or discrete act of the trustee). Trustee removal actions are sometimes premised on the trustee's prior behavior but exist to prevent the trustee from engaging in further behavior that could potentially harm the trust. *Id.* at 192. As long as potential harm to the trust remains, an action to remove the trustee should be allowed to proceed. *Id.* A trustee may be removed by a court under property code section 113.082 for various reasons. Tex. Prop. Code Ann. § 113.082 (listing as grounds material violation or attempted violation of the terms of the trust resulting in a material financial loss, incapacitation or insolvency of the trustee, failure of the trustee to make an accounting required by law or the trust's terms, and, broadly, "other cause for removal").

[109] *Hill* involved the construction and application of the bylaws of Sportsman's World Ranch Owners' Association, Inc., a Texas nonprofit corporation created in connection with a real estate development, and the declaration of covenants, conditions, and restrictions associated with the development, which provided that record property owners were members of the corporation, with one vote per acre owned. 2010 WL 2477686, at *1–2. The bylaws provided for a board of three trustees and that any trustee could be removed, with or without cause, by a majority vote of the corporation's membership; if a trustee died, resigned, or was removed, his successor would be selected by the two remaining board members to serve out his predecessor's unexpired term. *Id.* at *2. The corporation's members sought to remove two of the three trustees and asked the remaining trustee to appoint two new ones; he did so. *Id.* at *3. The court held that this complied with the bylaws, which logically must have envisioned "member" as either singular or plural, in anticipation of two trustees resigning or dying at the same time. *Id.* at *6.

831, 837 (Tex. 2009),[110] section 22.212 of the business organizations code,[111] and

section 112.054 of the property code.[112]

---

[110]In *Kappus*, the court addressed an alleged conflict of interest between the independent executor of an estate and a good-faith dispute over his percentage ownership of estate assets. 284 S.W.3d at 833. The court held that "conflict of interest" was not a ground listed in the probate code for removing an executor and that it would not engraft one onto the statute; there was no evidence to support the executor's removal under the statutory grounds (such as dishonesty or misappropriation, gross misconduct or gross mismanagement, or legal incapacity). *Id.* at 833, 836–38 (observing that a potential conflict does not equal actual misconduct or make one mentally or physically impaired to the extent that personal decision-making is impossible). The court noted that the fiduciary duties owed by both an executor and a trustee are similar but that removal of a trustee under property code section 113.082 gives the trial court more leeway. *Id.* at 838 (holding that the trial court did not abuse its discretion by not removing executor as trustee of testamentary trust when, viewing the same conduct, it was not error to keep him as independent executor).

[111]Business organizations code section 22.212, "Vacancy," does not address what happens if there are *no* qualified directors left on the board to fill a vacancy. *See* Tex. Bus. Orgs. Code Ann. § 22.212(a). Apparently, neither the parties nor our legislature has considered what might happen if a disaster were to wipe out an entire corporate board.

[112]Property code section 112.054, "Judicial Modification, Reformation, or Termination of Trusts," states in subsection (a) that on the petition of a trustee or a beneficiary, the court may order, among other things, that the trustee be changed. Tex. Prop. Code Ann. § 112.054(a). Subsection (b) states that the court has the discretion to order a modification, termination, or reformation of the trust "in the manner that conforms as nearly as possible" to the settlor's probable intent. *Id.* § 112.054(b).

### (2) Corporation's Owner

There is no question that the Corporation became a nonprofit corporation under Texas law in 1983 and that its board was allowed to amend its bylaws and articles. As pointed out by the supreme court in *Masterson*,

> Absent specific, lawful provisions in a corporation's articles of incorporation or bylaws otherwise, whether and how a corporation's directors or those entitled to control its affairs can change its articles of incorporation and bylaws are secular, not ecclesiastical, matters. . . . The current statutory scheme changes the default rule on who is authorized to amend the bylaws, but under neither the former nor the current statute is an *external* entity empowered to amend them absent specific, lawful provision in the corporate documents.

422 S.W.3d at 609–10 (emphasis added) (referencing revised civil statutes article 1396-2.09 and business organizations code section 22.102).

According to the supreme court in *Masterson*, if nothing in the corporate documents requires amendments to be subject to approval of *TEC*, and no Texas law precludes such a corporation from amending its articles and bylaws to exclude references to TEC, then there is no requirement under Texas corporations law to otherwise subject the Corporation to *TEC*'s attempted interference. *See id.* at 613 ("To the contrary, the articles of incorporation and bylaws specified that qualified parish members were entitled to elect the vestry and amend the bylaws"). As nothing in the Corporation's documents provides for TEC's approval and nothing in our law precludes the amendments to exclude references to TEC, TEC lacks standing for a claim as to the Corporation, and to the extent the trial court granted summary judgment on this basis, it did not err.

171

Further, according to the amended bylaws, the board of directors identifies the "Bishop" for the Corporation's purposes. Although this might otherwise be considered an "ecclesiastical" determination, because the bylaws treat the identification of the "Bishop" as merely the identification of the Corporation's chairman of the board, we cannot say that a title alone, under the circumstances presented in the bylaws here, requires "consideration of doctrinal matters," i.e., "the ritual and liturgy of worship or the tenets of faith," *see Jones*, 443 U.S. at 602, 99 S. Ct. at 3025, particularly as the bylaws provide the methodology for the Corporation's board to identify the "Bishop" for the Corporation's purposes.

However, the bylaws were amended on August 15, 2006, when there was only one "body *now known as* the Episcopal Diocese of Fort Worth," from which lay and clergy members of the board were drawn and the bishop identified, and that body was affiliated with TEC. [Emphasis added.] Over two years later, on November 15, 2008, Appellees voted to leave TEC. The schism gave rise to two distinct entities: one recognized by TEC as the Episcopal Diocese of Fort Worth and one *self*-identified by Appellees as such. The bylaws and articles do not provide a description of the characteristics of the diocese self-identified by Appellees, but they do require that elected trustees be either lay persons in good standing of a parish or mission, or canonically resident, in the entity identified by the Corporation's board as "the body *now known as* the Episcopal Diocese of Fort Worth." [Emphasis added.] As set out above, it is within TEC's province to identify its diocese in the geographic area identified as Fort Worth and what it takes to be

172

a member in good standing or canonically resident therein. Accordingly, on November 15, 2008, when Appellees voted to disaffiliate, it was TEC's prerogative to determine whether the board members of the diocese formerly associated with TEC had become disqualified under the Corporation's bylaws.

We conclude that the TEC-affiliated EDFW controls appointment to the Corporation's board and therefore that the TEC parties identified within the TEC-affiliated EDFW have standing for these related complaints. We sustain the TEC parties' subissue 1(h).

### 4. Remaining Arguments: Constructive Trust, Estoppel

Paralleling the complaints in their live pleading, the TEC parties refer us to TEC canon I.17.8, "Fiduciary responsibility," which refers to a TEC officer's duty to "well and faithfully" perform the duties of that office in the Church and to a lay person's responsibility to be a communicant in good standing. They further refer us to the "Declaration of Conformity" that Bishop Iker and "every dissident cleric" signed, refer us to prior statements by Bishop Iker and others in previous cases involving dissidents that could be read to contradict Bishop Iker's nouveau-dissident position here, and complain that the trial court allowed Bishop Iker et al. "to renege on their promises, break their commitments, and breach relationships of trust and confidence as Church officers."

The TEC parties base their constructive trust argument on the basis of a fiduciary duty owed to them as the diocese and congregations that remained loyal to TEC, asserting that Appellees "broke a century's worth of oaths and

173

commitments" when they left and took the TEC-affiliated property, resources, and name. They rely on IRS disclosures and assertions in other lawsuits as a basis for estoppel. Based on our resolution above, however, we need not address these arguments with regard to any of the TEC parties except for TEC itself.

As to TEC, these arguments misplace the measuring stick and would require us to delve into the mysteries of faith, when—on the face of the documents before us—procedure, not position, at least with regard to the causes of action that have not been severed out, determines the outcome of this portion of the case. Specifically, this case does not turn on a breach of contract in the usual transactional sense. Indeed, the TEC parties did not bring a claim for any such breach of an actual contract. Instead, their causes of action were for

- "Breach of Express Trust," based on, among other things,

  - the November 13, 1982 subscription to TEC's constitution and canons;

  - the June 29, 1984 petition in the friendly lawsuit between the Diocese of Dallas and EDFW; and

  - "the associational benefits of affiliation," described as consideration and the basis of a contractual trust;

- "Constructive Trust – Conveyance," based on the exchange of property for accession as consideration;

- "Constructive Trust – Fiduciary Commitments," based on a "confidential relationship with [TEC] and its subordinate entities" and commitments on how they would hold the property;

- "Estoppel," which the TEC parties further clarify is actually "quasi-estoppel," based on some of the same actions above;

174

- "Diocesan Trust" and "Congregation-level Trust," based on the same express and constructive trust arguments;

- "Promissory Estoppel," based on "promises to [TEC] as a condition of" EDFW's formation, "receipt of disputed property," and the same actions as relied upon in their other claims;

- "Conversion," by unlawfully retaining and claiming property—sacramental and liturgical instruments and materials, bank and brokerage accounts, monies, valuable chattels, personnel records, financial records, real property records and deeds, and historical records—"in a way that departed from the conditions under which it was received";

- "Texas Business & [Commerce] Code § 16.29," for using EDFW's trade names and trademarks without permission "and in a manner likely to dilute the distinctive quality of the foregoing trade names and marks";

- "Breach of Fiduciary Duty," with regard to Appellees' "constitutional and canonical obligations to the Diocese, the Church, and the Episcopal Parishes and Missions," among other misfeasance;

- "Action to Quiet Title" with regard to the disputed property on a table attached to their petition; and

- "Trespass to Try Title," with regard to the same property in their quiet title claim.[113]

Of these, conversion, damages for breach of fiduciary duty, the action to quiet title and for an accounting, and the claims under business and commerce code section 16.29 were severed out of the instant case and remain pending in the original action, cause number 141-237105-09.

As to the claims not severed out, and as to the relief sought in the form of a constructive trust, TEC relies on the idea of a confidential relationship that is more

---

[113]They also sought declaratory and injunctive relief and an accounting.

175

intimate than any kind generally considered under our law outside of the divorce context. Just as the dissolution of a long-term marriage involving allegations of infidelity and abuse can result in a messy, unpleasant divorce for all involved, likewise, the disassociation of a faction within a religious entity can be (and, as here, has been) equally messy and unpleasant for everyone involved. Whether, in a religious or personal sense, Bishop Iker and the rest are the perfidious oath-breakers characterized by the TEC parties is not for us to determine because such questions are inextricably intertwined with First Amendment implications. To the extent TEC has rights outside of the ones brought by the other TEC parties,[114] we have not found a legal or equitable basis under our neutral principles analysis and the documents in the record before us for imposing a constructive or resulting trust. *See* McConnell & Goodrich, 58 Ariz. L. Rev. at 354 ("Courts that have applied

---

[114]Many of the assertions set out above pertain to ecclesiastical matters. And much like the end of a fiduciary duty between marital partners at divorce, when Bishop Iker et al. excised their faction from TEC, any fiduciary duty obligations to TEC ended. *See, e.g.*, *In re Marriage of Notash*, 118 S.W.3d 868, 872 (Tex. App.—Texarkana 2003, no pet.) ("The fiduciary duty between husband and wife terminates on divorce."); *Parker v. Parker*, 897 S.W.2d 918, 924 (Tex. App.—Fort Worth 1995, writ denied) ("While marriage may bring about a fiduciary relationship, such a relationship terminates in a contested divorce when a husband and wife each have independent attorneys and financial advisers."), *disapproved of on other grounds by Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41 (Tex. 1998) (op. on reh'g). Jane R. Parrott, a financial records custodian, stated in an affidavit that all loans from TEC prior to the 2008 disaffiliation "were fully repaid before that date." Parrott also attached a summary of the financial contributions and receipts between EDFW and TEC showing that EDFW had contributed more than $2 million to TEC during the years of affiliation.

ordinary principles of trust law have generally found that internal church rules and relationships fail to create either a resulting trust or a constructive trust.").

Accordingly, we overrule subissues 1(f) and (g) as they pertain to TEC; as to the remaining TEC parties, based on our disposition of the associations, corporations, and trust questions above, we need not reach them. *See* Tex. R. App. P. 47.1.

## IV. Conclusion

Based on all of the above, to the extent that TEC has standing, we sustain its sole stand-alone issue with regard to its ecclesiastical determination of which entity constitutes EDFW but overrule its portion of the TEC parties' subissues (f), (g), and (j) as they pertain to the issues in this appeal.

We sustain all of the TEC parties' subissues (a), (b), (h), and (i). As to all of the TEC parties except for TEC itself, we sustain in part subissues (c), (e), (j), and (k) and do not reach subissue (d) or the remaining TEC parties' subissues (f) and (g). We thereby hold as follows in response to the questions directed on remand by the Supreme Court of Texas:

(1) Appellees' actions, as corporate trustees, were invalid under Texas law after disaffiliation in 2008.

(2) Under Texas Corporations Law, the articles of incorporation and bylaws at issue were amenable to amendment but the plain language used in 2006—"now known as"—prior to disaffiliation in 2008 means that the TEC-affiliated EDFW controls appointment to the Corporation's board.

177

(3) To the extent that the Dennis Canon could be construed as attempting to create a trust, it did not impose one on EDFW's property in favor of TEC.

(4) Equitable title to the property in the 1947 deed is held for the TEC-affiliated EDFW; the Corporation holds legal and equitable title to the property in the 1950 deed.

(5) Based on the above, all of the TEC parties except for TEC have standing to bring the above claims that are not barred by ecclesiastical abstention, and on remand, TEC may have standing with regard to some of the severed claims.

Accordingly, we affirm in part and reverse in part the trial court's judgment and remand the case to the trial court for further proceedings not inconsistent with this opinion.

/s/ Bonnie Sudderth

BONNIE SUDDERTH
CHIEF JUSTICE

PANEL: SUDDERTH, C.J.; GABRIEL, J.

GABRIEL, J., concurs without opinion.

DELIVERED: April 5, 2018